# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------X

MERHAV AMPAL GROUP, LTD. f/k/a
MERHAV-AMPAL ENERGY, LTD.,

               Plaintiff,

     -against-

MERHAV (M.N.F.) LIMITED and YOSEF A.
MAIMAN,

               Defendants.

-------------------------------------------------------------X

              :    Index No.:

              :    Date Filed: September 3, 2014

              :    ***SUMMONS***

**TO THE ABOVE-NAMED DEFENDANTS:**

    **YOU ARE HEREBY SUMMONED** and required to submit to Plaintiff's attorneys your answering papers in response to Plaintiff's motion for summary judgment in lieu of complaint within the time provided in the annexed notice of motion. In case of your failure to submit answering papers, judgment will be taken against you by default for the relief demanded in the notice of motion.

    Pursuant to CPLR 501 venue is designated in New York County based on that certain Guaranty of Yosef A. Maiman dated as of December 25, 2008, whereby defendant Yosef A. Maiman irrevocably consented to venue in New York County for any suit, action or proceeding arising out of the Guaranty or any transaction contemplated thereby.

Dated: New York, New York
September  3  , 2014

TROUTMAN SANDERS LLP

By: _____
John P. Campo
J. David Dantzler, Jr.
John S. Kinzey
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Tel. No. (212) 704-6000

*Counsel for Plaintiff Merhav Ampal Group, Ltd. f/k/a Merhav-Ampal Energy, Ltd.*

Defendants' Address:

Merhav (M.N.F.) Limited
33 Havatzelet Hasharon Street
Herzlia, Israel

Yosef A. Maiman
33 Havatzelet Hasharon Street
Herzlia, Israel

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------X

MERHAV AMPAL GROUP, LTD. f/k/a
MERHAV-AMPAL ENERGY, LTD.,

                          Plaintiff,

             -against-

MERHAV (M.N.F.) LIMITED and YOSEF A.
MAIMAN,

                 Defendants.

-------------------------------------------------------------X

Index No.:

**NOTICE OF MOTION FOR
SUMMARY JUDGMENT IN
LIEU OF COMPLAINT**

      **PLEASE TAKE NOTICE,** that upon the Summons, dated September 3, 2014, the annexed affidavit of Shlomi Kelsi, sworn to on August 21, 2014, and the exhibits annexed thereto and the accompanying Memorandum of Law, Plaintiff will move this Court before the Motion Support Office, Room 130 at the Courthouse of the Supreme Court of the State of New York, County of New York, located at 60 Centre Street, New York, New York on December 12, 2014 at 9:30 a.m., or as soon thereafter as counsel may be heard, for an order pursuant to CPLR 3213 granting Plaintiff summary judgment in lieu of complaint against Defendants in the amount of $25,618,365.00 (which includes interest through August 13, 2014), plus default rate interest for the period beginning August 14, 2014 and post-judgment interest, as well as attorneys fees to be determined by the Court, together with the costs and disbursements of this action; and for such other and further relief as the Court deems just and proper, on the ground that this action is based upon certain instruments for the payment of money only which is now due and payable and there is no defense to this action.

**PLEASE TAKE FURTHER NOTICE,** that answering papers are required to be served upon the undersigned not later than the later of: (i) the thirty-first day after service is complete, if the summons and notice of motion are not personally delivered to you within the State of New York; or (ii) ten days prior to the return date of this motion.

Dated: New York, New York
     September  3 , 2014

TROUTMAN SANDERS LLP

By: _____
    John P. Campo
    J. David Dantzler, Jr.
    John S. Kinzey
    The Chrysler Building
    405 Lexington Avenue
    New York, New York 10174
    Tel. No. (212) 704-6000

*Counsel for Plaintiff Merhav Ampal Group, Ltd. f/k/a Merhav-Ampal Energy, Ltd.*

To:    Merhav (M.N.F.) Limited
       33 Havatzelet Hasharon Street
       Herzlia, Israel

       Yosef A. Maiman
       33 Havatzelet Hasharon Street
       Herzlia, Israel

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------------X

                                                            :     Index No.:
MERHAV AMPAL GROUP, LTD. f/k/a                              :
MERHAV-AMPAL ENERGY, LTD.,                                  :
                                                            :
                        Plaintiff,                          :
                                                            :
            -against-                                       :
                                                            :
MERHAV (M.N.F.) LIMITED and YOSEF A.                        :
MAIMAN,                                                     :
                        Defendants.                         :
                                                            :
----------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY <u>JUDGMENT IN LIEU OF COMPLAINT</u>

TROUTMAN SANDERS LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 704-6000

*Attorneys for Plaintiff*

## **TABLE OF CONTENTS**

TABLE OF AUTHOTITIES ......................................................................................... ii

PRELIMINARY STATEMENT AND FACTS ......................................................... 1

ARGUMENT ................................................................................................................. 3

SUMMARY JUDGMENT SHOULD BE GRANTED ............................................... 3

      A.     The 2008 Note is an Instrument for the Payment of Money Only ........................ 4

      B.     Defendant Has Failed to Pay the Amounts Due Under the 2008 Note ................. 4

      C.     The Guaranty is an Instrument for the Payment of Money Only ......................... 5

      D.     Maiman Has Failed to Pay the Amounts Due Under the Guaranty ...................... 6

CONCLUSION ............................................................................................................. 6

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Aranoff v. Lipskar,
269 A.D.2d 124 (1st Dept. 2000).................................................................4

Bank of America, N.A. v. Solow,
19 Misc. 3d 1123A, 2008 N.Y. Misc. LEXIS 2362 (Sup. Ct. N.Y. Cnty. 2008) ....................5

Bank of America, N.A. v. Solow,
59 A.D.3d 304, 874 N.Y.S.2d 48 (1st Dept. 2009)..............................................3, 5

Capital Circulation Corp. v. Gallop Leasing Corp.,
248 A.D.2d 578 (2d Dept. 1998) ...............................................................4

Corvetti v. Hudson,
252 A.D.2d 787, 676 N.Y.S.2d 263 (3d Dept. 1998) ...........................................5

E.D.S. Sec. Sys., Inc. v. Allyn,
262 A.D.2d 351, 691 N.Y.S.2d 567 (2d Dept. 1999) ..........................................3

European Am. Bank v. Lofrese,
182 A.D.2d 67, 586 N.Y.S.2d 816 (2d Dept. 1992) .........................................5, 6

JPMorgan Chase Bank, N.A. v. Galt Grp., Inc.,
84 A.D.3d 1028, 923 N.Y.S.2d 643 (2d Dept. 2011) ..........................................3

Judarl L.L.C. v. Cycletech, Inc.,
246 A.D.2d 736, 667 N.Y.2d 451 (3d Dept. 1998)............................................5

Maglich v. Saxe, Bacon & Bolan, P.C.,
97 A.D.2d 19, 468 N.Y.S.2d 618 (1st Dept. 1983)...........................................3

Orix Credit Alliance, Inc. v. N.Y. Bell Bagel, Inc.,
222 A.D.2d 566, 635 N.Y.S.2d 303 (2d Dept. 1995) .........................................5

Schwartz v. Turner Holdings, Inc.,
139 A.D.2d 458, 527 N.Y.S.2d 229 (1st Dept.1988)..........................................6

Seaman-Andwall Corp. v. Wright Mach. Corp.,
31 A.D.2d 136, 295 N.Y.S.2d 752 (1st Dept. 1968), aff'd, 29 N.Y.2d 617, 324
N.Y.S.2d 410 (1971)........................................................................3, 4

Torres & Leonard P.C. v. Select Prof'l Realties, Ltd.,
118 A.D.2d 467, 499 N.Y.S.2d 707 (1st Dept. 1986)..........................................5

**STATUTES**

CPLR 3213................................................................................................................ passim

Plaintiff Merhav Ampal Group, Ltd. f/k/a Merhav-Ampal Energy, Ltd. ("MAG") respectfully submits this memorandum of law in support of his motion for summary judgment in lieu of complaint against defendants Merhav (M.N.F.) Limited ("MNF") and Yosef A. Maiman ("Maiman," and together with MNF, collectively, the "Defendants") pursuant to CPLR 3213.

## PRELIMINARY STATEMENT AND FACTS

This is an action based on certain instruments for the payment of money only, a promissory note and an unconditional guaranty, and accordingly was commenced pursuant to CPLR 3213 by filing of the accompanying summons, notice of motion for summary judgment and supporting papers, which include the affidavit of Shlomi Kelsi, sworn to the 21st day of August, 2014 (the "Kelsi Aff."),[1] with attached exhibits. The relevant facts underlying this action to recover from the issuer of the promissory note and guarantor of those obligations due under such promissory note are fully set forth in the Kelsi Aff., and will not be repeated here.

In short, in connection with a loan made by MAG's assignor, Ampal-American Israel Corporation ("Ampal"), to MNF in the principal amount of twenty million ($20,000,000.00) dollars (the "Loan") to develop an ethanol plant in Colombia, MNF executed a certain Promissory Note dated December 25, 2007 (the "2007 Note") in favor of Ampal, which was subsequently amended and restated by that certain Amended and Restated Promissory Note dated December 25, 2008 in favor of Ampal (the "2008 Note", and together with the 2007 Note, collectively, the "Notes"). The 2007 Note provided for interest on the unpaid principal amount of the Loan at a per annum rate equal to LIBOR plus 2.25% from and after December 25, 2007, and included a maturity date of the earlier of (i) December 25, 2008 and (ii) the Financing Date (as defined in the 2007 Note). (Kelsi Aff., ¶ 8 and Exh. A). MNF failed to repay the 2007 Note on December 25, 2008, and Ampal and MNF entered into the 2008 Note which increased the rate

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Kelsi Aff.

of interest on the unpaid principal amount of the Loan to a per annum rate equal to LIBOR plus 3.25%, and extended the maturity date to the earlier of (i) December 31, 2009 and (ii) the Financing Date (as defined in the 2008 Note) . (Kelsi Aff., ¶ 11 and Exh. D). The 2008 Note also provided for default interest on the aggregate outstanding principal balance of the Loan at a rate equal to 5% per annum in excess of the rate applicable to such Loan. (Kelsi Aff., ¶ 30 and Exh. D). Each of the Notes additionally required MNF to pay all of Ampal's costs and expenses, including reasonable counsel fees, in connection with the collection of any sums due to Ampal in connection with the enforcement of Ampal's rights. (Kelsi Aff., ¶ 31 and Exh. D).

In order to induce Ampal to advance the Loan to MNF, and as additional security,[2] Maiman entered into an unconditional Guaranty dated December 25, 2008 (the "Guaranty") in favor of Ampal. (Kelsi Aff., ¶ 13 and Exh. E). As guarantor, Maiman irrevocably and unconditionally guaranteed to Ampal and all of its successors and assigns the payment and performance of all sums due or to become due and payable by MNF pursuant to the 2008 Note, the Pledge Agreement and all other instruments and documents executed in connection with the Loan. (Kelsi Aff., ¶¶ 32, 33 and Exh. E).

On December 31, 2010, pursuant to a certain Assignment & Assumption Agreement (the "Assignment"), Ampal assigned MAG all of its rights and obligations under the 2008 Note, the Option Agreement, the Exercise Agreement, the Pledge Agreement and the Guaranty. (Kelsi Aff., ¶ 17 and Exh. H). By agreement among MAG (and its predecessor Ampal) and MNF the payment dated under the 2008 Note was extended on certain occasions to the earlier of (i) December 31, 2012 and (ii) the Qualified Financing Date (as defined in the Exercise Agreement). (Kelsi Aff., ¶ 18 and Exh. H). There were no further extensions of the 2008 Note,

---

[2] As security for the Loan, MNF and Ampal entered into a Pledge Agreement dated December 25, 2007 (the "Pledge Agreement") pursuant to which MNF pledge certain shares of Ampal owned by MNF as security for the payment of the 2007 Note. (Kelsi Aff., ¶ 10 and Exh. C).

and the Qualified Financing Date never occurred.  Hence, the Loan matured on December 31,

2012.  Neither MNF nor Maiman have made any payments to MAG to satisfy their respective

obligations under the 2008 Note and Guaranty.  (Kelsi Aff., ¶¶ 23, 24, 27).

## ARGUMENT

## SUMMARY JUDGMENT SHOULD BE GRANTED

Pursuant to CPLR 3213, a plaintiff may move for summary judgment in lieu of a

complaint to collect on an instrument for the payment of money only.[3]  This procedure "affords

a speedy and efficient remedy to secure a judgment in certain cases where service of formal

pleadings would be unnecessary for the expeditious resolution of the dispute between the

parties."  Maglich v. Saxe, Bacon & Bolan, P.C., 97 A.D.2d 19, 21, 468 N.Y.S.2d 618, 620 (1st

Dept. 1983).

To qualify for CPLR 3213 treatment, plaintiff must prove a prima facie case by

submitting proof of the underlying note and guaranty as well as an affidavit of nonpayment.  See

JPMorgan Chase Bank, N.A. v. Galt Grp., Inc., 84 A.D.3d 1028, 1029, 923 N.Y.S.2d 643 (2d

Dept. 2011) ("To make a prima facie showing of entitlement to judgment as a matter of law in an

action to recover on a note, and on a guaranty thereof, a plaintiff must establish 'the existence of

a note and guaranty and the defendants' failure to make payments according to their terms.'"

(quoting Verela v. Citrus Lake Dev., Inc., 53 A.D.3d 574, 575, 862 N.Y.S.2d 96, 97 (2nd Dept.

2008)); see also  Bank of America, N.A. v. Solow, 59 A.D.3d 304, 304, 874 N.Y.S.2d 48, 48-49

(1st Dept. 2009); E.D.S. Sec. Sys., Inc. v. Allyn, 262 A.D.2d 351, 691 N.Y.S.2d 567 (2d Dept.

1999); Seaman-Andwall Corp. v. Wright Mach. Corp., 31 A.D.2d 136, 137, 295 N.Y.S.2d 752,

---

[3] CPLR 3213 provides in part:  "When an action is based upon an instrument for the payment of money only or upon
any judgment, the plaintiff may serve with the summons a notice of motion for summary judgment and the
supporting papers in lieu of a complaint."

753 (1st Dept. 1968), aff'd, 29 N.Y.2d 617, 324 N.Y.S.2d 410 (1971); Capital Circulation Corp.

v. Gallop Leasing Corp., 248 A.D.2d 578 (2d Dept. 1998).

### A. The 2008 Note is an Instrument for the Payment of Money Only

Promissory notes, such as the 2008 Note at issue here, qualify as instruments for the

payment of money only, making CPLR 3213 applicable.  See Aranoff v. Lipskar, 269 A.D.2d

124 (1st Dept. 2000) (holding that the Supreme Court, New York County erred in denying

plaintiff's motion for summary judgment in lieu of complaint where it was uncontroverted that

each defendant signed a promissory note); Capital Circulation Corp., 248 A.D.2d at 578 ("The

plaintiff established a prima facie case by proving the existence and genuineness of the

promissory note and guaranty at issue and the respondents' failure to make payment

thereunder."); Seaman-Andwall Corp., 31 A.D.2d at 137.

Thus, there can be no dispute that the 2008 Note qualifies as an instrument under CPLR

3213.  Pursuant to the plain terms of the 2008 Note, MNF unconditionally promised to pay to the

order of Ampal, the assignor of the 2008 Note, the principal sum of twenty million

($20,000,000.00) dollars (or so much thereof as may be the aggregate unpaid principal balance

of the loan from Ampal to MNF), plus interest (and default interest), and agreed to pay all of

Ampal's costs and expenses, including reasonable counsel fees, in connection with the collection

of any sums due to Ampal in connection with the enforcement of Ampal's rights.  (Kelsi Aff.,

Exhs. D and H).

### B. Defendant Has Failed to Pay the Amounts Due Under the 2008 Note

MNF failed to repay the twenty million ($20,000,000.00) dollars in principal due under

the 2008 Note, which continues to be outstanding.  (Kelsi Aff., ¶¶ 23, 27). Pursuant to the 2008

Note, MNF is obligated to repay to MAG, as assignee of the 2008 Note, the principal amount,

together with interest on the unpaid principal amount at the rate provided under the Note.[4]  (Kelsi

Aff., ¶ 29 and Exhs. D and H).  To date, MNF has failed to do so.  (Kelsi Aff., ¶¶ 23, 27).

### C.      The Guaranty is an Instrument for the Payment of Money Only

In addition, it is well settled that a guaranty such as the one in this case, may qualify as an

instrument for the payment of money only such that CPLR 3213 applies.  See Bank of America,

N.A. v. Solow, 59 A.D.3d at 305, 874 N.Y.S.2d at 49 ("Recourse to CPLR 3213 was

appropriate, since the guaranty was 'an instrument for the payment of money only.'"); Torres &

Leonard P.C. v. Select Prof'l Realties, Ltd., 118 A.D.2d 467, 468, 499 N.Y.S.2d 707, 708 (1st

Dept. 1986); European Am. Bank v. Lofrese, 182 A.D.2d 67, 71, 586 N.Y.S.2d 816, 818 (2d

Dept. 1992); see also Orix Credit Alliance, Inc. v. N.Y. Bell Bagel, Inc., 222 A.D.2d 566, 635

N.Y.S.2d 303 (2d Dept. 1995); Corvetti v. Hudson, 252 A.D.2d 787, 788, 676 N.Y.S.2d 263,

264-65 (3d Dept. 1998); Judarl L.L.C. v. Cycletech, Inc., 246 A.D.2d 736, 737, 667 N.Y.2d 451,

452 (3d Dept. 1998).

Moreover, "[t]he application of CPLR 3213 'is not affected by the circumstance that the

instrument in question was part of a larger transaction, such as the sale of business, as long as the

instrument requires the defendant to make certain payments and nothing else.'"  See Bank of

America, N.A. v. Solow, 19 Misc. 3d 1123A, 2008 N.Y. Misc. LEXIS 2362, at *9 (Sup. Ct. N.Y.

Cnty. 2008) (citing Torres & Leonard P.C., 118 A.D.2d at 468, 499 N.Y.S.2d at 708).  Similarly,

"the need to consult the underlying documents to establish the amount of liability does not affect

the availability of CPLR 3213." Id. (citing European Am. Bank v. Cohen, 183 A.D.2d 453, 453,

---

[4] As stated supra, pursuant to the 2007 Note, MNF promised to pay interest on the unpaid principal amount of the Loan at a rate per annum equal to LIBOR plus 2.25%. (Kelsi Aff., Exh. A). As of the date of the 2008 Note, the accrued and unpaid interest due under the 2007 Note totaled $988,576.40.  (Kelsi Aff., ¶ 29 and Exh. D).  Pursuant to the 2008 Note, MNF agreed to modify the rate of interest on the unpaid principal amount of the Loan to a rate per annum equal to LIBOR plus 3.25%.  (Kelsi Aff., ¶ 29 and Exh. D).  The 2008 Note also provided default interest on the aggregate outstanding principal balance of the Loan at a rate equal to 5% per annum in excess of the rate applicable to such Loan.   (Kelsi Aff., ¶ 30 and Exh. D ).

585 N.Y.S.2d 1017, 1017 (1st Dept. 1992)); European Am. Bank v. Lofrese, 182 A.D.2d at 71,

586 N.Y.S.2d at 818; Schwartz v. Turner Holdings, Inc., 139 A.D.2d 458, 459, 527 N.Y.S.2d

229, 230 (1st Dept.1988).

Thus, there can be no dispute that the Guaranty is a qualifying instrument under CPLR

3213. Pursuant to the plain terms thereof, Maiman irrevocably and unconditionally guaranteed

to MAG the payment and performance of all sums due or to become due and payable by MNF

pursuant to the 2008 Note, the Pledge Agreement and those other instruments and documents

executed in connection with the Loan. (Kelsi Aff., ¶¶ 32, 33 and Exh. E).

### D. Maiman Has Failed to Pay the Amounts Due Under the Guaranty

Pursuant to the Guaranty, Maiman is obligated to repay the $20,000,000.00 dollars in

principal amount due under the 2008 Note, accrued and unpaid interest due under the 2007 Note

in the amount of $988,576.00 as of December 25, 2008, $4,629,789.00 in interest accrued on the

2008 Note through August 13, 2014 (at the per annum rate equal to LIBOR plus 3.25%), default

rate interest for the period beginning August 14, 2014 until judgment is entered at the default rate

provided for in the 2008 Note (i.e., LIBOR plus 8.25%), post-judgment interest, and all of

MAG's costs and expenses, including reasonable counsel fees, in connection with the collection

of such sums, as a result of MNF's failure to repay the full amount of the Loan. (Kelsi Aff., ¶¶

23, 27). To date, Maiman has failed to do so. (Kelsi Aff., ¶ 27).

### CONCLUSION

By reason of the forgoing, MAG's motion for summary judgment in lieu of complaint

should be granted in its entirety against the Defendants, and an order should be made and entered

awarding MAG (1) a judgment in the amount of $25,618,365.00; (2) default rate interest for the

period beginning August 14, 2014 until judgment is entered; (3) post-judgment interest in an

amount to be determined by the Court; (4) MAG's costs and disbursements in connection with

collecting such sums, including reasonable attorneys fees and expenses in an amount to be determined by the Court; and (5) such other and further relief as this Court deems just and proper.

Dated: New York, New York
    September 3, 2014

TROUTMAN SANDERS LLP

By: _____
    John P. Campo
    J. David Dantzler, Jr.
    John S. Kinzey
    The Chrysler Building
    405 Lexington Avenue
    New York, New York 10174
    Tel. No. (212) 704-6000

*Counsel for Plaintiff Merhav Ampal Group, Ltd. f/k/a Merhav-Ampal Energy, Ltd.*

FILED: NEW YORK COUNTY CLERK 09/03/2014 06:24 PM
INDEX NO. 652697/2014

NYSCEF DOC. NO. 2 14-02385-smb Doc 736 Filed 09/24/14 Entered 09/24/14 12:58:47 Pg 17 of 132 RECEIVED NYSCEF: 09/03/2014

Pg 17 of 132

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------X

MERHAV AMPAL GROUP, LTD. f/k/a
MERHAV-AMPAL ENERGY, LTD.,

                                    Plaintiff,

            -against-

MERHAV (M.N.F.) LIMITED and YOSEF A.
MAIMAN,

                                    Defendants.

-------------------------------------------------------------X

Index No.:

**AFFIDAVIT OF SHLOMI KELSI
IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT
IN LIEU OF COMPLAINT**

TEL AVIV, ISRAEL

SHLOMI KELSI, having been duly sworn by an officer authorized to administer an oath, deposes and states as follows:

1.      I am the Managing Director of Merhav Ampal Group, Ltd., which was formerly known as Merhav-Ampal Energy, Ltd. ("MAG").  I make this affidavit in support of MAG's motion pursuant to CPLR §3213 for summary judgment in lieu of complaint.

2.      I am the custodian of the records of MAG and am personally familiar with the facts and circumstances set forth herein based upon my review of MAG's books and records, including the documents annexed hereto.

3.      This is an action based upon instruments for the payment of money only, namely an Amended and Restated Promissory Note dated December 25, 2008 and a Guaranty dated December 25, 2008.

4.      There are no triable issues of fact and defendants have no meritorious defense to this action.

## THE PARTIES

5.      MAG is a corporation organized under the laws of Israel and is a wholly owned subsidiary of Ampal Energy, LTD, which is a wholly owned subsidiary of Ampal-American Israel Corporation ("Ampal").  Ampal is a corporation organized under the laws of the State of New York and is currently the Debtor in a liquidation proceeding pending in the United States Bankruptcy Court for the Southern District of New York pursuant to Chapter 7 of the United States Bankruptcy Code.

6.      Defendant Merhav (M.N.F.) Limited ("MNF") is a corporation organized under the laws of Israel.

7.      To the best of my knowledge, Defendant Yosef A. Maiman ("Maiman") is a resident of Israel.  Upon information and belief, at all relevant times, Maiman was the owner, either directly or indirectly, of MNF and directed the business operations of MNF.  Upon information and belief, Maiman also was Chairman of Ampal's board of directors and its Chief Executive Officer at all times relevant to this action.

## THE LOAN AND GUARANTY

8.      Pursuant to the terms of a promissory note dated December 25, 2007 ("the 2007 Note"), Ampal loaned $20,000,000 to MNF, which provided that the loan was to be repaid with interest "on the earlier of (i) December 25, 2008 and (ii) the Financing Date [which is a defined term]."  The loan proceeds were to be used by MNF to develop an ethanol plant in Colombia (the "Colombia Ethanol Project").  The 2007 Note also included a provision that provided that the $20,000,000 debt could be converted by Ampal to an equity interest in the Colombia Ethanol Project.  A true and accurate copy of the 2007 Note is attached to this Affidavit as Exhibit A.

9.    Contemporaneously with the execution of the 2007 Note, Ampal and MNF entered into an Option Agreement (the "Option Agreement"), pursuant to which MNF granted Ampal the option to purchase up to thirty-five percent (35%) of the Colombia Ethanol Project, using the loan balance on the 2007 Note as purchase consideration. A true and accurate copy of the Option Agreement is attached to this Affidavit as Exhibit B.

10.    In addition, MNF and Ampal entered into a Pledge Agreement dated December 25, 2007 (the "Pledge Agreement"), pursuant to which MNF pledged certain Ampal shares owned by MNF as security for the payment of the 2007 Note. A true and accurate copy of the Pledge Agreement is attached to this Affidavit as Exhibit C.

11.    MNF did not repay to Ampal the amounts due under the 2007 Note on December 25, 2008. Instead, Ampal and MNF entered into the subject Amended and Restated Promissory Note dated December 25, 2008 (the "2008 Note") attached hereto as Exhibit D. Among other things, the original interest rate was increased from the 2007 Note and the repayment date was extended to "the earlier of (i) December 31, 2009 and (ii) the Financing Date [which is a defined term]." The 2008 Note is one of the instruments for the payment of money upon which this action is based.

12.    The 2008 Note was secured by the Pledge Agreement.

13.    As additional security for the loan, Maiman guaranteed the payment of the 2008 Note by executing the Guaranty dated December 25, 2008 (the "Guaranty") attached hereto as Exhibit E. The Guaranty is one of the instruments for the payment of money upon which this action is based.

## THE OPTION EXERCISE

14.    In connection with the execution of the 2008 Note and the Guaranty, the Option

Agreement was amended.  A true and accurate copy of the letter agreement dated December 25, 2008 between MNF and Ampal reflecting these amendments is attached to this Affidavit as Exhibit F.

15.     Ampal and MNF entered into an Option Exercise Agreement dated as of December 31, 2009 (the "Exercise Agreement").  A true and accurate copy of the Exercise Agreement is attached to this Affidavit as Exhibit G.  In sum, pursuant to the terms of the Exercise Agreement, Ampal agreed to purchase and MNF agreed to sell a twenty-five percent (25%) interest in the company formed by MNF to develop the Colombia Ethanol Project.  The purchase and sale transaction was subject to certain conditions including, but not limited to, obtaining "long term debt financing [for the Colombia Ethanol Project] from Banco Do Brazil or any other unaffiliated Third Party in an amount not less than $185 Million and the first disbursement under the financing facility has been provided or other proof of such financing commitment has been presented to Ampal to its full satisfaction." (Section 2.3(b)(i) of the Exercise Agreement and Definition of Qualified Financing Date.)

16.     The effect of the execution of the Exercise Agreement was to extend the payment due date under the 2008 Note to December 31, 2010 if the closing of the purchase and sale transaction did not occur by that date.  (Section 4.3 of the Exercise Agreement.)

**ASSIGNMENT TO MAG AND FURTHER EXTENSIONS**

17.     Pursuant to the terms of an Assignment & Assumption Agreement dated December 31, 2010 (the "Assignment"), Ampal assigned to MAG all of its rights and obligations under the 2008 Note, the Option Agreement, the Exercise Agreement, the Pledge Agreement and the Guaranty.  A true and accurate copy of the Assignment is attached hereto as Exhibit H.

18.     At or about the time of the Assignment, the Termination Date of the Exercise

Agreement was extended until December 31, 2011, and the payment date under the 2008 Note was extended "to the earlier of (i) December 31, 2011 and (ii) the Qualified Financing Date [which was defined in the Exercise Agreement and as set forth in Paragraph 15, above]." A true and accurate copy of the letter agreement dated December 31, 2010 between MNF and Ampal reflecting these amendments is attached to this Affidavit as Exhibit I.

19.    By early December 2011, the transaction contemplated by the Exercise Agreement had not closed, and the 2008 Note had not been paid. As a result, the Termination Date of the Exercise Agreement was extended until December 2012, and the payment date under the 2008 Note was extended "to the earlier of (i) December 31, 2012 and (ii) the Qualified Financing Date [which was defined in the Exercise Agreement and as set forth in Paragraph 15, above]." A true and accurate copy of the letter agreement dated December 8, 2011 between MNF and MAG reflecting these amendments is attached to this Affidavit as Exhibit J.

20.    There were no further extensions of the Exercise Agreement or the 2008 Note.

## MNF HAS NOT PAID THE AMOUNTS DUE UNDER THE 2008 NOTE

21.    The transaction contemplated by the Exercise Agreement did not close by December 31, 2012.

22.    In accordance with its terms, as amended, the 2008 Note was due to be paid on December 31, 2012.

23.    MNF has not paid MAG the amounts due under the 2008 Note.

24.    Because MNF has not paid MAG the amount owed, Maiman is obligated to make payment to MAG for amounts due under the 2008 Note.

25.    A written demand for payment of amounts due under the 2008 Note was delivered

to MNF no later than July 14, 2014. A true and accurate copy of the written demand dated July 14, 2014 from MAG to MNF is attached to this Affidavit as Exhibit K.

26. A written demand for payment of amounts due under the 2008 Note was delivered to Maiman, as guarantor, no later than July 14, 2014. A true and accurate copy of the written demand dated July 14, 2014 from MAG to Maiman is attached to this Affidavit as Exhibit L.

27. As of the filing of this action, neither MNF nor Maiman have made any payment to MAG in satisfaction of their respective obligations under the 2008 Note and Guaranty.

## AMOUNTS OWED UNDER THE 2008 NOTE AND GUARANTY

28. Through counsel, I have asked EisnerAmper LLP, Certified Public Accountants, to calculate the interest accrued on the 2008 Note. I have reviewed those calculations and believe them to be correct. Accordingly, I have relied on those calculations in providing the specific amounts set forth below. A schedule setting forth the interest calculation is attached hereto as Exhibit M.

29. At the time of the execution of the 2008 Note, the principal outstanding balance owed was $20,000,000, plus $988,576.00 in interest accrued in accordance with the 2007 Note. MNF confirmed these amounts and agreed that interest would continue to accrue on the outstanding principal amount at a per annum rate equal to LIBOR plus 3.25%. As of August 13, 2014 (i.e., 30 days from delivery of the written demand), the interest accrued on the 2008 Note since December 25, 2008 is $4,629,789.00.

30. The 2008 Note further provides that "upon and following an Event of Default and/or after any stated or any accelerated maturity of the indebtedness evidenced hereby, the aggregate outstanding principal balance of the loan shall bear interest (compounded daily at a

rate equal to 5% per annum in excess of the rate applicable to such Loan, payable on demand."
In relevant part, Event of Default is defined as "(a) default in making any payment of principal,
interest, or any other sum payable under this Note when due and such failure shall continue un
remedied for a period of 30 days after Borrower receives notice from Lender . . ." (2008 Note,
Section 5(a).) Hence, additional interest has accrued on the 2008 Note since no later than August
13, 2014. As of the filing of this action, this additional interest continues to accrue from that
date at this "default rate" under the 2008 Note.

       31.     The 2008 Note also provides that "Borrower agrees to pay on demand all of
Lender's costs and expenses, including reasonable counsel fees, in connection with the collection
of any sums due to Lender in connection with the enforcement of its rights thereunder [sic]."
(2008 Note, Section 9(a).) Demand is hereby made for MAG's costs and expenses, including
reasonable attorneys fees, incurred in enforcing its rights under the 2008 Note.

       32.     Pursuant to the Guaranty, Maiman irrevocably and unconditionally guaranteed
payment of all sums due under the 2008 Note immediately upon demand by MAG. Moreover,
Maiman waived any right he might have to require MAG to pursue collection of the amounts due
from MNF before seeking payment from him.

       33.     Maiman also agreed to pay all costs and expenses, including court costs and
reasonable attorneys' fees, incurred by MAG in enforcing its rights under the Guaranty.

       34.     There is no meritorious defense to this action.

       WHEREFORE, MAG respectfully requests that an order be made and entered granting
summary judgment against MNF as follows:

    A.  a judgment in the amount of $25,618,365.00, which includes $20,000,000.00 in principal, plus $988,576.00 in interest accrued on the 2007 Note, plus $4,629,789.00 in interest accrued on the 2008 Note through August 13, 2014;

    B.  interest for the period beginning August 14, 2014 until judgment is entered calculated at the default rate provided for in the 2008 Note (i.e., LIBOR plus 8.25% );

    C.  post-judgment interest in an amount to be determined by the Court;

    D.  reasonable attorneys fees and expenses in an amount to be determined by the Court;

    E.  the costs and disbursements of this action; and,

    F.  such other and further relief as this Court deems just and proper.

AND, MAG requests that an order be made and entered granting summary judgment against Maiman as follows:

    A.  a judgment in the amount of $25,618,365.00, which includes $20,000,000.00 in principal, plus $988,576.00 in interest accrued on the 2007 Note, plus $4,629,789.00 in interest accrued on the 2008 Note through August 13, 2014; plus,

    B.  interest for the period beginning August 14, 2014 until judgment is entered calculated at the default rate provided for in the 2008 Note (i.e., LIBOR plus 8.25% );

    C.  post-judgment interest in an amount to be determined by the Court;

D.  reasonable attorneys fees and expenses in an amount to be determined by the

   Court;

E.  the costs and disbursements of this action; and,

F.  such other and further relief as this Court deems just and proper.

Below is my printed name, my signature.  I hereby swear and affirm that my above affidavit is the truth.

SHLOMI KELSI

I, Tal Lenchner, an attorney admitted to practice law in Israel and the State of New York, hereby confirm that on August 21, 2014, Shlomi Kelsi, personally appeared before me for the purpose of executing this Affidavit under oath.  In accordance with Israeli law and consistent with the laws of New York, I warned Mr. Kelsi that he must testify truthfully and that if he does not do so he shall be liable for penalties set by law.  After affirming the truthfulness of his testimony, he executed the above affidavit.

Tal Lenchner, Advocate
Israeli License Number 40629

TAL LENCHNER
Israeli Bar Member No. 40629

FILED: NEW YORK COUNTY CLERK 09/03/2014 06:24 PM          INDEX NO. 652697/2014
NYSCEF DOC. NO. 385   Case 14-cv-07186-WHP   Document 1   Filed 09/24/14   Page 26 of 132   RECEIVED NYSCEF: 09/03/2014

Pg 26 of 132

# EXHIBIT A

EXECUTION COPY

## PROMISSORY NOTE

$20,000,000.00                 December 25, 2007

FOR VALUE RECEIVED, MERHAV (M.N.F) LIMITED, a company formed pursuant to the laws of the State of Israel, located at 33 Havatzelet Hasharon Street, Herzlia, Israel ("Borrower"), promises to pay to the order of Ampal-American Israel Corporation, a New York corporation, located at 111 Arlozorov Street, Tel Aviv 62098, Israel ("Lender"), at such office of Lender or at such other place as the holder hereof may from time to time appoint in writing, in lawful money of the United States of America in immediately available funds, the principal sum of TWENTY MILLION ($20,000,000.00) Dollars or so much thereof as may then be the aggregate unpaid principal balance of such loan made by Lender to Borrower hereunder (the "Loan") as shown on the schedule attached to and made a part of this Note. Borrower also promises to pay interest (computed on the basis of a 360 day year for actual days elapsed) at said office in like money on the unpaid principal amount of the Loan from time to time outstanding at a rate per annum equal to LIBOR Plus 2.25%. The entire unpaid balance, together with all interest accrued and unpaid thereon, and all other sums then due and payable to Lender under this Note shall be due and payable in full on the earlier of (i) December 25, 2008 and (ii) the Financing Date (as defined below) (the "Maturity Date"). Interest on outstanding amounts hereunder shall accrue on a quarterly basis and be payable on the earlier of (i) the date on which any portion of the balance of this Note is converted in accordance with Section 4 hereof or (ii) together with principal and any other amounts due hereunder, on the maturity hereof. Borrower further agrees that upon and following an Event of Default and/or after any stated or any accelerated maturity of the indebtedness evidenced hereby, the aggregate outstanding principal balance of the Loan shall bear interest (computed daily) at a rate equal to 5% per annum in excess of the rate applicable to such Loan, payable on demand. In no event shall interest payable hereunder be in excess of the maximum rate of interest permitted under applicable law. If any payment to be so made hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day and, to the extent permitted by applicable law, interest thereon shall be payable during such extension.

All payments made in connection with this Note shall be in lawful money of the United States in immediately available funds. All such payments shall be applied first to the payment of all fees, expenses and other amounts due to Lender (excluding principal and interest), then to accrued interest, and the balance on account of outstanding principal; provided, however, that after the occurrence of an Event of Default, payments will be applied to the obligations of Borrower to Lender as Lender determines in its sole discretion. Borrower hereby expressly authorizes Lender to record on the attached schedule the amount and date of the Loan and the date and amount of each payment of principal. All such notations shall be presumptive as to the correctness thereof (absent manifest error); provided, however, the failure of Lender to make any such notation shall not limit or otherwise affect the obligations of Borrower under this Note.

In consideration of the granting of the Loan evidenced by this Note, Borrower hereby agrees as follows:

1.   Loan. Lender agrees to make a Loan to the Borrower in the aggregate amount of $20,000,000 upon the request of the Borrower. The request for the Loan may be made up until 11:00 a.m., New York time, on the date the Loan is to be made. Any request for the Loan (i) must be written and may be delivered to Lender via email or facsimile transmission, (ii) must be accompanied with a full executed version of the Option Agreement, dated as of he date hereof, between Borrower and Lender, in the form attached hereto as Exhibit A (the "Option Agreement") and (iii) must be accompanied by evidence that the Loan, and the execution, delivery and performance of this Note and the Option Agreement have been approved by the board of directors or other governing body of Borrower.

2. Prepayment. Borrower may not prepay the Loan at any time in whole or in part

3. Use of Proceeds. The proceeds of the Loan shall be used to facilitate the Project and to fund the purchase of 11,000 hectares of real property located in Colombia in connection with the development of an ethanol producing Project more fully described on Exhibit B.

4. Conversion/Mandatory. This Note shall be convertible into equity interests in the Project in the manner and in accordance with the Option Agreement. Interest shall cease to accrue on such portion of the outstanding amounts hereunder converted on the date of the Option Closing under the Option Agreement.

5. Events of Default. Upon the occurrence of any of the following specified events of default (each an "Event of Default"): (a) default in making any payment of principal, interest, or any other sum payable under this Note when due and such failure shall continue unremedied for a period of 30 days after Borrower receives notice thereof from Lender; or (b) default by Borrower (i) of any other obligation hereunder or (ii) in the due payment of any other obligation owing to Lender or (iii) under any other Loan Document, and the failure set forth in (i), (ii) or (iii) above shall continue unremedied for a period of 30 days after Borrower receives notice thereof from Lender; or (c) default by Borrower in the due payment of any other indebtedness for borrowed money or default in the observance or performance of any covenant or condition contained in any agreement or instrument evidencing, securing, or relating to any such indebtedness, which causes or permits the acceleration of the maturity thereof; or (d) Borrower becomes insolvent or bankrupt, is generally not paying its debts as they become due, or makes an assignment for the benefit of creditors, or a trustee or receiver is appointed for Borrower or for the greater part of the properties of Borrower with the consent of Borrower, or if appointed without the consent of Borrower, such trustee or receiver is not discharged within 60 days, or bankruptcy, reorganization, liquidation or similar proceedings are instituted by or against Borrower under the laws of any jurisdiction, and if instituted against Borrower are consented to by it or remain undismissed for 60 days, or a writ or warrant of attachment or similar process shall be issued against a substantial part of the property of Borrower and shall not be released or bonded within 30 days after levy; or (e) Borrower shall be in default beyond any applicable grace period under any Loan Document; then, in any such event, and at any time thereafter, if any Event of Default shall then be continuing, Lender may declare the principal and the accrued interest in respect of the Loan under this Note to be, whereupon the Note shall become, immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are expressly waived by Borrower, provided that in the case of any event described in clause (d) of this Section with respect to Borrower, the principal of the Loan then outstanding, together with accrued interest thereon and all fees and other obligations of Borrower accrued under the Loan Documents, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Borrower.

6. Collateral Security. This Note is secured by the Pledge Agreement.

7. Covenants. So long as any obligations are outstanding under this Note, Borrower hereby represents, covenants and agrees as follows:

(a) Borrower is the legal and beneficial owner of 4,476,389 shares (the "Shares") of Class A Stock, par value, $1.00 per share, of Ampal-American Israel Corporation, free and clear of any liens, security interests, pledges or other agreements or encumbrances. Borrower shall not sell, transfer, pledge or otherwise encumber it right, title and interest in any of the Shares.

2

NY02DOCS\1455183.7

(b) Borrower shall keep Lender timely informed on the progress of the Project, and provide Lender with reports, analysis, financial and such other information as Lender may reasonably request.

(c) Borrower shall permit Lender, at reasonable times and with reasonable notice, to inspect the Project. Lender may, and Borrower shall assist Lender, in reviewing and inspecting any books, records, data or other information relating to the Project. Lender may make copies of any information and documents relating to the Project.

(d) Borrower shall not sell, dispose or otherwise transfer the Project or assets thereof, without the consent of the Lender, other than (i) up to a 35% equity interest in the Project to a single strategic partner, and (ii) up to a 2.5% equity interest in the Project to Riagro S.A.

(e) Borrower shall not merge with or into or consolidate with another entity; or otherwise dissolve or liquidate without the consent of the Lender.

8. <u>Definitions</u>. As used herein:

(a) "Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York or Israel are required or permitted by law to remain closed.

(b) "Loan Documents" means each document, instrument or agreement executed pursuant hereto or in connection herewith, together with each other document, instrument or agreement made with or in favor of Lender, including this Note, the Option Agreement and the Pledge Agreement.

(c) "Pledge Agreement" means the Pledge Agreement, dated as of the date hereof, between Borrower and Lender, as the same, from time to time, may be amended, restated, replaced, extended, supplemented or otherwise modified.

(d) "LIBOR" means the rate per annum quoted in the London interbank market for dollar deposits having a term of thirty (30) days, as quoted from Bloomberg or a similar service as may be selected by Lender from time to time.

(e) "Financing Date " means the date on which (i) Borrower has obtained from unaffiliated third party debt financing for the Project and (ii) a unaffiliated third party holds an equity interest on the Project of no less than 25%.

9. <u>Miscellaneous</u>.

(a) Borrower agrees to pay on demand all of Lender's costs and expenses, including reasonable counsel fees, in connection with the collection of any sums due to Lender in connection with the enforcement of its rights thereunder.

(b) No modification or waiver of any provision of this Note shall be effective unless such modification or waiver shall be in writing and signed by a duly authorized officer of Lender and Borrower, and the same shall then be effective only for the period and on the conditions and for the specific instances specified in such writing. No failure or delay by Lender in exercising any right, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any rights, power or privilege.

3

(c)    Borrower hereby waives presentment, demand for payment, notice of protest, notice of dishonor, and any and all other notices or demands except as otherwise expressly provided for herein.

(d)    This Note shall be construed in accordance with and governed by the internal laws of the State of New York.

(e)    EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

(f)    This Note shall be binding upon and inure to the benefit of Borrower, Lender, all future holders of this Note and their respective successors and assigns, except that Borrower may not assign or transfer any of its rights under this Note without the prior written consent of Lender. The term "Lender" as used herein shall be deemed to include Lender and its successors, endorsees and assigns. Lender shall have the unrestricted right at any time or from time to time, and without Borrower's consent, to assign all or any portion of its rights and obligations hereunder, and Borrower agrees that it shall execute, or cause to be executed, such documents, including without limitation, amendments to this Note and to any other documents, instruments and agreements executed in connection herewith as Lender shall deem necessary to effect the foregoing.

(g)    This Note and the other Loan Documents are intended by the parties as the final, complete and exclusive statement of the transactions evidenced thereby. All prior or contemporaneous promises, agreements and understandings, whether oral or written, are deemed to be superceded by this Note and such other Loan Documents, and no party is relying on any promise, agreement or understanding not set forth in this Note or such other Loan Documents.

MERHAV (M.N.F) LTD.

By: _____

Name:  Yosef A. Maiman

Title: _____

4

LOAN AND REPAYMENT SCHEDULE
PROMISSORY NOTE DATED DECEMBER 25, 2007
Merhav (m.n.f.) Limited
to
Ampal-American Israel Corporation

| Date | Amount of Loan | Interest Rate | Amount of Principal Repayment | Unpaid Principal Balance | Notation Made By |
|---|---|---|---|---|---|
| 25.12.07 | $10,000,000 | Libor + 2.25% | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

EXHIBIT A

OPTION AGREEMENT

# EXHIBIT B

EXECUTION COPY

OPTION AGREEMENT

among

AMPAL-AMERICAN ISRAEL CORPORATION

and

MERHAV (M.N.F.) Limited

dated as of December 25, 2007

# TABLE OF CONTENTS

Page(s)

ARTICLE I DEFINITIONS ................................................................................................. 1

ARTICLE II OPTION ......................................................................................................... 4
    2.1    Option. ...................................................................................................... 4

ARTICLE III MERHAV'S REPRESENTATIONS AND WARRANTIES ......................... 6
    3.1    Existence; Authority; Enforceability ..................................................... 6
    3.2    Interests in the Project ............................................................................ 6
    3.3    Absence of Conflicts .............................................................................. 6
    3.4    Compliance With Law; Consents ............................................................ 6
    3.5    Fees ......................................................................................................... 7
    3.6    Disclosure ............................................................................................... 7

ARTICLE IV COVENANTS ............................................................................................... 7
    4.1    Due Diligence ......................................................................................... 7
    4.2    Further Assurances ................................................................................. 7

ARTICLE V SURVIVAL ................................................................................................... 7
    5.1    Survival .................................................................................................. 7

ARTICLE VI MISCELLANEOUS ..................................................................................... 8
    6.1    Governing Law ....................................................................................... 8
    6.2    Arbitration. ............................................................................................. 8
    6.3    Severability ............................................................................................ 8
    6.4    Interpretation. ......................................................................................... 8
    6.5    Costs and Expenses ................................................................................ 8
    6.6    Notices ................................................................................................... 8
    6.7    Counterparts ........................................................................................... 9
    6.8    Entire Agreement ................................................................................... 9
    6.9    No Third Party Rights; Assignment ....................................................... 9
    6.10    Waivers and Amendments .................................................................... 10

# OPTION AGREEMENT

OPTION AGREEMENT (this "Agreement"), dated as of December 25, 2007, by and among Ampal-American Israel Corporation, a New York corporation ("Ampal"), and Merhav (m.n.f.) Limited, a company organized under the laws of the State of Israel ("Merhav") (each, a "Party" and, collectively, the "Parties").

## RECITALS

WHEREAS, Merhav, directly and through certain subsidiaries, intends to develop an ethanol-producing project in Colombia, as more fully described on Exhibit A hereto (the "Project");

WHEREAS, Merhav has offered Ampal the opportunity to participate in the Project;

WHEREAS, Ampal has expressed interest in the Project but requires additional time to complete its due diligence with respect to the Project;

WHEREAS, Merhav needed to fund the purchase of the real property for the Project prior to the anticipated completion of Ampal's due diligence;

WHEREAS, to provide Merhav the required funding and Ampal the additional required time to complete its due diligence on the Project, (i) Ampal extended Merhav a loan in the original principal amount of $20,000,000 (the "Loan") pursuant to the Promissory Note, dated as of the same date hereof by Merhav in favor of Ampal (the "Promissory Note") and (ii) Merhav granted Ampal the option set forth in this Agreement to purchase up to 35% percent interest in the Project on the terms herein set forth;

NOW, THEREFORE, in consideration of the aforesaid premises and of the mutual representations, warranties and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

The following terms shall have the following meanings for purposes of this Agreement:

"Affiliate" means (i) with respect to any Person, a Person that controls, is controlled by, or is under common control with such Person (it being understood, that a Person shall be deemed to "control" another Person, for purposes of this definition, if such Person directly or indirectly has the power to direct or cause the direction of the management and policies of such other Person, whether through holding ownership interests in such other Person, through agreements or otherwise); and (ii) with respect to any natural Person, (1) any parent, grandparent, sibling, child or spouse of such natural Person, or other Person related by marriage to any such Persons,

1

(2) any trust established for the benefit of such natural Person or any Affiliate of such natural Person or (3) any executor or administrator of the estate of such natural Person.

"Agreement" has the meaning set forth in the Preamble.

"Authority" means any governmental, judicial, legislative, executive, administrative or regulatory authority of Israel and the United States or any state, local, provincial or foreign government or any subdivision, agency, commission, office or judicial, administrative or regulatory authority thereof.

"Business Day" means any day other than a Saturday, Sunday or a day on which banking institutions in New York, New York or Israel are authorized or obligated by law or executive order to close.

"Charter Documents" means any by-laws, charter, memorandum, certificate of incorporation, articles of association and any other similar constitutive or governing documents.

"Consent" means any consent, waiver, approval, authorization, exemption, registration, permit, license or declaration of or by any Person or any Authority, or expiration or termination of any applicable waiting period under any Legal Requirement, that is required with respect to any Party in connection with (i) the execution and delivery of this Agreement or any other Transaction Document or (ii) the consummation and performance of any of the transactions provided for hereby or thereby.

"Contract" or "Contracts" means any and all contracts and agreements, including those that are franchises, warranties, understandings, arrangements, leases, licenses, registrations, authorizations, mortgages, bonds, notes and other instruments (whether written or oral).

"Definitive Documentation" has the meaning set forth in Section 2.1(c).

"Judgments" means any and all judgments, orders, writs, directives, rulings, decisions, injunctions, decrees, settlement agreements or awards of any Authority or arbitrator.

"Legal Requirements" means any and all (i) laws, ordinances and regulations, whether federal, provincial, state or local, of Israel, the United States, or any other applicable jurisdiction; (ii) codes, standards, rules, requirements and criteria issued under any laws, ordinances and regulations, whether federal, provincial, state or local of Israel, the United States or any other applicable jurisdiction; and (iii) Judgments.

"Liabilities" means any obligation, liability, or indebtedness of any kind, character or description, whether absolute, contingent, accrued, liquidated, unliquidated, known, unknown, executory or otherwise.

"Lien" means any mortgage, pledge, hypothecation, charge, assignment, deposit arrangement, encumbrance, security interest, lien, fiduciary assignment and any security or similar agreement of any kind or nature whatsoever.

"Loan" has the meaning set forth in the Recitals.

2

"<u>Necessary Action</u>" means, with respect to a result required to be caused, all actions (to the extent such actions are permitted by applicable Legal Requirements) reasonably necessary to cause such result.

"<u>Note Balance</u>" has the meaning set forth in Section 2.1(b).

"<u>Option</u>" has the meaning set forth in Section 2.1(a).

"<u>Option Closing</u>" has the meaning set forth in Section 2.1(c).

"<u>Option Interest</u>" has the meaning set forth in Section 2.1(a).

"<u>Option Termination Date</u>" means the earlier of (i) one year from the date hereof or (ii) the Qualified Financing Date.

"<u>Party</u>" or "<u>Parties</u>" has the meaning set forth in the Preamble.

"<u>Person</u>" means an individual, corporation, partnership, trust, limited liability company, a branch of any legal entity, unincorporated organization, joint stock company, joint venture, association or other entity, or any government, or any agency or political subdivision thereof.

"<u>Pledge Agreement</u>" means the Pledge Agreement, dated as of the date hereof, between Merhav and Ampal, delivered a security for the Loan.

"<u>Preamble</u>" means the preamble to this Agreement.

"<u>Promissory Note</u>" has the meaning set forth in the Recitals.

"<u>Project</u>" shall have the meaning set forth in the recitals.

"<u>Purchase Price</u>" has the meaning set forth in Section 2.1(b).

"<u>Qualified Financing Date</u>" means the date on which both of the following events have occurred: (i) Merhav has obtained debt financing for the Project from an unaffiliated Third Party and (ii) an unaffiliated third party holds no less than a 25% equity interest in the Project.

"<u>Recitals</u>" means the recitals to this Agreement.

"<u>Third-Party Price</u>" means the lowest price paid by an unaffiliated third party for interests in the Project.

"<u>Transaction Documents</u>" means each of this Agreement, the Promissory Note, the Pledge and any other agreement, certificate or instrument delivered pursuant to any of the foregoing.

"<u>Transfer</u>" means, whether voluntary or involuntary, any transfer, assignment (including any fiduciary assignment), conveyance, sale, pledge or hypothecation.

"Valuation Model" means the model, dated as of October 2007 prepared by Merhav and Galileo and attached hereto as Exhibit B, as reasonably updated with respect to project costs, financing costs and other similar changes by Merhav and Galileo, as such updates are approved by Houlihan Lokey Howard & Zukin as being consistent with the methodology and assumptions set forth in the original model attached hereto as Exhibit B.

## ARTICLE II

## OPTION

2.1    Option.

(a)    At any time from the date hereof through the Option Termination Date, Ampal shall have the option (but not the obligation) to purchase from Merhav (or the relevant subsidiary or Affiliate of Merhav) up to a 35% equity interest in the Project on a fully diluted basis (the "Option"). Ampal may exercise the Option set forth in this Section 2.1 by delivering written notice of its exercise of such right to Merhav (the "Option Notice") prior to the Option Termination Date, setting forth the percentage interest (the "Optioned Interest") up to 35% of the Project that Ampal shall acquire pursuant to the Option.

(b)    The Purchase Price (as defined below) for the Option Interest shall be paid as follows: (i) first, by conversion of the balance (up to the amount of the Purchase Price) of the outstanding balance of principal, interest and all other amounts due under the Promissory Note (the "Note Balance") and (ii) if the Purchase Price exceeds the Note Balance, the excess of the Purchase Price over the Note Balance shall be paid by Ampal to Merhav at the Option Closing. The purchase price for the Optioned Interest (the "Purchase Price") shall be determined as follows: the sum of (A) to the extent the Note Balance is being converted for the purchase of the Optioned Interest, the purchase price for each portion of the Optioned Interest shall be the lower of (x) the purchase price for the Optioned Interest based on a valuation of the Project in accordance with the Valuation Model or (y) the Third Party Price, and (B) after converting the Note Balance in full at the price determined pursuant to clause (A) of this sentence, any portion of the Optioned Interest that remains to be purchased shall be purchased at the Third Party Price, except if no Third Party price exists the purchase price will be based on the Valuation Model.

(c)    Upon exercise of the Option, Ampal and Merhav shall execute within 45 days (the "Option Closing") of the date of the Option Notice but not later than the Qualified Financing Date definitive documents evidencing (i) the purchase by Ampal from Merhav of the Optioned Interest, which documents shall have customary representations and warranties from Merhav, including with respect to Merhav (and any relevant subsidiary and affiliate relating to the Project), the Project and the Optioned Interest and (ii) the agreement between Ampal and Merhav with respect to the management and governance of the Project and the rights of Ampal as a holder of an Interest in the Project (the "Definitive Documents"). At the Option Closing, Merhav shall deliver to Ampal such documentation reasonably requested by Ampal and required

4

to transfer to Ampal the Optioned Interest, free and clear of any Liens attributable to Merhav or any of is Affiliates. Merhav hereby acknowledges and confirms that Ampal's obligation to consummate the purchase of the Optioned Interest is expressly conditioned upon the approval by the Audit Committee of the Board of Directors of Ampal of the Definitive Documents. Without limiting anything contained herein, Merhav and Ampal hereby agree that the Definitive Documents shall contain the following provisions:

(i)    the right to appoint such number of the directors (or members of any applicable governing body of the Project) of the total board of directors (or similar body) managing the project equal to the percentage interest the Optioned Interest is to the total outstanding equity interests of the Project (to the extent there is more than one entity is involved in the Project, this provision shall be read to provide Ampal with the ability to exercise the same amount of control as such number of directors (or other persons) would have if the Project was a single entity);

(ii)    the right to participate in any sale of an interest in the Project by an other interest holder on the same terms as such interest holder;

(iii)    full ratchet anti-dilution protection with respect to the Optioned Interest, with respect to any equity interest of the Project sold by the Company from and after the date of the Option Closing;

(iv)    right of first refusal for Ampal on any sale of any equity interest by Merhav after the Option Closing, provided that Merhav may transfer shares not subject to such right of first refusal (i) to a single strategic partner to the extent that such transferred equity interest, together with any equity interest currently held by such strategic partner, will not result in such strategic partner or its affiliates having an equity interest in the Project in excess of 35% of the Project and (ii) to Riagro S.A. to the extent such transferred equity interest does not exceed 2.5% of the Project;

(v)    any financing obtained by and for the Project shall be non-recourse to Ampal without Ampal's consent;

(vi)    Ampal shall have the right to consent to any modification of the Charter Documents of the Project or any entity comprising the Project in a manner adverse to Ampal or any change in purpose of the Project;

(vii)    the right for Ampal to consent to any transactions involving the Project and Merhav or any of its Affiliates.

(viii)    customary preemptive rights; and

(ix)    Ampal shall be permitted to Transfer its interest.

5

(d)     Notwithstanding the forgoing and without limiting the forgoing requirements of the Definitive Documents, Ampal shall have the benefit of any broader rights and preferences held or granted to any other investor.

## ARTICLE III

## MERHAV'S REPRESENTATIONS AND WARRANTIES

Merhav hereby represents and warrants to Ampal on the date hereof:

3.1     <u>Existence; Authority; Enforceability</u>.  Merhav is a company duly organized and validly existing under the laws of Israel. Merhav has the requisite power and authority to enter into each Transaction Document to which it is a party and to perform its respective obligations thereunder.  The execution, delivery and performance by Merhav of each Transaction Document to which it will be a party and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized and approved by all corporate action of Merhav.  Merhav has duly and validly executed and delivered each Transaction Document to which it is a party, and each such Transaction Document constitutes its legal, valid and binding obligation, enforceable against Merhav, in accordance with its terms.

3.2     <u>Interests in the Project</u>. (a)  Merhav currently owns 100% of the outstanding equity interests in the Project. All of the issued and outstanding interests in the Project have been duly authorized, validly issued and are be fully paid, nonassessable, free of preemptive rights, with no personal liability attaching to the ownership thereof.  There are no outstanding securities convertible into, exchangeable for, or carrying the right to acquire, any interest in the Project, or subscriptions, warrants, options, calls, rights (pre-emptive or other) or other arrangements or commitments obligating any person to issue or dispose of any of its capital stock or any ownership interest therein, other than an Agreement with Riagro S.A., pursuant to which Riagro shall be entitled to up to a 2.5% equity interest in the Project, coming from Merhav's holdings in the Project.

3.3     <u>Absence of Conflicts</u>.  The execution and delivery by Merhav of the Transaction Documents to which it is a party and the performance of its respective obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby does not and will not conflict with, or result in the breach of any provision of, the Charter Documents of Merhav or any Contract or violate any Legal Requirement applicable to Merhav.

3.4     <u>Compliance With Law; Consents</u>.  No Consent is required to be made or obtained by Merhav in connection with (i) the execution, delivery or performance of the Transaction Documents to be entered into by Merhav or (ii) the consummation of any of the transactions contemplated by the Transaction Documents.  To the best of Merhav's knowledge, Merhav and the Project are in compliance in all respects with all applicable Legal Requirements, except where such failure would not have or could not reasonably by expected to have a material adverse effect on Merhav, the Project or Merhav's ability to consummate the transactions contemplated by, and perform its obligations, under the Transaction Documents.

3.5    Fees. Neither Merhav nor any of its Affiliates has paid or become obligated to pay any fee or commission to any broker, finder or intermediary in connection with the transactions contemplated hereby.

3.6    Disclosure. Merhav has provided to Ampal all documents and information (i) in Merhav's or any of its Affiliate's possession relating to the Project, and (ii) that is reasonably material in connection with a decision to make the Loan or exercise the Option, including without limitation the reports and evaluations of the Project set forth on Exhibit C hereto. No representation or warranty by Merhav contained in this Agreement or any other Transaction Document and no information contained in any other instrument furnished or to be furnished to Ampal pursuant hereto or in connection with the transaction contemplated by this Agreement or any other Transaction Document contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained herein or therein not misleading. Merhav is not aware of any facts or circumstances which would cause the representations and warranties of Merhav contained in this Agreement or any other Transaction Documents to be untrue or incorrect. To the knowledge of Merhav, after due inquiry, there is no fact, circumstance or condition which has had or could reasonably be expected to have a material adverse effect on Merhav or the Project, which has not been disclosed to Ampal or its representatives.

## ARTICLE IV

## COVENANTS

4.1    Due Diligence. Merhav hereby agrees to cooperate with Ampal in its due diligence and shall provide Ampal with such information and documents as Ampal shall reasonably request The Parties agree that the due diligence to be conducted by Ampal shall be to assist Ampal (i) in confirming the representations and warranties of Merhav set forth in this Agreement, and (ii) determining whether to exercise its Option. In addition, Merhav hereby agrees to promptly deliver to Ampal (x) any new material information with respect to the Project in its possession or control and (y) any reports, models, projections or other information provided to any other person or entity.

4.2    Further Assurances. Subject to the terms and conditions herein, each of the Parties agrees to take, or use reasonable commercial efforts in order to cause to be taken, all Necessary Actions and to do, or use reasonable commercial efforts in order to cause to be done, all things necessary, proper or advisable under all applicable Legal Requirements to consummate and make effective the transactions contemplated by the Transaction Documents to which it is a party.

## ARTICLE V

## SURVIVAL

5.1    Survival. Each representation and warranty in this Agreement shall survive for a period of two years after the date hereof, provided that (i) the representation set forth in Section

3.1 and 3.2 shall survive indefinitely and (ii) the survival periods set forth in this Section 5.1 shall not apply to any claims involving fraud or bad faith on the part of any Party hereto.

## ARTICLE VI

## MISCELLANEOUS

6.1     Governing Law. This Agreement shall be governed in all respects, including validity, interpretation and effect, by the internal laws of the State of New York without regard to its conflict of law principles (other than Section 5-1401 of the New York General Obligation Law).

6.2     Arbitration. . All disputes between the parties hereto arising under the terms of this Agreement or any other Transaction Documents shall be arbitrated in New York City under the rules of the American Arbitration Association then obtaining in the City of New York judgment on any award made by the arbitrators hereunder may be rendered in any court having jurisdiction.

6.3     Severability. Each Section, subsection and clause of this Agreement and each other Transaction Documents constitutes a separate and distinct undertaking, covenant or provision hereof. In the event that any provision of this Agreement or any other Transaction Document shall finally be determined to be unlawful, such provision shall be deemed severed from this Agreement or such Transaction Document, but every other provision of this Agreement or such Transaction Document shall remain in full force and effect.

6.4     Interpretation. Whenever used in this Agreement, except as otherwise expressly provided or unless the context otherwise requires, any noun or pronoun shall be deemed to include the plural as well as the singular and to cover all genders. Unless otherwise specified, words such as "herein", "hereof", "hereby", "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular Section or subsection of this Agreement, and references herein to "Articles" or "Sections" refer to Articles or Sections of this Agreement. The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

6.5     Costs and Expenses. Each Party shall bear its own expenses incurred in connection with the negotiation, preparation, execution and closing of this Agreement and each other Transaction Document and the transactions provided for hereby and thereby.

6.6     Notices. All notices or other communications required or permitted by this Agreement or any other Transaction Document shall be effective upon receipt and shall be in writing and delivered personally or by overnight courier, or sent by facsimile (with confirmation copies delivered personally or by courier within three (3) Business Days), as follows:

If to Merhav, to:

> Merhav (m.n.f) Ltd
> 33 Havatzelet Hasharon Street
> Herzlia, Israel
> Attention: Mr. Yossef Maiman and Mr. Leo Malamud
> Facsimile:+972-9-9501733

If to Ampal, to:

> Ampal-American Israel Corporation
> 111 Arlozorov Street
> Tel Aviv 62098 Israel
> Attention: Yoram Firon
> Facsimile:+972-3-6080101

with copies to:

> Bryan Cave LLP
> 1290 Avenue of the Americas
> New York, NY, USA 10019
> Attention: Kenneth Henderson, Esq.
> Facsimile: (212) 541-1357

or to such other address as hereafter shall be furnished as provided in this Section 6.6 by any Party to any other Party. Any demand, notice or other communication given by personal delivery shall be conclusively deemed to have been given on the day of actual delivery thereof and, if given by facsimile, on the day of transmittal thereof if given during the normal business hours of the recipient, and on the Business Day during which such normal business hours next occur if not given during such hours on any day.

6.7     Counterparts.  This Agreement and each other Transaction Document may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute a single instrument.

6.8     Entire Agreement.  This Agreement together with the other Transaction Documents set forth the entire understanding and agreement between the Parties as to the matters covered herein and therein and supersede and replace any prior understanding, agreement or statement of intent, in each case, written or oral, of any and every nature with respect thereto.  In the event of any inconsistency between this Agreement and the other Transaction Documents, this Agreement shall govern as between the Parties with respect to the matters set forth herein.

6.9     No Third Party Rights; Assignment.  This Agreement is intended to be solely for the benefit of the Parties and is not intended to confer any benefits upon, or create any rights in favor, of any Person other than the Parties and shall not be assignable without the prior written

9

Consent of the other Parties.  Notwithstanding any of the foregoing, Ampal may transfer its rights and interests hereunder to an Affiliate.

6.10    <u>Waivers and Amendments</u>.  No modification of or amendment to this Agreement or any other Transaction Document shall be valid unless in writing signed by the Parties referring specifically to this Agreement or such other Transaction Document and stating the Parties' intention to modify or amend the same.  Any waiver of any term or condition of this Agreement or any other Transaction Document must be in a writing signed by the Party sought to be charged with such waiver referring specifically to the term or condition to be waived, and no such waiver shall be deemed to constitute the waiver of any other breach of the same or of any other term or condition of this Agreement or any other Transaction Document.

IN WITNESS WHEREOF, the parties hereto have duly executed this Option Agreement as of the date first above written.

**AMPAL-AMERICAN ISRAEL CORPORATION**

By: _____

Name: Irit Eluz, Yoram Firon

Title:   CFO          VP

**MERHAV (M.N.F) LIMITED**

By: _____

Name:  Yosef A. Maiman

Title: _____

[SIGNATURE PAGE TO OPTION AGREEMENT]

# EXHIBIT C

EXECUTION COPY

## PLEDGE AGREEMENT

PLEDGE AGREEMENT, dated as of December 25, 2007, Merhav (m.n.f.) Limited a company established under the laws of Israel ("Pledgor") and Ampal-American Israel Corporation, a New York Corporation ("Pledgee").

### W I T N E S S E T H:

WHEREAS, concurrently with the execution and delivery of this Agreement, Pledgee has loaned the Pledgor $20,000,000 (the "Loan") pursuant to a Promissory Note, dated the date hereof, in the (the "Note"); and

WHEREAS, it is a condition precedent to the Loan that the Pledgor shall have made the pledge contemplated by this Agreement.

NOW, THEREFORE, in consideration of the premises and in order to induce the Pledgee to consummate the transactions contemplated by the Note, the parties hereto hereby agree as follows:

SECTION 1. Pledge. The Pledgor hereby pledges with, hypothecates to, delivers and transfers into the possession of the Pledgee, his assigns, heirs and legal representatives and grants to the Pledgee, its assigns, heirs and legal representatives a continuing first priority security interest in, the following (collectively the "Pledged Collateral"):

(i) all Class A Stock, par value $1.00 per share (the "Class A Stock"), of Ampal-American Israel Corporation (collectively, the "Pledged Shares") currently owned or hereinafter acquired;

(ii) the certificates representing the shares referred to in clauses (i) above; and

(iii) subject to Section 6, all dividends, cash, instruments, options, rights and other property or proceeds, from time to time received, receivable or otherwise distributed or distributable in respect of or in exchange for any or all of the shares referred to in clause (i) above.

SECTION 2. Security for Obligations. This Agreement secures and the Pledged Collateral is security for the indefeasible payment in full when due, whether at the stated maturity, by acceleration or otherwise, of the obligations of the Pledgor pursuant to the Note, and all obligations of the Pledgor now or hereafter existing under this Agreement (all such obligations of the Pledgor being referred to herein as the "Secured Obligations").

SECTION 3. Delivery of Pledged Collateral. All certificates or instruments representing or evidencing the Pledged Collateral shall be delivered to and held by Pledgee and shall be accompanied by undated stock powers duly endorsed in blank and irrevocable proxies substantially in the form of Exhibit A hereto.

SECTION 4.  Representations and Warranties.      (a) The Pledgor represents and warrants as follows:

(i)      The Pledgor currently is the legal and beneficial owner of 4,476,389 shares of Class A Stock and such shares are all of the Class A Stock of Pledgee owned by Pledgor.  There are no existing options, warrants, calls, commitments, rights (pre-emptive or otherwise), or subscriptions of any character whatsoever relating to any of the Pledged Shares except for those created or incurred by or at the direction of the Pledgee.

(ii)      The Pledgor is the direct and beneficial owner of the Pledged Collateral free and clear of any lien, claim or encumbrance other than the encumbrance granted to the Pledgee hereunder.

(iii)      This Agreement has been duly executed and delivered by the Pledgor and constitutes the legal, valid and binding obligation of the Pledgor, enforceable against the Pledgor in accordance with its terms.

(iv)      The pledge of the Pledged Collateral pursuant to this Agreement creates a valid and perfected first priority security interest in the Pledged Collateral securing the payment of the Secured Obligations, subject to no prior lien or to any agreement purporting to grant to any third party a security interest in the property or assets of the Pledgor which would include the Pledged Collateral.

(b)      The representations and warranties set forth in this Section 4 shall survive the execution and delivery of this Agreement.

SECTION 5.  Further Assurances; Supplements.      (a) The Pledgor agrees that at any time and from time to time, at the expense of the Pledgor, the Pledgor will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable in order to perfect and protect any security interest granted or purported to be granted hereby or to enable the Pledgee to exercise and enforce its rights and remedies hereunder with respect to any Pledged Collateral including, without limitation, the execution and delivery of UCC-1 financing statements for filing by and at the sole expense of Pledgee.  Pledgor hereby authorizes Pledgee to file all UCC-1 financing statements or other instruments that Pledgee deems necessary or desirable to perfect the Pledgee and security interest created hereunder.

(b)      The Pledgor will defend Pledgee's right, title, special property and security interest in and to the Pledged Collateral pledged by it hereunder and the encumbrances of the Pledgee thereon against the claim of any person and will maintain and preserve such Encumbrances so long as any Secured Obligations are outstanding.

(c)      If the Pledgor shall become entitled to receive or shall receive any certificate or other instrument (including, without limitation, any certificate representing a stock dividend or distribution in connection with any reclassification, increase or reduction in capital), option or right, whether in addition to, in substitution of, or in exchange for any of the Pledged Collateral, the Pledgor shall accept any such certificate or other instrument as the Pledgee's agent, shall hold them in trust for the Pledgee, and shall deliver them forthwith to Pledgee in the exact form received, together with appropriate undated stock powers duly endorsed in blank and other

2

instruments of transfer which may be necessary or desirable duly executed in blank, to be held by the Pledgee, subject to the terms hereof, as further collateral for the Secured Obligations and the same shall for all purposes be deemed to be Pledged Collateral hereunder.

SECTION 6. Voting Rights; Dividends; Etc.       (a)  As long as no Default (as defined in Section 10) shall have occurred and be continuing and, in the case of Section 6(a)(i), as long as no notice thereof shall have been given by the Pledgee to the Pledgor):

(i)       The Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Pledged Collateral pledged by it hereunder or any part thereof for any purpose not inconsistent with the terms of this Agreement or the Note; *provided, however,* that the Pledgor shall not exercise or refrain from exercising any such right if such action would have an adverse effect on the value of the Pledged Collateral or any part thereof.

(ii)       The Pledgor shall be entitled to receive and retain any and all dividends paid in respect of the Pledged Collateral pledged by it hereunder, other than any and all

(A)  dividends paid or payable other than in cash in respect of, and instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for, any Pledged Collateral,

(B)  dividends and other distributions paid or payable in cash in respect of any Pledged Collateral in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in-surplus, and

(C)  cash paid, payable or otherwise distributed in redemption of, or in exchange for, any Pledged Collateral,

all of which shall be, and all of which shall be forthwith delivered to the Pledgee to hold as Pledged Collateral and shall, if received by the Pledgor, be received in trust for the benefit of the Pledgee, be segregated from the other property or funds of the Pledgor, and be forthwith delivered to the Pledgee as Pledged Collateral in the same form as so received (with any necessary endorsement).

(iii)  The Pledgee shall execute and deliver (or cause to be executed and delivered) to the Pledgor all such proxies and other instruments as the Pledgor may reasonably request for the purpose of enabling the Pledgor to exercise the voting and other rights which it is entitled to exercise pursuant to paragraph (i) above and to receive the dividends which it is authorized to receive and retain pursuant to paragraph (ii) above.

(b)       Upon the occurrence and during the continuance of a Default:

3

(i)    All rights of the Pledgor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to Section 6(a)(i) above shall cease upon notice from the Pledgee to the Pledgor, and all such rights shall thereupon become vested in the Pledgee who shall thereupon have the sole right to exercise such voting and other consensual rights and any and all rights of conversion, exchange, subscription or any other rights, privileges or options pertaining to the Pledged Collateral or any part thereof, and Pledgee may exercise such powers in such manner as the Pledgee may elect, but the Pledgee shall have no duty to exercise any of the aforesaid right, privileges or options and shall not be responsible for any failure to do so or delay in doing so.

(ii)    All rights of the Pledgor to receive the dividends which it or he would otherwise be authorized to receive and retain pursuant to Section 6(a)(ii) above shall cease, and all such rights shall thereupon become vested in the Pledgee who shall thereupon have the sole right to receive and hold as Pledged Collateral such dividends.

(iii)    All dividends which are received by the Pledgor contrary to the provisions of paragraph (ii) of this Section 6(b) shall be received in trust for the benefit of the Pledgee, shall be segregated from other funds of the Pledgor and shall be forthwith paid over to the Pledgee as Pledged Collateral in the same form as so received (with any necessary endorsement).

(c)    In order to permit the Pledgee to exercise the voting and other rights which it may be entitled to exercise pursuant to Section 6(b)(i) above, and to receive all dividends and distributions which it may be entitled to receive under Section 6(b)(ii) above, the Pledgor shall, if necessary, upon written notice of the Pledgee, from time to time execute and deliver to the Pledgee appropriate proxies, dividend payment orders and other instruments as the Pledgee may reasonably request including, without limitation, the irrevocable proxies in the form of Exhibit A hereto delivered by the Pledgor to the Pledgee on the date hereof.

SECTION 7.  Transfers and Other Liens; Additional Shares or Warrants.  (a) The Pledgor agrees that it will not (i) sell, assign or transfer or otherwise dispose of, or grant any option, warrant, subscription, call, warrants or other agreements with respect to, any of the Pledged Collateral, or (ii) create or permit to exist any encumbrance upon or with respect to any of the Pledged Collateral, except for the encumbrance in favor of the Pledgee under this Agreement.

(b)    The Pledgor agrees that it will not cause, consent to or approve the issuance of any additional shares of any class of capital stock of the Companies, except in each instance to the Pledgor, with delivery thereof to be made to the Pledgee to be held as additional Pledged Collateral hereunder.

SECTION 8.  Power of Attorney.  The Pledgor hereby authorizes the Pledgee and does hereby make, constitute and appoint the Pledgee and any officer of agent of the Pledgee, with full power of substitution, as the Pledgor's true and lawful attorney-in-fact, with power, in its own name and in the name of the Pledgor upon the occurrence and continuance of a Default, to

4

endorse any notes, checks, drafts, money orders or other instruments of payments in respect of the Pledged Collateral that may come into possession of the Pledgee; to sign and endorse any drafts against debtors, assignments, verifications and notices in connection with accounts and other documents relating to the Pledged Collateral; to pay or discharge taxes, liens, security interests or other encumbrances at any time levied or places on or threatened against the Pledged Collateral; to demand, collect, receipt for, comprise, settle and sue for monies due in respect of the Pledged Collateral; and generally, to do, at the Pledgee's option each at the Pledgor's expense, at any time, or from time to time, all acts and things, which the Pledgee deems necessary to protect, preserve and realize upon the Pledged Collateral and Pledgee's security interest therein in order to effect the intent of this Agreement all as fully and effectually as the Pledgor might or would do; and the Pledgor hereby ratifies all that said attorney shall lawfully do or cause to be done by virtue hereof. This power of attorney shall be irrevocable for the term of this Agreement and thereafter as long as any of the Secured Obligations shall be outstanding.

SECTION 9. Pledgee May Perform. If the Pledgor fails to perform any agreement contained herein, the Pledgee may itself perform, or cause performance of, such agreement, and the expenses of the Pledgee incurred in connection therewith shall be payable by the Pledgor under Section 11 of this Agreement.

SECTION 10. Remedies Upon Default. For purposes of this Agreement, "Default" shall mean (i) a default in Pledgor's obligations under the Note, and (ii) any breach or default under the terms of this Agreement, which breach or default under this clause (ii) has not been cured within 30 days after receipt of written notice of the occurrence thereof. Upon the occurrence of an Event of Default and the delivery of the Pledged Collateral to the Pledgee pursuant to Section 10, in addition to any other rights and remedies provided for herein or available to him, the Seller may cause all or any part of the Pledged Collateral to be registered in the name of Pledgee or his designee and, in addition:

(a) The Pledgee may exercise in respect of the Pledged Collateral, all the rights and remedies of a secured party in default under the Uniform Commercial Code (the "Code") in effect in the State of New York at that time, and the Pledgee may also, without notice except as specified below, sell the Pledged Collateral or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any of the Pledgee's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Pledgee may deem commercially reasonable and the Pledgee may be the purchaser of any or all of the Pledged Collateral so sold. Each purchaser at any such sale, including, without limitation, the Pledgee, shall hold the property sold, absolutely, free and clear from any claim or right of redemption of the Pledgor, whom specifically waives all rights of redemption, stay or appraisal which he may has or may have under any rule or law or statute now existing or hereafter adopted. The Pledgor agrees that, to the extent notice of sale shall be required by law, at least ten business days' notice to the Pledgor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Pledgee shall not be obligated to make any sale of Pledged Collateral regardless of notice of sale having been given. The Pledgee may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

NY02DOCS\1455590

(b)     The Pledgor recognizes that, by reason of certain requirements and prohibitions contained in the Securities Act of 1933, as amended (the "Securities Act"), and applicable state securities laws, the Pledgee may with respect to any sale of all or any part of the Pledged Collateral, limit purchasers to those who will agree, among other things, to acquire such securities for their own account, for investment, and not with a view to the distribution or resale thereof. The Pledgor acknowledges and agrees that any such sale may result in prices and other terms less favorable to the seller than if such sale were a public sale without such restrictions and, notwithstanding such circumstances, agrees that any such sale shall be deemed to have been made in a commercially reasonable manner. The Pledgee shall be under no obligation to delay the sale of any of the Pledged Shares for the period of time necessary to permit the Pledgor to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if the Pledgor would agree to do so.

(c)     If the Pledgee determines to exercise its right to sell any or all of the Pledged Collateral, upon written request, the Pledgor shall, from time to time, furnish to the Pledgee all such information as the Pledgee may reasonably request in order to determine the number of shares and other instruments included in the Pledged Collateral which may be sold by the Pledgee as exempt transactions under the Securities Act and rules of the Securities and Exchange Commission thereunder, as the same are from time to time in effect.

(d)     Any cash held by the Pledgee as Pledged Collateral and all cash proceeds received by the Pledgee in respect of any sale of, collection from, or other realization upon all or any part of the Pledged Collateral shall be applied by the Pledgee:

First, to the payment of the reasonable costs and expenses of such sale, including reasonable compensation to the Pledgee and its agents and counsel, and all reasonable expenses, liabilities and advances made or incurred by the Pledgee in connection therewith;

Next, to the Pledgee on account of the Secured Obligations in such order as the Pledgee may elect; and

Finally, after indefeasible payment in full of all Secured Obligations, to the payment to the Pledgor, or his assigns, heirs or legal representatives or to whomsoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct, of any surplus then remaining from such proceeds.

SECTION 12. Expenses. The Pledgor will upon demand pay to the Pledgee the amount of any and all expenses, including the reasonable fees and expenses of its counsel and of any experts and agents, which the Pledgee may incur in connection with the exercise or enforcement of any of the rights of the Pledgee hereunder with respect to its Pledged Collateral or the failure by the Pledgor to perform or observe any of the provisions hereof.

SECTION 13. Security Interest Absolute. All rights of the Pledgee and security interests hereunder, and all obligations of the Pledgor hereunder, shall be absolute and unconditional irrespective of any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Note.

6

SECTION 14. Waiver. No delay on the Pledgee's part in exercising any power of sale, encumbrance, option or other right hereunder, and no notice or demand which may be given to or made upon the Pledgor by the Pledgee with respect to any power of sale, encumbrance, option or other right hereunder, shall constitute a waiver thereof, or limit or impair the Pledgee's right to take any action or to exercise any power of sale, encumbrance, option, or any other right hereunder, without notice or demand, or prejudice the Pledgee's rights hereunder or the rights of the Pledgee under the Note.

SECTION 15. Amendments. Etc. No amendment or waiver of any provision of this Agreement, nor consent to any departure by the Pledgor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Pledgee, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 16. Addresses for Notices. All notices and other communications provided for hereunder shall be in writing and deemed delivered (i) upon receipt if by hand, overnight courier or telecopy (provided a copy is mailed by certified mail, return receipt requested, postage prepaid) and (ii) three days after mailing by certified mail, return receipt requested, postage prepaid, to the Pledgor or to the Pledgee at the address provided for in the Note, or at such other address as shall be designated by such person in a written notice to each other person complying as to delivery with the terms of this Section.

SECTION 17. Continuing Security Interest. (a) This Agreement shall create a continuing first priority security interest in the Pledged Collateral, and shall (a) remain in full force and effect until indefeasible payment in full of the Secured Obligations; (b) continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by the obligee of the Secured Obligations, all as though such payment or performance had not been made; (c) be binding upon the Pledgor, his assigns; heirs and legal representatives and (d) inure to the benefit of the Pledgee and his heirs, legal representatives, transferees and assigns.

(b)     Upon the indefeasible payment in full of the Secured Obligations the security interest created by this Agreement shall be terminated an released without further action, and the Pledgor shall be entitled to the return, upon his request, of such of the Pledged Collateral pledged by him hereunder as shall not have been sold or otherwise applied pursuant to the terms hereof. Pledgee shall take such actions and execute such documents (at Pledgor's expense) reasonably requested by Pledgor to effectuate the release of the security interest created hereunder.

SECTION 18. Severability. If for any reason any provision or provisions hereof are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or effect those portions of this Agreement which are valid.

SECTION 19. Section Titles. The Section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

7

SECTION 20.  <u>Waiver of Jury Trial</u>.  The parties hereto hereby agree to waive any right they may have to a jury trial in connection with any action, suit or proceeding arising out of or related in any way to this Agreement.

SECTION 21.  <u>Governing Law: Terms</u>.  This Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York.

8

IN WITNESS WHEREOF, the Pledgor has caused this Agreement to be duly executed and delivered by its officer thereunto duly authorized, as of the date first above written.

**[Release and further assurance]**

PLEDGOR:

MERHAV (M.N.F.) LIMITED

By: _____

Name: Yosef A. Maina

Title:

PLEDGEE:

AMPAL-AMERICAN ISRAEL CORPORATION

By: _____

Name: Irit Eluz, Yoram Firon

Title:   CFO        VP

9

EXHIBIT A
TO
PLEDGE AGREEMENT

IRREVOCABLE PROXY

KNOW ALL MEN BY THESE PRESENTS that the undersigned does hereby make, constitute and appoint AMPAL AMERICAN ISRAEL CORPORATION (the "Pledgee"), its true and lawful attorney, for it and in its name, place and stead, to act as its proxy in respect of all of the shares of capital stock of AMPAL-AMERICAN ISRAEL CORPORATION, a New York corporation (the "Corporation"), which it now or hereafter may own or hold including, without limitation, the right, on its behalf, to demand the call by any proper officer of the Corporation pursuant to the provisions of its certificate of incorporation or bylaws and as permitted by law of a meeting of its shareholders and at any such meeting of shareholders, annual, general or special, to vote for the transaction of any and all business that may come before such meeting, or at any adjournment thereof including, without limitation, the right to vote for the sale of all or any part of the assets of the Corporation and/or the liquidation and dissolution of the Corporation; giving and granting to its said attorneys full power and authority to do and perform each and every act and thing whether necessary or desirable to be done in and about the premises, as fully as it might or could do if personally present with full power of substitution, appointment and revocation, hereby ratifying and confirming all that its said attorneys shall do or cause to be done by virtue hereof.

**THIS IRREVOCABLE PROXY SHALL ONLY BE EFFECTIVE UPON THE OCCURRENCE AND DURING THE CONTINUATION OF A "DEFAULT" AS THAT TERM IS DEFINED IN THE PLEDGE AND SECURITY AGREEMENT ("THE PLEDGE AGREEMENT") DATED AS OF THE DATE HEREOF BETWEEN THE UNDERSIGNED, AS PLEDGOR AND THE PLEDGEE, AS PLEDGEE.**

This Irrevocable Proxy is given to Pledgee pursuant to the terms and conditions of the Pledge Agreement in order to carry out the covenants and agreements of the undersigned contained therein, this Proxy is governed by the terms and conditions of the Pledge Agreement, and this Proxy is coupled with an interest and shall not be revocable or revoked by the undersigned, and shall be binding upon its successors and assigns until the expiration or termination of the Pledge Agreement pursuant to its terms.

IN WITNESS WHEREOF, the undersigned has executed this Irrevocable Proxy as of this 25th day of December, 2007.

MERHAV (M.N.F.) LIMITED

By: _____
Name: Yosef A. Maiman
Title:

10

# EXHIBIT D

## AMENDED AND RESTATED PROMISSORY NOTE

$20,000,000.00                                          December 25, 2008

FOR VALUE RECEIVED, MERHAV (M.N.F) LIMITED, a company formed pursuant to the laws of the State of Israel, located at 33 Havatzelet Hasharon Street, Herzlia, Israel ("Borrower"), promises to pay to the order of Ampal-American Israel Corporation, a New York corporation, located at 10 Abba Even St., Ackerstein Tower C, 9th Floor, Herzliya, Israel ("Lender"), at such office of Lender or at such other place as the holder hereof may from time to time appoint in writing, in lawful money of the United States of America in immediately available funds, the principal sum of TWENTY MILLION ($20,000,000.00) Dollars or so much thereof as may then be the aggregate unpaid principal balance of such loan made by Lender to Borrower hereunder (the "Loan") as shown on the schedule attached to and made a part of this Note. Borrower also promises to pay interest (computed on the basis of a 360 day year for actual days elapsed) at said office in like money on the unpaid principal amount of the Loan from time to time outstanding at a rate per annum equal to LIBOR plus 3.25%. The applicable interest rate shall be reset on the first Business Day of each month. The entire unpaid balance, together with all interest accrued and unpaid thereon, and all other sums then due and payable to Lender under this Note shall be due and payable in full on the earlier of (i) December 31, 2009 and (ii) the Financing Date (as defined below) (the "Maturity Date").

This Amended and Restated Promissory Note amends and restates in its entirety the Promissory Note, dated December 24, 2007, executed by the Borrower. .  This Note shall have the benefit of the Guaranty, dated as of the date hereof, from Yosef Maiman in favor of Lender.

Interest on outstanding amounts hereunder shall accrue on a quarterly basis and be payable on the earlier of (i) the date on which any portion of the balance of this Note is converted in accordance with Section 4 hereof or (ii) together with principal and any other amounts due hereunder, on the maturity hereof. Borrower further agrees that upon and following an Event of Default and/or after any stated or any accelerated maturity of the indebtedness evidenced hereby, the aggregate outstanding principal balance of the Loan shall bear interest (computed daily) at a rate equal to 5% per annum in excess of the rate applicable to such Loan, payable on demand. In no event shall interest payable hereunder be in excess of the maximum rate of interest permitted under applicable law. If any payment to be so made hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day and, to the extent permitted by applicable law, interest thereon shall be payable during such extension.

All payments made in connection with this Note shall be in lawful money of the United States in immediately available funds. All such payments shall be applied first to the payment of all fees, expenses and other amounts due to Lender (excluding principal and interest), then to accrued interest, and the balance on account of outstanding principal; provided, however, that after the occurrence of an Event of Default, payments will be applied to the obligations of Borrower to Lender as Lender determines in its sole discretion. Borrower hereby expressly authorizes Lender to record on the attached schedule the amount and date of the Loan and the date and amount of each payment of principal. All such notations shall be presumptive as to the correctness thereof (absent manifest error); provided, however, the failure of Lender to make any such notation shall not limit or otherwise affect the obligations of Borrower under this Note.

In consideration of the granting of the Loan evidenced by this Note, Borrower hereby agrees as follows:

1. <u>Loan</u>. Borrower hereby confirms that the principal amount outstanding under this Promissory Note as of the date hereof is $20,000,000 and the accrued and unpaid interest as of the date hereof is $988,576.40. Interest shall continue to accrue on the outstanding principal amount from the date hereof at the interest rate set forth herein.

2. <u>Prepayment</u>. Borrower may not prepay the Loan at any time in whole or in part.

3. <u>Use of Proceeds</u>. The proceeds of the Loan shall be used to facilitate the Project (as defined in the Option Agreement) and to fund the purchase of 11,000 hectares of real property located in Colombia in connection with the development of an ethanol producing Project more fully described on Exhibit B.

4. <u>Conversion</u>. This Note shall be convertible into equity interests in the Project in the manner and in accordance with the Option Agreement, dated as of December 24, 2007, between Borrower and Lender (as amended from time to time, the "<u>Option Agreement</u>"). Interest shall cease to accrue on such portion of the outstanding amounts hereunder converted on the date of the Option Closing (as defined in the Option Agreement) under the Option Agreement.

5. <u>Events of Default</u>. Upon the occurrence of any of the following specified events of default (each an "<u>Event of Default</u>"): (a) default in making any payment of principal, interest, or any other sum payable under this Note when due and such failure shall continue unremedied for a period of 30 days after Borrower receives notice thereof from Lender; or (b) default by Borrower (i) of any other obligation hereunder or (ii) in the due payment of any other obligation owing to Lender or (iii) under any other Loan Document, and the failure set forth in (i), (ii) or (iii) above shall continue unremedied for a period of 30 days after Borrower receives notice thereof from Lender; or (c) default by Borrower in the due payment of any other indebtedness for borrowed money or default in the observance or performance of any covenant or condition contained in any agreement or instrument evidencing, securing, or relating to any such indebtedness, which causes or permits the acceleration of the maturity thereof; or (d) Borrower becomes insolvent or bankrupt, is generally not paying its debts as they become due, or makes an assignment for the benefit of creditors, or a trustee or receiver is appointed for Borrower or for the greater part of the properties of Borrower with the consent of Borrower, or if appointed without the consent of Borrower, such trustee or receiver is not discharged within 60 days, or bankruptcy, reorganization, liquidation or similar proceedings are instituted by or against Borrower under the laws of any jurisdiction, and if instituted against Borrower are consented to by it or remain undismissed for 60 days, or a writ or warrant of attachment or similar process shall be issued against a substantial part of the property of Borrower and shall not be released or bonded within 30 days after levy; or (e) Borrower shall be in default beyond any applicable grace period under any Loan Document; then, in any such event, and at any time thereafter, if any Event of Default shall then be continuing, Lender may declare the principal and the accrued interest in respect of the Loan under this Note to be, whereupon the Note shall become, immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are expressly waived by Borrower, provided that in the case of any event described in clause (d) of this Section with respect to Borrower, the principal of the Loan then outstanding, together with accrued interest thereon and all fees and other obligations of Borrower accrued under the Loan Documents, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Borrower.

6. <u>Collateral Security</u>. This Note is secured by the Pledge Agreement.

7. <u>Covenants</u>. So long as any obligations are outstanding under this Note, Borrower hereby represents, covenants and agrees as follows:

(a)     Borrower is the legal and beneficial owner of 6,043,623 shares (the "Shares") of Class A Stock, par value, $1.00 per share, of Ampal-American Israel Corporation, free and clear of any liens, security interests, pledges or other agreements or encumbrances.   Borrower shall not sell, transfer, pledge or otherwise encumber it right, title and interest in any of the Shares.

(b)     Borrower shall keep Lender timely informed on the progress of the Project, and provide Lender with reports, analysis, financial and such other information as Lender may reasonably request.

(c)     Borrower shall permit Lender, at reasonable times and with reasonable notice, to inspect the Project.  Lender may, and Borrower shall assist Lender, in reviewing and inspecting any books, records, data or other information relating to the Project.  Lender may make copies of any information and documents relating to the Project.

(d)     Borrower shall not sell, dispose or otherwise transfer the Project or assets thereof, without the consent of the Lender, other than (i) up to a 35% equity interest in the Project to a single strategic partner, and (ii) up to a 2.5% equity interest in the Project to Riagro S.A.

(e)     Borrower shall not merge with or into or consolidate with another entity; or otherwise dissolve or liquidate without the consent of the Lender.

8.  Definitions.  As used herein:

(a)     "Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York or Israel are required or permitted by law to remain closed.

(b)     "Loan Documents" means each document, instrument or agreement executed pursuant hereto or in connection herewith, together with each other document, instrument or agreement made with or in favor of Lender, including this Note, the Letter Agreement, the Option Agreement and the Pledge Agreement.

(c)     "Pledge Agreement" means the Pledge Agreement, dated as of December 24, 2007, between Borrower and Lender, as the same, from time to time, may be amended, restated, replaced, extended, supplemented or otherwise modified.

(d)     "LIBOR" means the rate per annum quoted in the London interbank market for dollar deposits having a term of thirty (30) days, as quoted from Bloomberg or a similar service as may be selected by Lender from time to time.

(e)     "Financing Date " means the date on which (i) Borrower has obtained from unaffiliated third party debt financing for the Project and (ii) a unaffiliated third party holds an equity interest on the Project of no less than 25%.

9.  Miscellaneous.

(a)     Borrower agrees to pay on demand all of Lender's costs and expenses, including reasonable counsel fees, in connection with the collection of any sums due to Lender in connection with the enforcement of its rights thereunder.

(b)     No modification or waiver of any provision of this Note shall be effective unless such modification or waiver shall be in writing and signed by a duly authorized officer of Lender and Borrower, and the same shall then be effective only for the period and on the conditions and for the specific instances specified in such writing.  No failure or delay by Lender in exercising any right, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any rights, power or privilege.

(c)     Borrower hereby waives presentment, demand for payment, notice of protest, notice of dishonor, and any and all other notices or demands except as otherwise expressly provided for herein.

(d)     This Note shall be construed in accordance with and governed by the internal laws of the State of New York.

(e)     EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

(f)     This Note shall be binding upon and inure to the benefit of Borrower, Lender, all future holders of this Note and their respective successors and assigns, except that Borrower may not assign or transfer any of its rights under this Note without the prior written consent of Lender.  The term "Lender" as used herein shall be deemed to include Lender and its successors, endorsees and assigns. Lender shall have the unrestricted right at any time or from time to time, and without Borrower's consent, to assign all or any portion of its rights and obligations hereunder, and Borrower agrees that it shall execute, or cause to be executed, such documents, including without limitation, amendments to this Note and to any other documents, instruments and agreements executed in connection herewith as Lender shall deem necessary to effect the foregoing.

(g)     This Note and the other Loan Documents are intended by the parties as the final, complete and exclusive statement of the transactions evidenced thereby.  All prior or contemporaneous promises, agreements and understandings, whether oral or written, are deemed to be superceded by this Note and such other Loan Documents, and no party is relying on any promise, agreement or understanding not set forth in this Note or such other Loan Documents.

MERHAV (M.N.F) LTD.

By:_____

Name:_____

Title:_____

LOAN AND REPAYMENT SCHEDULE
PROMISSORY NOTE DATED DECEMBER 25, 2008
Merhav (m.n.f.) Limited
to
Ampal-American Israel Corporation

| Date | Amount of Loan | Interest Rate | Amount of Principal Repayment | Unpaid Principal Balance | Notation Made By |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

EXHIBIT A

OPTION AGREEMENT

EXHIBIT B

PROJECT DESCRIPTION

# EXHIBIT E

# GUARANTY

This GUARANTY ("**Guaranty**") is executed as of December 25, 2008, by Yosef A. Maiman ("**Guarantor**"), for the benefit of Ampal-American Israel Corporation, a New York Corporation ("**Lender**").

## W I T N E S S E T H :

WHEREAS, Lender loaned Merhav (m.n.f.) Ltd. (the "Borrower") $20,000,000 (the "Loan") pursuant to a Promissory Note, dated December 24, 2007 (the "Original Promissory Note");

WHEREAS, the Original Promissory Note was scheduled to mature on December 24, 2008;

WHEREAS, Borrower and Lender have agreed, to amend the Original Promissory Note to extend its maturity and modify the rate of interest;

WHEREAS, to reflect such amendments, the Borrower executed and delivered that certain Amended and Restated Promissory Note, dated as of the date hereof, payable to the order of Lender in the original principal amount of $20,000,000 (together with all renewals, modifications, increases and extensions thereof, the "**Note**"), which is secured by the lien and security interest of a Pledge Agreement, dated as of December 24, 2007, given by Borrower to Lender (the "**Pledge Agreement**"), and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan (together with the Note and Pledge Agreement, the "**Loan Documents**");

WHEREAS, Lender was not willing to extend the maturity of the Original Promissory Note unless Guarantor unconditionally guaranteed payment and performance to Lender of the Guaranteed Obligations (as herein defined); and

WHEREAS, Guarantor is the direct or indirect owner of the Borrower and directly benefits from the extension of the Original Promissory Note.

NOW, THEREFORE, as an inducement to Lender to extend the maturity of the Original Promissory Note, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## ARTICLE I

## NATURE AND SCOPE OF GUARANTY

**1.1**    **Guaranty of Obligation.**  Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise.  Guarantor hereby irrevocably and

unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

**1.2**   **Definition of Guaranteed Obligations.**  As used herein, the term "**Guaranteed Obligations**" means all sums which may now or hereafter become due and payable by Borrower pursuant to the Note, the Pledge Agreement or the other Loan Documents.

**1.3**   **Nature of Guaranty.**  This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection.  This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs).  The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations.  This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

**1.4**   **Payment By Guarantor.**  If all or any part of the Guaranteed Obligations shall not be punctually paid when due (subject to any applicable notice and cure periods set forth in the Loan Documents), whether at demand, maturity, acceleration or otherwise, Guarantor shall, immediately upon demand by Lender, and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity, or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein.  Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations, and may be made from time to time with respect to the same or different items of Guaranteed Obligations.  Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

**1.5**   **No Duty To Pursue Others.**  It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

**1.6**   **Waivers.**  Guarantor agrees to the provisions of the Loan Documents, and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Pledge Agreement or of any other Loan Documents, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other

2

documents arising under the Loan Documents, (v) the occurrence of any breach by Borrower or an Event of Default, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender, and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and the obligations hereby guaranteed.

**1.7** **Payment of Expenses.** In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, immediately upon demand by Lender, pay Lender all costs and expenses (including court costs and reasonable attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder. The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations.

**1.8** **Effect of Bankruptcy.** In the event that, pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law, or any judgment, order or decision thereunder, Lender must rescind or restore any payment, or any part thereof, received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect, and this Guaranty shall remain in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

**1.9** **Waiver of Subrogation, Reimbursement and Contribution.** Notwithstanding anything to the contrary contained in this Guaranty, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating the Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

**1.10** **Borrower.** The term "**Borrower**" as used herein shall include any new or successor corporation, association, partnership (general or limited), joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Borrower or any interest in Borrower.

## ARTICLE II

### EVENTS AND CIRCUMSTANCES NOT REDUCING
### OR DISCHARGING GUARANTOR'S OBLIGATIONS

Guarantor hereby consents and agrees to each of the following, and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following, and waives any common law, equitable, statutory

3

or other rights (including without limitation rights to notice) which Guarantor might otherwise have as a result of or in connection with any of the following:

**2.1** **Modifications.** Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Pledge Agreement, the other Loan Documents, or any other document, instrument, contract or understanding between Borrower and Lender, or any other parties, pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

**2.2** **Condition of Borrower or Guarantor.** The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower, or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor, or any changes in the shareholders, partners or members of Borrower or any reorganization of Borrower.

**2.3** **Release of Obligors.** Any full or partial release of the liability of Borrower on the Guaranteed Obligations, or any part thereof, or of any co-guarantors, or any other person or entity now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations.

**2.4** **Other Collateral.** The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

**2.5** **Release of Collateral.** Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

**2.6** **Care and Diligence.** The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of such collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

**2.7** **Unenforceability.** The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the

4

Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectibility or value of any of the collateral for the Guaranteed Obligations.

**2.8    Merger.** The reorganization, merger or consolidation of Borrower into or with any other corporation or entity.

**2.9    Preference.** Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws, or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

**2.10    Other Actions Taken or Omitted.** Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into the Loan Documents and extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

**3.1    Benefit.** Guarantor is the direct or indirect 100% owner of the the Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

**3.2    Familiarity and Reliance.** Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and the Owner and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

**3.3    No Representation By Lender.** Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce the Guarantor to execute this Guaranty.

**3.4    Guarantor's Financial Condition.** As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is, and will be, solvent, and has and will have assets which, fairly valued, exceed its obligations, liabilities

5

(including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

**3.5** **Legality.** The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not, and will not, contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, mortgage, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor. This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

**3.6** **Survival.** All representations and warranties made by Guarantor herein shall survive the execution hereof.

## ARTICLE IV

## SUBORDINATION OF CERTAIN INDEBTEDNESS

**4.1** **Subordination of All Guarantor Claims.** As used herein, the term **"Guarantor Claims"** shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the person or persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor. The Guarantor Claims shall include without limitation all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations. Upon the occurrence of an Event of Default or the occurrence of an event which would, with the giving of notice or the passage of time, or both, constitute an Event of Default, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other party any amount upon the Guarantor Claims.

**4.2** **Claims in Bankruptcy.** In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims. Guarantor hereby assigns such dividends and payments to Lender. Should Lender receive, for application upon the Guaranteed Obligations, any such dividend or payment which is otherwise payable to Guarantor, and which, as between Borrower and Guarantor, shall constitute a credit upon the Guarantor Claims, then upon payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which

6

would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

**4.3** **Payments Held in Trust**. In the event that, notwithstanding anything to the contrary in this Guaranty, Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

**4.4** **Liens Subordinate**. Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach. Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, mortgage, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower held by Guarantor.

## ARTICLE V

## MISCELLANEOUS

**5.1** **Waiver**. No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

**5.2** **Notices**. All notices given hereunder shall be in writing and shall be either hand delivered or mailed, by registered U.S. mail, Return Receipt Requested, first class postage prepaid, to the parties at their respective addresses below or at such other address for any party as such party may designate by notice to the other parties hereto:

> To Borrower: MERHAV (M.N.F) LTD
> 33 Havatzelet Hasharon Street
> Herzlia, Israel
> Att: Yosef A. Maiman

To Lender:           Ampal-American Israel Corporation
10 Abba Even St.,
Ackersten Tower C
9th Floor
Herzliya, Israel
Att: Yoram Firon

To Guarantor, addressed to Guarantor at:
33 Havatzelet Hasharon Street
Herzlia, Israel

Notices shall be deemed to have been given on the date they are actually received; provided, that the inability to deliver notices because of a changed address of which no notice was given, or rejection or refusal to accept any notice offered for delivery shall be deemed to be receipt of the notice as of the date of such inability to deliver or rejection or refusal to accept delivery. Notice for either party may be given by its respective counsel.

**5.3**    <u>**Governing Law.**</u> This Guaranty shall be governed by and construed in accordance with the laws of the State of New York and the applicable laws of the United States of America.

**5.4**    <u>**Consent to Jurisdiction**</u>. Guarantor hereby irrevocably submits to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York located in the borough of Manhattan in the City of New York, or if such court does not have jurisdiction, the Supreme Court of the State of New York, New York County, for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Guarantor further agrees that service of any process, summons, notice or document by U.S. registered mail to the address set forth in Section 5.2 for the Guarantor shall be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above in the immediately preceding sentence. Guarantor irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in (i) the United States District Court for the Southern District of New York or (ii) the Supreme Court of the State of New York, New York County, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

**5.5**    <u>**Invalid Provisions**</u>. If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and

the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

5.6     **Amendments.** This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

5.7     **Parties Bound; Assignment; Joint and Several.** This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Guarantor may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder. If Guarantor consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

5.8     **Headings.** Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

5.9     **Recitals.** The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered _prima facie_ evidence of the facts and documents referred to therein.

5.10     **Counterparts.** To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

5.11     **Rights and Remedies.** If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

5.12     **Other Defined Terms.** Any capitalized term utilized herein shall have the meaning as specified in the Note, unless such term is otherwise specifically defined herein.

5.13     **Entirety.** **THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS,**

9

REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.

 5.14    Waiver of Right To Trial By Jury. GUARANTOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE PLEDGE AGREEMENT, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY GUARANTOR.

 5.15    Reinstatement in Certain Circumstances. If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, the Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment has been due but not made at such time.

 EXECUTED as of the day and year first above written.


GUARANTOR:                                        X _____
                                                      Yosef A. Maiman

10

# EXHIBIT F

MERHAV (M.N.F) LTD
33 Havatzelet Hasharon Street
Herzlia, Israel

Ampal-American Israel Corporation
10 Abba Even St.,
Ackersten Tower C
9th Floor
Herzliya, Israel

December 25, 2008

Re:  Amendment to Colombia Ethanol Project Option Agreement

Ladies & Gentlemen:

Reference is made to the Option Agreement, dated as of December 24, 2007 (the "Original Option Agreement"), between Merhav (m.n.f.) Ltd. ("Merhav") and Ampal-American Israel Corporation ("Ampal"). Capitalized terms used herein but not defined herein shall have the meanings set forth in the Original Option Agreement.

Merhav has informed Ampal that the Qualified Financing Date has not occurred and is unlikely to occur by December 24, 2008, the date on which (i) Ampal's Option (the "Option") to purchase up to a 35% equity interest in the Project in accordance with the Original Option Agreement expires and (ii) the date on which the repayment of the $20,000,000 loan made pursuant to the Promissory Note, dated December 24, 2007 (the "Original Note") , from Ampal to Merhav is due. Mcharv has requested, and Ampal has agreed, that the maturity of the Promissory Note be extended to December 31, 2009 in consideration for (x) an increase of 100 basis points on the applicable interest rate set forth in the Promissory Note, (y) an extension of the Option to December 31, 2009 and (z) receiving a personal guarantee of Yosef Maiman.

To carry out the agreements set forth in the preceding paragraph, Merhav and Ampal hereby agree as follows:

1. Amendment to Promissory Note. Merhav shall deliver to Ampal an executed, valid and binding Amended and Restated Promissory Note in the form attached hereto as Exhibit A (the "Amended Note"). Merhav hereby confirms to Ampal that the outstanding principal balance under the Promissory Note is $20,000,000 and the accrued and unpaid interest as of the date hereof is $988,576.40. Other than the accrual of interest through the date of the Amended Note, upon the delivery of the Amended Note to Ampal, the Original Note shall be null and void and of no further force or effect.

2. Amendment to Original Option Agreement. The Original Option Agreement is hereby amended as follows:

(a) The definition of "Option Termination Date" is amended in its entirety to read as follows:

"'<u>Option Termination Date</u>' means the earlier of (i) June 30, 2009 or (ii) the Qualified Financing Date."

(b) The definition of "Promissory Note" is amended in its entirety to read as follows:

"'<u>Promissory Note</u>' mans the Amended and Restated Promissory Note, dated December 25, 2008, by Merhav in favor of Ampal."

(c) A definition of "Maximum Purchase Price" is added to Article I of the Original Option Agreement which shall read in its entirety as follows:

"'<u>Maximum Purchase Price</u>' has the meaning set forth in Section 2.1(b)"

(d) Section 2.1(b) of the Original Option Agreement is hereby amended to read in its entirety as follows:

(b) The Purchase Price (as defined below) for the Option Interest shall be paid as follows: (i) first, by conversion of the balance (up to the amount of the Purchase Price) of the outstanding balance of principal, interest and all other amounts due under the Promissory Note (the "<u>Note Balance</u>") and (ii) if the Purchase Price exceeds the Note Balance, the excess of the Purchase Price over the Note Balance shall be paid by Ampal to Merhav at the Option Closing. Except as provided in the last sentence of this Section 2.1(b), the Purchase Price will be the Maximum Purchase Price (as defined below). The "Maximum Purchase Price" for the Optioned Interest shall be determined as follows: the sum of (A) to the extent the Note Balance is being converted for the purchase of the Optioned Interest, the purchase price for each portion of the Optioned Interest shall be the lower of (x) the purchase price for the Optioned Interest based on a valuation of the Project in accordance with the Valuation Model (without giving effect to any change in the assumed 12% discount rate set forth in the Valuation Model) or (y) the Third Party Price, and (B) after converting the Note Balance in full at the price determined pursuant to clause (A) of this sentence, any portion of the Optioned Interest that remains to be purchased shall be purchased at the Third Party Price, except if no Third Party price exists the purchase price will be based on the Valuation Model. Prior to the exercise of the Option, at the request of Ampal, Merhav and Ampal shall negotiate in good faith an increase to the 12% discount rate provided for in the Valuation Model for determining the Purchase Price (all other assumptions and methodologies used in the Valuation Model shall not be subject to negotiations or adjustment pursuant to this Section 2.1(b)) for determining the Purchase Price based on the Valuation Model, <u>provided</u>, <u>however</u> in no event shall the Purchase Price be more than the Maximum Purchase Price. For the avoidance of doubt, it is hereby specifically declared and agreed that the forgoing shall not be interpreted as Merhav having agreed to an increase in the discount rate.

3. <u>Effectiveness</u>. This Letter Agreement, and the amendments to the Promissory Note and the Original Option Agreement set forth herein, shall not be effective until Ampal has received this Letter Agreement and the Amended Note fully executed by an authorized officer of Merhav.

If you are in Agreement with the forgoing please sign a copy of this letter and return it to the undersigned.

MERHAV (M.N.F) LIMITED

By: _____

Name:

Title:

AMPAL-AMERICAN ISRAEL
CORPORATION

By: _____

Name:

Title:

# EXHIBIT G

OPTION EXERCISE AGREEMENT

among

AMPAL-AMERICAN ISRAEL CORPORATION

and

MERHAV (M.N.F.) Limited

dated as of December 31, 2009

# TABLE OF CONTENTS

**Page(s)**

ARTICLE I DEFINITIONS ........................................................................................ 1

ARTICLE II EXERCISE OF OPTION ...................................................................... 4
    2.1    Exercise of Option ......................................................................... 4
    2.2    Share Adjustment ......................................................................... 5
    2.3    Closing. .......................................................................................... 6

ARTICLE III MERHAV'S REPRESENTATIONS AND WARRANTIES .............. 6
    3.1    Existence; Authority; Enforceability ......................................... 6
    3.2    Interests in the Project ................................................................. 7
    3.3    Absence of Conflicts ..................................................................... 7
    3.4    Compliance With Law; Consents ................................................ 7
    3.5    Litigation. ....................................................................................... 7
    3.6    Fees ................................................................................................. 8
    3.7    Disclosure ...................................................................................... 8

ARTICLE IV COVENANTS ...................................................................................... 8
    4.1    Due Diligence ................................................................................. 8
    4.2    Further Assurances ...................................................................... 8

ARTICLE V INDEMNITY SURVIVAL ................................................................... 10
    5.1    Survival ......................................................................................... 10
    5.2    Indemnification ............................................................................ 10
    5.3    Procedures Relating to Indemnification .................................. 10
    5.4    Other Claims ................................................................................ 12
    5.5    Indemnification Limitations ...................................................... 12

ARTICLE VI MISCELLANEOUS ............................................................................ 12
    6.1    Governing Law ............................................................................. 12
    6.2    Arbitration .................................................................................... 13
    6.3    Severability .................................................................................. 13
    6.4    Interpretation .............................................................................. 13
    6.5    Costs and Expenses ..................................................................... 13
    6.6    Notices .......................................................................................... 13
    6.7    Counterparts ................................................................................ 14
    6.8    Entire Agreement ........................................................................ 14
    6.9    No Third Party Rights; Assignment ......................................... 14
    6.10    Waivers and Amendments ........................................................ 14

# OPTION EXERCISE AGREEMENT

OPTION EXERCISE AGREEMENT (this "Agreement"), dated as of December 31, 2009, by and among Ampal-American Israel Corporation, a New York corporation ("Ampal"), and Merhav (m.n.f.) Limited, a company organized under the laws of the State of Israel ("Merhav") (each, a "Party" and, collectively, the "Parties").

## RECITALS

WHEREAS, Merhav, directly and through certain subsidiaries, including Merhav Renewable Energies Limited, a corporation organized under the laws of Cyprus (the "Company"), intends to develop a sugarcane ethanol-producing project in Colombia, as more fully described on Exhibit A hereto (the "Project");

WHEREAS, Merhav and Ampal entered in to an Option Agreement, dated as of December 24, 2007 (as amended by the Letter Agreement, dated December 25, 2008, the "Option Agreement") pursuant to which Ampal had an Option to purchase an equity interest in the Project; and

WHEREAS, as partial consideration for entering into and amending the original the Option Agreement Ampal loaned Merhav $20,000,000 evidenced by the Amended and Restated Promissory Note, dated as of December 25, 2008, by Merhav in favor of Ampal (the "Promissory Note"); and

WHEREAS, in consideration for Merhav (i) delaying the payment date for the purchase price of the equity interest upon the exercise of the Option and (ii) otherwise amending the terms of the exercise of the Option as contained herein, Ampal has agreed to extend the maturity of the Promissory Note as provided herein.

NOW, THEREFORE, in consideration of the aforesaid premises and of the mutual representations, warranties and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

The following terms shall have the following meanings for purposes of this Agreement:

"Adjusted Share Amount" has the meaning set forth in Section 2.2.

"Adjustment Termination Date" means the date which is 180 days after commercial operations of the Project commenced.

"Affiliate" means (i) with respect to any Person, a Person that controls, is controlled by, or is under common control with such Person (it being understood, that a Person shall be deemed

to "control" another Person, for purposes of this definition, if such Person directly or indirectly has the power to direct or cause the direction of the management and policies of such other Person, whether through holding ownership interests in such other Person, through agreements or otherwise); and (ii) with respect to any natural Person, (1) any parent, grandparent, sibling, child or spouse of such natural Person, or other Person related by marriage to any such Persons, (2) any trust established for the benefit of such natural Person or any Affiliate of such natural Person or (3) any executor or administrator of the estate of such natural Person.

"Agreement" has the meaning set forth in the Preamble.

"Ampal Shares" has the meaning set forth in Section 2.1(a).

"Authority" means any governmental, judicial, legislative, executive, administrative or regulatory authority of Columbia, Israel and the United States or any state, local, provincial or foreign government or any subdivision, agency, commission, office or judicial, administrative or regulatory authority thereof.

"Business Day" means any day other than a Saturday, Sunday or a day on which banking institutions in New York, New York or Israel are authorized or obligated by law or executive order to close.

"Charter Documents" means any by-laws, charter, memorandum, certificate of incorporation, articles of association and any other similar constitutive or governing documents.

"Closing Date" means the date on which the sale and purchase of the Shares occurs in accordance with Section 2.3.

"Consent" means any consent, waiver, approval, authorization, exemption, registration, permit, license or declaration of or by any Person or any Authority, or expiration or termination of any applicable waiting period under any Legal Requirement, that is required with respect to any Party in connection with (i) the execution and delivery of this Agreement or any other Transaction Document or (ii) the consummation and performance of any of the transactions provided for hereby or thereby.

"Contract" or "Contracts" means any and all contracts and agreements, including those that are franchises, warranties, understandings, arrangements, leases, licenses, registrations, authorizations, mortgages, bonds, notes and other instruments (whether written or oral).

"Judgments" means any and all judgments, orders, writs, directives, rulings, decisions, injunctions, decrees, settlement agreements or awards of any Authority or arbitrator.

"Legal Requirements" means any and all (i) laws, ordinances and regulations, whether federal, provincial, state or local, of Israel, the United States, or any other applicable jurisdiction; (ii) codes, standards, rules, requirements and criteria issued under any laws, ordinances and regulations, whether federal, provincial, state or local of Israel, the United States or any other applicable jurisdiction; and (iii) Judgments.

2

"Liabilities" means any obligation, liability, or indebtedness of any kind, character or description, whether absolute, contingent, accrued, liquidated, unliquidated, known, unknown, executory or otherwise.

"Lien" means any mortgage, pledge, hypothecation, charge, assignment, deposit arrangement, encumbrance, security interest, lien, fiduciary assignment and any security or similar agreement of any kind or nature whatsoever.

"Necessary Action" means, with respect to a result required to be caused, all actions (to the extent such actions are permitted by applicable Legal Requirements) reasonably necessary to cause such result.

"Note Balance" means the outstanding balance of principal, interest and all other amounts due under the Promissory Note as of the date hereof, which is $22,249,000.

"Option" has the meaning set forth in the Option Agreement.

"Option Agreement" has the meaning set forth in the Recitals.

"Merhav Loan" has the meaning set forth in Section 4.4(b).

"Party" or "Parties" has the meaning set forth in the Preamble.

"Per Share Purchase Price" means the quotient of the Purchase Price divided by the number of Ampal Shares.

"Person" means an individual, corporation, partnership, trust, limited liability company, a branch of any legal entity, unincorporated organization, joint stock company, joint venture, association or other entity, or any government, or any agency or political subdivision thereof.

"Pledge Agreement" means the Pledge Agreement, dated as of December 24, 2007, between Merhav and Ampal, delivered a security for the Loan.

"Preamble" means the preamble to this Agreement.

"Promissory Note" has the meaning set forth in the Recitals.

"Project" has the meaning set forth in the recitals.

"Purchase Price" has the meaning set forth in Section 2.1(b).

"Qualified Financing Date" means the date on which long term debt financing was obtained for the Project from Banco Do Brazil or any other unaffiliated Third Party in an amount not less than $185 Million and the first disbursement under the financing facility has been provided or other proof of such financing commitment has been presented to Ampal to its full satisfaction.

"Recitals" means the recitals to this Agreement.

3

C060741/0213231/1563174.5

"Shares" means shares, par value 1 Euro per share, of the Company.

"Share Equivalents" means any securities which entitle the holder thereof to acquire Shares at any time, including without limitation, any debt, preferred stock, rights, options, warrants or other instrument that is at any time convertible into or exchangeable for, or otherwise entitles the holder thereof to receive, Shares or other securities that entitle the holder to receive, directly or indirectly, Shares.

"Shareholders Agreement" has the meaning set forth in Section 2.1(c) (ii).

"Strategic Partner Equity" means an equity interest not to exceed, after giving effect to the sale or issuance of such equity interest, 10% of the outstanding equity interests in the Project on a fully diluted basis, issued to a strategic partner mutually agreed to by Ampal and Merhav.

"Termination Date" means December 31, 2010.

"Transaction Documents" means each of this Agreement, the Shareholders Agreement, the Disclosure Letter, the Share Issuance Documentation and any other agreement, certificate or instrument delivered pursuant to any of the foregoing.

"Share Issuance Documentation" has the meaning set forth in Section 2.1(b)(i).

## ARTICLE II

## EXERCISE OF OPTION

2.1     Exercise of Option.  Subject to the conditions set forth in this Agreement, including without limitation Sections 2.1 (c), 2.1 (d) and Section 2.3 hereof.

(a)     On the Closing Date, against payment of the Purchase Price in accordance with Section 2.1(b), Merhav shall sell, or cause the Company to issue, to Ampal or its designee (after giving effect to such sale or issuance and subject to adjustment as set forth in Section 2.3 herein) such number of Shares representing a 25% interest in all the issued and outstanding equity interests in the Company, on a fully diluted basis (the "Ampal Shares").

(b)     The Purchase Price for the Ampal Shares shall be the Note Balance as of the date of this Agreement, and shall be paid, unless otherwise agreed by the parties, on the Closing Date.  Merhav shall give Ampal 5 days notice of the proposed Qualified Financing Date, which shall be the proposed scheduled Closing Date.

(c)     On the Closing Date, Merhav shall deliver to Ampal (and Ampal's obligations under this Agreement shall be subject to the receipt or waiver by Ampal) of the following:

(i)     such documentation reasonably requested by, and satisfactory to, Ampal necessary and desirable to transfer to Ampal the Ampal Shares, free and clear of any Liens(the "Share Issuance Documentation");

C060741/0213231/1563174.5

(ii)   a duly executed Shareholder's Agreement, among the equity holders in the Project, substantially in the form of <u>Exhibit B</u> hereto (the "<u>Shareholders Agreement</u>");

(iii)   Merhav shall have delivered to Buyer a certificate, dated as of the Closing Date and executed by an officer of Merhav, certifying to the fulfillment of the conditions specified in Section 2.3(b);

(iv)   payment in full of all outstanding amounts due and payable under the Promissory Note;

(v)   such other documentation reasonably requested by Ampal; and

(vi)   deliver to Ampal a Disclosure Letter reasonably satisfactory to Ampal.

(d) On the Closing Date, Ampal shall deliver to Merhav (and Merhav's obligations under this Agreement shall be subject to the receipt or waiver by Merhav of) the following:

(vii)   the Shareholder's Agreement duly executed by Ampal, and

(viii)   such documentation reasonably requested by Merhav to evidence the cancellation of the Promissory Note and the release of the pledge under the Pledge Agreement.

2.2   <u>Share Adjustment</u>.  (a)  If prior to the Adjustment Termination Date, other than with respect to any Strategic Partner Equity, Merhav sells or the Company issues  Shares (or Share Equivalents entitling any Person to acquire Shares) at a price per Share less than the Per Share Purchase Price (if the holder of the Shares or Share Equivalents so issued shall at any time, whether by operation of purchase price adjustments, reset provisions, floating conversion, exercise or exchange prices or otherwise, or due to warrants, options or rights issued in connection with such sale or issuance, be entitled to receive Shares at a price less than the Per Share Purchase Price, such issuance shall be deemed to have occurred for less than the Per Share Price), then, the Per Share Purchase Price shall be reduced to equal such lower price, and (i) if the adjustment occurs prior to the Closing Date, Ampal shall receive on the Closing Date such number of Shares equal to the Purchase Price divided by the Per Share Purchase Price as herein adjusted (the "<u>Adjusted Share Amount</u>") and (ii) if such adjustment occurs after the Closing Date but prior to the Adjustment Termination Date, Merhav shall cause the Company to issue additional Shares to Ampal so that such Shares, together with the Shares Ampal received on the Closing Date, equal the Adjusted Share Amount.  Such adjustment shall he made whenever such Share or Share Equivalents are issued or sold.  Merhav shall notify Ampal in writing, no later than the 10 days prior to the issuance or sale of such Shares or Share Equivalents, subject to this Section, indicating therein the applicable issuance price, or of applicable reset price, exchange price, conversion price and other pricing terms.

5

(b)     Notwithstanding the forgoing, Merhav may cause the issuance of additional Shares in the Company up to a maximum of 5% of the issued and outstanding Shares (after giving effect to any such issuances), provided that all holders of equity interests in the Company will be diluted *pro rata* with Ampal in connection with any such issuances.

2.3     Closing.

(a)     The Closing of the sale and purchase of the Ampal Shares will occur on the Qualifying Financing Date or as soon as practicable thereafter (the "Closing Date"), but no later than the Termination Date.

(b)     In addition to the conditions set forth in Section 2.1(c), Ampal's obligations to purchase the Ampal Shares hereunder is subject to the satisfaction, or waiver by Ampal, of the following conditions:

(i)     The occurrence of the Qualified Financing Date;

(ii)     From the date hereof through the Closing Date, no material adverse change has occurred to the business, properties, assets, condition (financial or otherwise) of the Project has occurred (a "Material Adverse Effect");

(iii)     There (i) shall not be in effect any Legal Requirement directing that the transactions provided for herein not be consummated as provided herein or which has the effect of rendering it impossible or illegal to consummate such transactions or (ii) there shall not be pending or threatened by any proceeding challenging or seeking to prohibit or materially limit the transactions contemplated by this Agreement or any other Transaction Document.

(iv)     Merhav's and the Company's representations and warranties made in this Agreement or any other Transaction Document shall be true and correct in all material respects as of the date hereof and as of the Closing Date as though made as of such date, except to the extent such representations and warranties expressly relate to a specified date (in which case such representations and warranties shall be true and correct on and as of such specified date).   Merhav shall have complied with all covenants required to be performed before the Closing Date.

## ARTICLE III

## MERHAV'S REPRESENTATIONS AND WARRANTIES

Merhav hereby represents and warrants to Ampal on the date hereof:

3.1     Existence; Authority; Enforceability.   Merhav is a company duly organized and validly existing under the laws of Israel.   The Company is a company duly organized and validly existing under the laws of Cyprus.   Each of Merhav and the Company has the requisite power and authority to enter into each Transaction Document to which it is a party and to perform its respective obligations thereunder.   The execution, delivery and performance by each of Merhav

6

and the Company of each Transaction Document to which it will be a party and the consummation by it of the transactions contemplated hereby and thereby have been (or when required to be delivered will be) duly authorized and approved by all corporate action of Merhav or the Company, as the case may be. Each of Merhav and the Company has duly and validly executed and delivered each Transaction Document to which it is a party, and each such Transaction Document constitutes (or when delivered shall constitute) its legal, valid and binding obligation, enforceable against Merhav or the Company, as the case may be, in accordance with its terms.

     3.2    <u>Interests in the Project</u>. (a) Merhav currently owns 100% of the outstanding equity interests in the Company. All of the issued and outstanding interests in the Company have been duly authorized, validly issued and are be fully paid, nonassessable, free of preemptive rights, with no personal liability attaching to the ownership thereof. There are no outstanding securities convertible into, exchangeable for, or carrying the right to acquire, any interest in the Company, or subscriptions, warrants, options, calls, rights (pre-emptive or other) or other arrangements or commitments obligating any person to issue or dispose of any of its capital stock or any ownership interest therein. When issued, the Ampal Shares shall be duly authorized, validly issued, fully paid, each assessable free of any preemptive right, with no liability attaching to the ownership thereof, and delivered to Ampal free and clean of any liens, other than an Agreement with Riagro S.A., pursuant to which Riagro shall be entitled to up to a 2.5% equity interest in the Project, coming from Merhav's holdings in the Project.

     3.3    <u>Absence of Conflicts</u>. The execution and delivery by each of Merhav and the Company of the Transaction Documents to which it is a party and the performance of its respective obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby does not and will not conflict with, or result in the breach of any provision of, the Charter Documents of Merhav or the Company, as the case may be, or any Contract or violate any Legal Requirement applicable to Merhav or the Company, as the case may be.

     3.4    <u>Compliance With Law; Consents</u>. No Consent is required to be made or obtained by Merhav or the Company in connection with (i) the execution, delivery or performance of the Transaction Documents to be entered into by Merhav or the Company or (ii) the consummation of any of the transactions contemplated by the Transaction Documents. To the best of Merhav's knowledge, each of Merhav, the Company and the Project are in compliance in all material respects with all applicable Legal Requirements, except where such failure would not have or could not reasonably by expected to have a Material Adverse Effect on Merhav, the Company, or the Project or Merhav's or the Company's ability to consummate the transactions contemplated by, and perform its obligations, under the Transaction Documents.

     3.5    <u>Litigation</u>. There is no (a) litigation pending on behalf of or against or, to the best knowledge of Merhav, material litigation threatened in writing on behalf of or against the Company, Merhav or the Project or any of their properties, rights or assets (including cease and desist letters or requests for a license) or (b) litigation which questions or challenges (i) the validity of this Agreement or any Transaction Document or (ii) any action taken or to be taken by Merhav or the Company pursuant to this Agreement or any Transaction Document or in connection with the transactions contemplated hereby or thereby.

7

3.6     Fees.  Neither Merhav nor any of its Affiliates has paid or become obligated to pay any fee or commission to any broker, finder or intermediary in connection with the transactions contemplated hereby.

3.7     Disclosure.  Merhav has provided to Ampal all documents and information (i) in Merhav's or any of its Affiliate's possession relating to the Project, and (ii) that is reasonably material in connection with its decision to exercise the Option. No representation or warranty by Merhav contained in this Agreement or any other Transaction Document and no information contained in any other instrument furnished or to be furnished to Ampal pursuant hereto or in connection with the transaction contemplated by this Agreement or any other Transaction Document contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained herein or therein not misleading.  Merhav is not aware of any facts or circumstances which would cause the representations and warranties of Merhav contained in this Agreement or any other Transaction Documents to be untrue or incorrect.  To the knowledge of Merhav, after due inquiry, there is no fact, circumstance or condition which has had or could reasonably be expected to have a Material Adverse Effect on Merhav or the Project, which has not been disclosed to Ampal or its representatives.

## ARTICLE IV

## COVENANTS

4.1     Due Diligence.  In addition, Merhav hereby agrees to promptly deliver to Ampal (x) any new material information with respect to the Project in its possession or control and (y) any reports, models, projections or other information provided to any other person or entity.

4.2     Further Assurances.  Subject to the terms and conditions herein, each of the Parties agrees to take, or use reasonable commercial efforts in order to cause to be taken, all Necessary Actions and to do, or use reasonable commercial efforts in order to cause to be done, all things necessary, proper or advisable under all applicable Legal Requirements to consummate and make effective the transactions contemplated by the Transaction Documents to which it is a party.

4.3     Amendment of Promissory Note.  The Promissory Note is hereby deemed amended to extend the maturity date to the earlier of (i)December 31, 2010 and (ii) the Qualified Financing Date.

4.4     Loan to the Company.  (a) Merhav and Ampal hereby agree that if they mutually determine that the Company needs additional funds for the continued development and operation of the Project, that, unless otherwise agreed, they shall each make a loan to the Company on identical  terms, which shall include, but not be limited to the following

        (i)     an original principal amount of up to $15,000,000;

        (ii)    an interest rate equal Ampal's interest cost for funding such loan;

8

(iii)    convertible into Shares of the Company at a conversion price equal to the Per Share Purchase Price; provided, however, the Merhav Loan shall not be so convertible so long as Merhav or any of its Affiliates (other than Ampal or its designee) remain the lender under such Merhav Loan; and

(iv)    such loans will to be subordinated in right of payment to any third-party financing for the Project.

(b)    Until the first anniversary of any loan extended to the Company (or its subsidiaries or Affiliates in connection with the Project) by Merhav in accordance with Section 4.4(a) (the "Merhav Loan"), Ampal shall have the right to purchase the Merhav Loan from Merhav for a purchase price equal to all the outstanding principal, interest and other amounts due under the loan, without premium.

4.5    Reporting Requirements. (a)    Merhav shall, or shall cause the Company to, provide Ampal, from time to time, with such information respecting the financial condition and operations of the Project, the Company and its subsidiaries as Ampal may reasonably request, including, without limitation,

(i)    any and all information that would be required for Ampal to comply with law, including, United States federal and state securities laws, and Israeli securities laws;

(ii)    requirements of NASDAQ and the Tel Aviv Stock Exchange, or any other stock exchange on which Ampal shares may be listed;

(iii)    as soon as available and in any event within 21 days after the end of each of the first three quarters of each fiscal year of the Company, a consolidated balance sheet of the Company and its consolidated subsidiaries as of the end of such quarter and a consolidated statement of income and cash flows of the Company and its consolidated subsidiaries for the period commencing at the end of the previous fiscal year and ending with the end of such quarter, setting forth in each case in comparative form the corresponding figures as of the corresponding date and for the corresponding period of the preceding fiscal year, all in reasonable detail; and certified by the principal financial officer of the Company, subject, however, to year-end auditing adjustments; and

(iv)    as soon as available and in any event within 40 days after the end of each fiscal year of the Company, a consolidated balance sheet of the Company and its consolidated subsidiaries as of the end of such fiscal year and the related consolidated statements of income and cash flows of the Company and its consolidated subsidiaries for such fiscal year setting forth in each case in comparative form the corresponding figures as of the close of and for the preceding fiscal year, all in reasonable detail and, if requested by Ampal, audited by an internationally recognized accounting firm reasonably acceptable to Ampal.

4.6    Organizational Documents. Prior to the Closing Date, Merhav shall cause the Company to make such changes to the Company's organizational documents as Ampal reasonably requests, to reflect the agreements set forth in the Shareholder's Agreement.

## ARTICLE V

## INDEMNITY SURVIVAL

5.1    Survival. Each representation and warranty in this Agreement shall survive for a period of two years after the date hereof, provided that (i) the representation set forth in Section 3.1 and 3.2 shall survive indefinitely and (ii) the survival periods set forth in this Section 5.1 shall not apply to any claims involving fraud or bad faith on the part of any Party hereto.

5.2    Indemnification. Merhav shall indemnify Ampal, its Affiliates and each of their respective officers, directors, employees, stockholders, agents and representatives (collectively, each an "Indemnified Party") against and hold them harmless from each and any and all actions, suits, proceedings, claims, liabilities, losses, charges, damages, costs and reasonable expenses (including reasonable fees and expenses of counsel) (collectively, "Losses") suffered or incurred by any such Indemnified Party arising from, in connection with, relating to or otherwise in respect of (i) any breach of, or any inaccuracy in, any representation or warranty made by Merhav in Article III of this Agreement, or Merhav or the Company in any other Transaction Document or in any certificate delivered by Merhav or any of it Affiliates pursuant hereto, in each case disregarding all qualifications and exceptions contained therein relating to materiality or material adverse effect or like words, solely for the purpose of determining the Losses suffered by the relevant Ampal Indemnity, or; (ii) any breach of any covenant of Merhav or the Company in this Agreement or any other Transaction Document.

5.3    Procedures Relating to Indemnification. (a) In order for any Indemnified Party specified in Section 5.2 to make a claim for any indemnification as provided for under Section 5.2 in respect of, arising out of or involving a claim or demand made by any person against the Indemnified Party (a "Third-Party Claim"), such Indemnified Party must notify the indemnifying party (the "Indemnifying Party") in writing, and in reasonable detail, of the Third-Party Claim within twenty Business Days after receipt by such Indemnified Party of written notice of the Third-Party Claim; provided, however, that failure to give such notification shall not affect the indemnification provided hereunder except to the extent the Indemnifying Party shall have been prejudiced as a result of such failure. Thereafter, the Indemnified Party shall deliver to the Indemnifying Party, within five Business Days after the Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Party relating to the Third-Party Claim; provided, however, that failure to give such notification shall not affect the indemnification provided hereunder except to the extent the Indemnifying Party shall have been prejudiced as a result of such failure.

(b)    If a Third-Party Claim is made against an Indemnified Party, the Indemnifying Party shall be entitled to participate in the defense thereof and, if it so chooses and acknowledges its obligation to indemnify the Indemnified Party therefor, to assume the defense thereof with counsel selected by the Indemnifying Party; provided that such counsel is not objected to by the Indemnified Party in its reasonable discretion. Should the Indemnifying Party

10

so elect to assume the defense of a Third-Party Claim, the Indemnifying Party shall not be liable to the Indemnified Party for legal expenses subsequently incurred by the Indemnified Party in connection with the defense thereof (except in the case of a conflict of interest, as described below). If the Indemnifying Party assumes such defense, the Indemnified Party shall have the right to participate in the defense thereof and to employ counsel, at its own expense, separate from the counsel employed by the Indemnifying Party, it being understood that the Indemnifying Party shall control such defense (except that if, in the reasonable judgment of the Indemnifying Party's counsel, a conflict of interest exists between the Indemnifying Party and the Indemnified Party, the Indemnified Party may employ its own counsel, separate from the counsel employed by the Indemnifying Party, and may control its defense to the extent deemed necessary by the Indemnified Party). The Indemnifying Party shall be liable for the fees and expenses of counsel employed by the Indemnified Party for any period during which the Indemnifying Party is not assuming the defense thereof or during a conflict of interest (as described above).

(c)        If the Indemnifying Party so elects to assume the defense of any Third-Party Claim, all of the Indemnified Parties shall cooperate with the Indemnifying Party in the defense or prosecution thereof. In any event, the Indemnified Party and its counsel shall cooperate with the Indemnifying Party and its counsel and shall not assert any position in any proceeding inconsistent with that asserted by the Indemnifying Party; provided, however, that the foregoing shall not prevent the Indemnified Party from taking the position that it is entitled to indemnification hereunder. All reasonable out-of-pocket costs and expenses incurred in connection with an Indemnified Party's cooperation shall be borne by the Indemnifying Party. Such cooperation shall include the retention and (upon the Indemnifying Party's request) the provision to the Indemnifying Party of records and information which are relevant to such Third-Party Claim, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Whether or not the Indemnifying Party shall have assumed the defense of a Third-Party Claim, the Indemnified Party shall not admit any liability with respect to, or settle, compromise or discharge, such Third-Party Claim without the Indemnifying Party's prior written consent. If the Indemnifying Party shall have assumed the defense of a Third-Party Claim, the Indemnified Party shall agree to any settlement, compromise or discharge of a Third-Party Claim which the Indemnifying Party may recommend and which by its terms releases the Indemnifying Party completely in connection with such Third-Party Claim and which would not impose on the Indemnified Party and obligation to pay any amount or otherwise adversely affect the Indemnified Party or require any relief other than monetary damages (provided, however, that the Indemnified Party shall not be required to consent to any settlement, compromise or discharge which would require payments by the Indemnified Party in connection with such Third Party Claim).

(d)        Notwithstanding the foregoing, the Indemnifying Party shall not be entitled to assume the defense of any Third-Party Claim (and shall be liable for the fees and expenses of counsel incurred by the Indemnified Party in defending such Third-Party Claim) if the Third-Party Claim seeks an order, injunction or other equitable relief or relief for other than money damages against the Indemnified Party. The indemnification required by Section 5.2 shall be made only after final judgment which can not be further appealed. All claims under Section 5.2 other than Third-Party Claims shall be governed by Section 54.

11

(e) The indemnification provisions of this Article V (i) shall apply without regard to, and shall not be subject to, any limitation by reason of set-off, limitation or otherwise and (ii) are intended to be comprehensive and not to be limited by any requirements of law concerning prominence of language or waiver of any legal right under any law (including, without limitation, rights under any workers compensation statute or similar statute conferring immunity from suit).

5.4    Other Claims.  In the event any Indemnified Party should have a claim against any Indemnifying Party under Section 5.2 that does not involve a Third-Party Claim being asserted against or sought to be collected from such Indemnified Party, the Indemnified Party shall deliver notice of such claim to the Indemnifying Party with reasonable promptness.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any liability which it may have to such Indemnified Party under Section 5.2, except to the extent that the Indemnifying Party has been prejudiced as a result of such failure.  If the Indemnifying Party does not notify the Indemnified Party within 20 Business Days following its receipt of such notice that the Indemnifying Party disputes its liability to the Indemnified Party under Section 5.2, such claim specified by the Indemnified Party in such notice shall be conclusively deemed a liability of the Indemnifying Party under Section 5.2 and the Indemnifying Party shall pay the amount of such liability to the Indemnified Party on demand or, in the case of any notice in which the amount of the Loss (or any portion thereof) is estimated, on such later date when the amount of such Loss (or such portion thereof) becomes finally determined.  If the Indemnifying Party has timely disputed its liability with respect to such claim, as provided above, the Indemnifying Party and the Indemnified Party shall resolve such dispute as follows: (i) first, the parties shall negotiate in good faith for a period of up to 15 Business Days to resolve such dispute, then (ii) if the Indemnifying Party and the Indemnified Party are unable to reach an agreement, they shall resolve such dispute in accordance with Section 6.2.

5.5    Indemnification Limitations.  (a) Notwithstanding anything to the contrary herein, the indemnification undertakings of Purchaser in this Article V shall be subject to the following limitations: (i) Seller shall not be required to make any indemnification payment hereunder until such time as the Loss suffered by the Purchaser Indemnities exceeds $1,000,000 in the aggregate, in which case the Purchaser Indemnitees shall be entitled to indemnification for the full amount of such Losses, including those up to the $1,000,000 threshold and (ii) in any event, Merhav shall not be under the obligation to make any indemnification payment hereunder in excess, in the aggregate, of the Purchase Price.

## ARTICLE VI

## MISCELLANEOUS

6.1    Governing Law.  This Agreement shall be governed in all respects, including validity, interpretation and effect, by the internal laws of the State of New York without regard to its conflict of law principles (other than Section 5-1401 of the New York General Obligation Law).

C060741/0213231/1563174.5

6.2    Arbitration. . All disputes between the parties hereto arising under the terms of this Agreement or any other Transaction Documents shall be arbitrated in New York City under the rules of the American Arbitration Association then obtaining in the City of New York judgment on any award made by the arbitrators hereunder may be rendered in any court having jurisdiction.

6.3    Severability. Each Section, subsection and clause of this Agreement and each other Transaction Documents constitutes a separate and distinct undertaking, covenant and provision hereof. In the event that any provision of this Agreement or any other Transaction Document shall finally be determined to be unlawful, such provision shall be deemed severed from this Agreement or such Transaction Document, but every other provision of this Agreement or such Transaction Document shall remain in full force and effect.

6.4    Interpretation. Whenever used in this Agreement, except as otherwise expressly provided or unless the context otherwise requires, any noun or pronoun shall be deemed to include the plural as well as the singular and to cover all genders. Unless otherwise specified, words such as "herein", "hereof", "hereby", "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular Section or subsection of this Agreement, and references herein to "Articles" or "Sections" refer to Articles or Sections of this Agreement. The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

6.5    Costs and Expenses. Each Party shall bear its own expenses incurred in connection with the negotiation, preparation, execution and closing of this Agreement and each other Transaction Document and the transactions provided for hereby and thereby.

6.6    Notices. All notices or other communications required or permitted by this Agreement or any other Transaction Document shall be effective upon receipt and shall be in writing and delivered personally or by overnight courier, or sent by facsimile (with confirmation copies delivered personally or by courier within three (3) Business Days), as follows:

If to Merhav, to:

Merhav (m.n.f) Ltd
33 Havatzelet Hasharon Street
Herzlia, Israel
Attention: Mr. Yossef Maiman and Mr. Leo Malamud
Facsimile:+972-9-9501733

If to Ampal, to:

Ampal-American Israel Corporation
10 Abba Avan St.
Ackerstein Tower C, 9th Floor
P. O. Box 12215
Herzlya 46733 Israel

13

C060741/021323I/1563174.5

Attention: Yoram Firon
Facsimile:+972-9-952-6001

with copies to:

Bryan Cave LLP
1290 Avenue of the Americas
New York, NY, USA 10019
Attention: Kenneth Henderson, Esq.
Facsimile: (212) 541-1357

or to such other address as hereafter shall be furnished as provided in this Section 6.6 by any Party to any other Party. Any demand, notice or other communication given by personal delivery shall be conclusively deemed to have been given on the day of actual delivery thereof and, if given by facsimile, on the day of transmittal thereof if given during the normal business hours of the recipient, and on the Business Day during which such normal business hours next occur if not given during such hours on any day.

6.7    Counterparts. This Agreement and each other Transaction Document may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute a single instrument.

6.8    Entire Agreement. This Agreement together with the other Transaction Documents set forth the entire understanding and agreement between the Parties as to the matters covered herein and therein and supersede and replace any prior understanding, agreement or statement of intent, in each case, written or oral, of any and every nature with respect thereto. In the event of any inconsistency between this Agreement and the other Transaction Documents, this Agreement shall govern as between the Parties with respect to the matters set forth herein.

6.9    No Third Party Rights; Assignment. This Agreement is intended to be solely for the benefit of the Parties and is not intended to confer any benefits upon, or create any rights in favor, of any Person other than the Parties and shall not be assignable without the prior written Consent of the other Parties. Notwithstanding any of the foregoing, Ampal may transfer its rights and interests hereunder to an Affiliate.

6.10    Waivers and Amendments. No modification of or amendment to this Agreement or any other Transaction Document shall be valid unless in writing signed by the Parties referring specifically to this Agreement or such other Transaction Document and stating the Parties' intention to modify or amend the same. Any waiver of any term or condition of this Agreement or any other Transaction Document must be in a writing signed by the Party sought to be charged with such waiver referring specifically to the term or condition to be waived, and no such waiver shall be deemed to constitute the waiver of any other breach of the same or of any other term or condition of this Agreement or any other Transaction Document.

14

IN WITNESS WHEREOF, the parties hereto have duly executed this Option Agreement as of the date first above written.

**AMPAL-AMERICAN ISRAEL CORPORATION**

By:_____

Name:

Title:

**MERHAV (M.N.F) LIMITED**

By:_____

Name:

Title:

[SIGNATURE PAGE TO OPTION EXERCISE AGREEMENT]

EXHIBIT A

PROJECT DESCRIPTION

EXHIBIT B

SHAREHOLDER'S AGREEMENT

FORM OF

AGREEMENT OF CERTAIN SHAREHOLDERS

AMONG

AMPAL-AMERICAN ISRAEL CORPORATION

MERHAV (M.N.F.) LIMITED

AND

MERHAV RENEWABLE ENERGIES LIMITED

dated as of [_____],

# TABLE OF CONTENTS

**Page(s)**

ARTICLE I DEFINITIONS.................................................................................................1

ARTICLE II TRANSFER OF SHARES ...........................................................................3
    2.1     Restriction on Transfer ..................................................................................3
    2.2     Right of First Refusal. ...................................................................................3
    2.3     Tag Along Right ............................................................................................4
    2.4     Drag Along ....................................................................................................5

ARTICLE III BOARD OF DIRECTORS; VOTING AGREEMENTS .............................5
    3.1     Designation of Directors................................................................................5

ARTICLE IV AMPAL EQUITY ADJUSTMENT ............................................................7
    4.I     Equity Adjustment.........................................................................................7

ARTICLE V PREEMPTIVE RIGHTS...............................................................................7
    5.1     Preemptive Rights..........................................................................................7

ARTICLE VI MISCELLANEOUS .....................................................................................8
    6.1     Governing Law ..............................................................................................8
    6.2     Consent to Jurisdiction .................................................................................8
    6.3     Remedies.......................................................................................................8
    6.4     Severability....................................................................................................8
    6.5     Interpretation.................................................................................................8
    6.6     Costs and Expenses .......................................................................................9
    6.7     Notices ...........................................................................................................9
    6.8     Counterparts...................................................................................................9
    6.9     Entire Agreement.........................................................................................10
    6.I0    No Third Party Rights; Assignment ...........................................................10
    6.I1    Waivers and Amendments ...........................................................................10

C060741/0213231/1563237.3

## AGREEMENT OF CERTAIN SHAREHOLDERS

AGREEMENT OF CERTAIN SHAREHOLDERS (this "Agreement"), dated as of [_____], between Merhav (m.n.f) Limited, a company organized under the laws of the State of Israel ("Merhav), and Ampal-American Israel Corporation, a New York corporation ("Ampal") and Merhav Renewable Energies Limited, a corporation organized under the laws of Cyprus (the "Company") (each, a "Party" and, collectively, the "Parties," and together with any other person that becomes party hereto (other than the Company), the "Shareholders").

## RECITALS

WHEREAS, Ampal has acquired _____ shares (together with any Shares subsequently acquired by Ampal or any of its Affiliates the "Ampal Shares") of the Company's _____ (the "Shares") pursuant to the Option Exercise Agreement, dated as of December ___, 2009, between Ampal and Merhav (the "Exercise Agreement"), such Shares representing [__]% of the issued and outstanding equity interests of the Company;

WHEREAS, as of the date hereof, Merhav owns [_____] Shares (together with any Shares subsequently acquired by Merhav or any of its Affiliates), such shares representing [__]% of the issued and outstanding equity interest of the Company (the "Merhav Shares"); and

WHEREAS, as a condition to Ampal's exercise of the Option (as defined in the Exercise Agreement) and purchase of the Ampal Shares pursuant to the Exercise Agreement, Merhav has agreed, to enter into this Agreement setting forth the Agreement of the parties with respect to certain matters relating to the Company.

NOW, THEREFORE, in consideration of the aforesaid premises and of the mutual representations, warranties and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Shareholders hereby agree as follows:

## ARTICLE I

## DEFINITIONS

The following terms shall have the following meanings for purposes of this Agreement:

"Affiliate" means (i) with respect to any Person, a Person that controls, is controlled by, or is under common control with such Person (it being understood, that a Person shall be deemed to "control" another Person, for purposes of this definition, if such Person directly or indirectly has the power to direct or cause the direction of the management and policies of such other Person, whether through holding ownership interests in such other Person, through agreements or otherwise); and (ii) with respect to any natural Person, (1) any parent, grandparent, sibling, child or spouse of such natural Person, or other Person related by marriage to any such Persons, (2) any trust established for the benefit of such natural Person or any Affiliate of such natural Person or (3) any executor or administrator of the estate of such natural Person.

"Agreement" has the meaning set forth in the Preamble.

"Ampal" has the meaning set forth in the Preamble.

"Ampal Directors" has the meaning set forth in Section 3.1.

"Ampal Shares" has the meaning set forth in the Recitals.

"Board of Directors" has the meaning set forth in Section 3.1.

"Company Organizational Documents" means [insert appropriate charter and other organizational documents of the Company]

"Shares" has the meaning set forth in the Recitals.

"Exercise Agreement" has the meaning set forth in the Recitals.

"Exercise Notice" has the meaning set forth in Section 2.2(b).

"Exercise Period" has the meaning set forth in Section 2.2(b).

"Lien" means any mortgage, pledge, hypothecation, charge, assignment, deposit arrangement, encumbrance, security interest, lien, fiduciary assignment and any security or similar agreement of any kind or nature whatsoever.

"Merhav Shares" has the meaning set forth in the Recitals.

"Merhav" has the meaning set forth in the Preamble.

"Offer" has the meaning set forth in Section 2.2(a).

"Offer Notice" has the meaning set forth in Section 2.2(a).

"Parties" has the meaning set forth in the Preamble.

"Party" has the meaning set forth in the Preamble.

"Person" means an individual, corporation, partnership, trust, limited liability company, a branch of any legal entity, unincorporated organization, joint stock company, joint venture, association or other entity, or any government, or any agency or political subdivision thereof.

"Shareholders" has the meaning set forth in the Preamble.

"Transfer" means, whether voluntary or involuntary, any direct or indirect (including transfer of interest in parent entities) transfer, assignment (including any fiduciary assignment), conveyance, sale, pledge or hypothecation.

"Transferee" has the meaning set forth in Section 2.1(a).

2

## ARTICLE II

## TRANSFER OF SHARES

2.1    <u>Restriction on Transfer</u>

(a)    Neither Shareholder may Transfer any of their Shares in the Company to any third party (a "<u>Transferee</u>") directly or indirectly, in whole or in part, other than as follows:

(i)    a Shareholder (the "<u>Trnasferring Shareholder</u>" may, or may cause an Affiliate to, Transfer the Shares to an Affiliate. If a Transferring Shareholder transfers all of its Shares to an Affiliate, such Affiliate shall be substituted for such Transferring Shareholder as a party hereto and shall have all the rights and obligations of such Transferring Shareholder. If such Transferring Shareholder transfers less than all of the its Shares to one or more Affiliates, then such Affiliates (x) shall vote such Shares held by them in the same manner as such Transferring Shareholder is required to vote pursuant to this Agreement; and (y) all such Shares held by such Affiliates shall be treated as being owned by such Transferring Shareholder for purposes of Sections 2.2, 2.3 and 2.4.

(ii)    the Transferring Shareholder may, or may cause an Affiliate, to Transfer all, but not less than all, of its (and its Affiliates) Shares to an unrelated third party at any time, provided that such Transferring Shareholder or its Affiliate have complied with Sections 2.2, 2.3 or 2.4, as applicable.

(b)    Any attempted or purported Transfer of any Shares in violation of the terms of this Agreement shall be null and void and the Company shall reject and refuse to transfer on its books any Shares which may have been transferred (or sought to be transferred) in violation of the provisions of this Agreement, and it shall not recognize any such transferee holding such Shares as a shareholder, nor shall any such person acquire any rights as a shareholder of the Company.

(c)    As a condition to the consummation of any Transfer to a Transferee, a Transferring Shareholder shall cause such Transferee to sign a counterpart to this Agreement and agree to be bound by the same terms to which such Transferring Shareholder is bound under this Agreement.

2.2    <u>Right of First Refusal.</u>

(a)    If at any time after the date hereof a Shareholder (the "<u>Offering Shareholder</u>") desires to Transfer some or all of its Shares (or cause the sale of Company) and the Offering Shareholder shall have obtained a bona fide written offer from an unrelated third-party proposed Transferee (an "<u>Offer</u>"), the Offering Shareholder shall promptly deliver to the other Shareholder (the "<u>Other Shareholder</u>") a written notice (an "<u>Offer Notice</u>"), enclosing a copy of the Offer and offering to sell to such Other Shareholders all or such portion of the Shares being offered thereby on the same terms and conditions as set forth in the Offer, except that if the Offer is for stock consideration of the Transferee or other Person, such Other Shareholders may

3

purchase such Shares for a price in cash representing the fair market value of such stock consideration as determined by the Board of Directors on a reasonable basis in good faith.

(b)     At any time during the 30-day period following the giving of an Offer Notice (an "Exercise Period"), the Other Shareholder shall have the right to deliver to the Offering Shareholder written notice (an "Exercise Notice") exercising its right to purchase the Shares being offered in such Offer Notice.

(c)     If the Other Shareholder timely delivers an Exercise Notice, then the Other Shareholder shall be bound to purchase and the Offering Shareholder shall be bound to sell the Shares specified in the Offer in accordance with this Section 2.2.

(d)     Any purchase by the Other Shareholder pursuant to this Section 2.2 shall be for the purchase price and on the terms and conditions set forth in the related Offer, and the closing thereof shall be take place no later than 30 days after the delivery of the Exercise Notice. At such closing, the Other Shareholder shall deliver the applicable purchase price against receipt of all necessary documents and instruments to evidence the transfer of beneficial and legal title to the Shares being purchased by the Other Shareholder. The Offering Shareholder shall have been deemed to represent and warrant to the Other Shareholder that such Shares are free and clear of any Liens.

(e)     In the event that the Other Shareholder does not elect to purchase the Merhav Shares set forth in the Offer pursuant to the provisions of this Section 2.2, then Merhav shall, subject to Section 2.3 hereof, have the right to consummate the Transfer of Shares in accordance with the terms of such Offer during the 90-day period following the expiration of the 60-day period following the delivery of the Notice relating to such Offer, provided that such Shares being offered shall, following such Transfer, continue to be subject to all of the provisions of this Agreement.

2.3     Tag Along Right

(a)     In the event that the Other Shareholder does not exercise its right pursuant to Section 2.2 hereof to purchase Shares subject to an Offer pursuant to Section 2.2 for which an Offering Shareholder has received an Offer from a proposed Transferee, then such Shareholder may exercise, during the Exercise Period related to such Offer, a right to sell a portion of its shares in such Offer to such Transferee on the same terms and conditions as set forth in such Offer, up to an amount of such number of shares equal to the product of (A) the number of Shares subject to the Offer and (B) a fraction, the numerator of which is the number of Shares held by the Other Shareholder and the denominator of which is the sum of the Ampal Shares and the Merhav Shares. The number of shares to be sold by the Offering Shareholder to such Transferee shall be reduced by the number of shares to be sold by the Other Shareholder hereunder.

(b)     Any election to sell made by the Other Shareholder hereunder shall be made by written notice to the Offering Shareholder during the Exercise Period.

(c)     Any Transfer by the Other Shareholder pursuant to this Section 2.3 shall be for the purchase price and on the terms and conditions set forth in the related Offer, and the closing thereof shall be concurrent with the Transfer by the Offering Shareholder.

4

(d)     In the event that the Other Shareholder does not elect to sell pursuant to this Section 2.3, then the Offering Shareholder shall, subject to Section 2.2 hereof, have the right to consummate the Transfer of Shares in accordance with the terms of the Offer during the 90-day period following the expiration of the 60-day period following the delivery of the Offer Notice relating to such Offer, provided that such Shares being offered shall, following such Transfer, continue to be subject to all of the provisions of this Agreement.

2.4     <u>Drag Along</u>.  Subject to the rights of the Shareholder set forth in Section 2.2, in the event Merhav desires to cause a sale of the Company to any unrelated third party after having received a bona fide written offer but which is structured as a sale of the Interests of the equity interests in the Company (a "<u>Drag Along Sale</u>"), each Shareholder, (i) will consent to and raise no objections against a Drag-Along Sale or the process pursuant to which the Drag-Along Sale was arranged and (ii) agrees to sell his, her or its Interest on the terms and conditions of the Drag-Along Sale, provided that the terms of the Sale shall be identical for all Shareholders. Notwithstanding the foregoing, no such sale of the Company or Transfer of Merhav Shares shall be permitted without the consent of Ampal unless the amount received by Ampal shall result in Ampal having received an annual rate of return on its investment in the Company of at least 12%.

## ARTICLE III

## BOARD OF DIRECTORS; VOTING AGREEMENTS

3.1     <u>Designation of Directors</u>.

(a)     The Shareholders agree that they shall, at all times and from time to time if lawfully permitted to do so, vote their Shares (or otherwise elect or designate members of the board  (the "<u>Board of Directors</u>")of directors (or other equivalent body of the Company) so that the Board of Directors shall consist of at least 25% of directors whom shall be designated by Ampal (each an "<u>Ampal Director</u>") and the remaining directors shall be elected by a majority vote of the Shareholders.  The initial Ampal Directors shall be _____.  The shareholders and the Company acknowledge and agree that such persons have already been appointed to, and serve on, the Board of Directors and that no further action is required by any Person to effectuate such appointments. No Ampal Director may be removed by the Shareholders without the prior written consent of Ampal.

(b)     Except with respect to (x) Major Decisions which shall require the approval of [80%] of Board, which shall include the Ampal Directors, the Board of Directors, either through its actions or through the actions of officers duly appointed by the Board of Directors and acting in accordance with the Company Organizational Documents, shall, among other things, have the full, exclusive and absolute discretion, right, power and authority to manage and control the Company, in accordance with applicable law.

(c)     Each of the Shareholders agrees that each member of the Board of Directors shall have one vote with respect to all matters before the Board of Directors.  A quorum for action at a meeting shall constitute a majority of the members of the Board of Directors, but such majority must include the Ampal Directors, in person, by telephone or proxy.  Whenever a

C060741/0213231/1563237.3

vote of the Board of Directors is required, the Board of Directors shall vote in accordance with the procedures established in the Company Organizational Documents.

(d)    The Board of Directors shall meet, at mutually convenient times and places. Meetings may be held by conference telephone and may be held in person at such times and places as agreed by the members of the Board of Directors. Reasonable costs incurred by a member of the Board of Directors and associated with attending a Board of Directors' meeting in person shall be borne by the Company.

(e)    The following matters shall require the approval of a 80% of the members of the Board of Directors (or if Shareholder approval is required under the Company Organizational Documents, the vote of **[80%]** of the Shareholders), which shall include the Ampal Directors (each, a "Major Decision"):

(i)    all annual budgets of the Company;

(ii)    capital expenditures of the Company in excess of amounts previously approved in an Approved Budget;

(iii)    agreements or arrangements of any kind with affiliates or related persons of any Shareholder, including without limitation employment agreements;

(iv)    entering into of any agreement that may have a material effect on the business or operations of the Company or the Project, including any financing or refinancing of indebtedness.

(v)    any change in the purpose of the Company;

(vi)    any sale of all or substantially all of the Company's assets;

(vii)    the merger or consolidation of the Company with any other party;

(viii)    the liquidation or dissolution of the Company;

(ix)    any proposed amendment to the Company Organizational Documents;

(x)    any demand for additional capital from the Shareholders;

(xi)    any request for special distributions from the Company; or

(xii)    any issuance of additional Shares or other securities convertible into Shares, except in accordance with the terms of the Exercise Agreement.

C060741/0213231/1563237.3

## ARTICLE IV

## AMPAL EQUITY ADJUSTMENT

4.1     Equity Adjustment.  The Shareholders and the Company confirm and acknowledge Ampal's right to receive under certain circumstances additional Shares pursuant to the terms of the Exercise Agreement.  The Shareholders hereby confirm they shall vote the Shares and cause any members of the Board of Directors appointed or designated by them to take all necessary actions to cause the issuance of such shares as set forth in Article II of the Exercise Agreement.  The Company hereby agrees, as a condition to issuing any additional Shares or securities that may be convertible into Shares, to cause any recipient of such Shares or securities to become party to this Agreement and confirm and acknowledge Ampal's rights hereunder and under the Exercise Agreement.

## ARTICLE V

## PREEMPTIVE RIGHTS

5.1     Preemptive Rights.  (a)   Subject to Ampal's rights to receive additional Shares pursuant to Article IV in which case the other Shareholders shall not be entitled to receive additional Shares, so long as a Shareholder holds any Shares, such Shareholder is hereby granted a preemptive right to purchase all or any part of its pro rata share of New Securities (as hereinafter defined) which the Company may, from time to time, propose to sell and issue, at the price and on the terms applicable to such proposed sale of New Securities.  A pro rata share of New Securities for purposes of this Section 5.1 as to each such holder, shall be quotient of the number of Shares held by such Shareholder divided by the aggregate number of Shares issued and outstanding.  "New Securities" means any shares of capital stock or other equity interest of the Company, whether or not now authorized, and any rights, options, warrants or other securities exercisable for or convertible into capital stock of the Company.

(b)       If the Company proposes to issue New Securities, it shall give such Shareholder written notice of its intention, describing the type of New Securities and the price and the terms upon which the Company proposes to issue the same.  If the terms involve a unique consideration which a Shareholder is unable to deliver, the Board shall determine, in good faith and on a reasonable basis, the fair market value of such consideration and such fair market value shall be the price offered to such Shareholder, payable in cash.  A Shareholder shall have 30 days from the date such notice is given to agree to purchase all or a portion of its pro rata share of such New Securities for the price and upon the terms specified in such notice by giving written notice to the Company and stating therein the quantity of New Securities to be purchased.

(c)       After expiration of the 30-day period described in Section 6.1(b), the Company shall have 90 days to sell or enter into an agreement (pursuant to which the sale of New Securities covered thereby shall be closed) to sell the New Securities in respect of which such holders' rights were not exercised on substantially the same terms or terms more favorable to the Company than specified in the Company's notice. If the Company has not sold such New Securities in accordance with the foregoing within such 90-day period, the Company shall not

7

thereafter issue or sell any of such New Securities without first offering such securities to the Shareholders in the manner provided above.

## ARTICLE VI

## MISCELLANEOUS

6.1 <u>Governing Law</u>. This Agreement shall be governed in all respects, including validity, interpretation and effect, by the internal laws of the State of New York without regard to its conflict of law principles (other than Section 5-1401 of the New York General Obligation Law), except with respect to matters relating to Cypriot corporate law, relating to the Company's status as a Cypriot corporate law, in which case Cypriot law shall govern. [Discuss enforceability with Cypriot counsel]

6.2 <u>Consent to Jurisdiction</u>. The Parties hereby agrees that: (i) any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby may be brought in federal court in the Southern District of New York or in any New York State Court located in Manhattan; (ii) such party shall not make any venue objection with respect to any action commenced in any such court; (iii) such party may be served by registered or certified U.S. mail, return receipt requested, addressed as provided in Section 6.7 hereof; and (iv) such party irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

6.3 <u>Remedies</u>. It is expressly understood that the equitable remedies of specific performance and injunction shall be available for the enforcement of the covenants and agreements herein, and that the availability of these equitable remedies shall not be deemed to limit any other right or remedy to which any party to this Agreement would otherwise be entitled.

6.4 <u>Severability</u>. Each Section, subsection and clause of this Agreement constitutes a separate and distinct undertaking, covenant or provision hereof. In the event that any provision of this Agreement shall finally be determined to be unlawful, such provision shall be deemed severed from this Agreement, but every other provision of this Agreement shall remain in full force and effect.

6.5 <u>Interpretation</u>. Whenever used in this Agreement, except as otherwise expressly provided or unless the context otherwise requires, any noun or pronoun shall be deemed to include the plural as well as the singular and to cover all genders. Unless otherwise specified, words such as "herein", "hereof", "hereby", "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular Section or subsection of this Agreement, and references herein to "Articles" or "Sections" refer to Articles or Sections of this Agreement. The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement.

8

6.6    <u>Costs and Expenses</u>. Each party shall bear its own expenses incurred in connection with the negotiation, preparation, execution and closing of this Agreement and the transactions provided for hereby.

6.7    <u>Notices</u>. All notices or other communications required or permitted by this Agreement or any other Transaction Document shall be effective upon receipt and shall be in writing and delivered personally or by overnight courier, or sent by facsimile (with confirmation copies delivered personally or by courier within three (3) business days), as follows:

If to Merhav, to:

> Merhav (m.n.f) Ltd.
> 33 Havatzelet Hasharon Street
> Herzlia, Israel
> Attention: Mr. Yossef Maiman and Mr. Leo Malamud
> Facsimile:+972-9-9501733

If to Ampal, to:

> Ampal-American Israel Corporation
> 10 Abba Avan St.
> Ackerstein Tower C, 9th Floor
> P. O. Box 12215
> Herzlya 46733 Israel
> Attention: Yoram Firon
> Facsimile:+972-9-952-6001

with copies to:

> Bryan Cave LLP
> 1290 Avenue of the Americas
> New York, NY, USA 10019
> Attention: Kenneth Henderson, Esq.
> Facsimile: (212) 541-1357

or to such other address as hereafter shall be furnished as provided in this Section 4.7 by any Party to any other Party. If notice is to be given to another Shareholder, such notice shall be sent to the address on the counterpart signature page pursuant to which such Shareholder became party to this Agreement. Any demand, notice or other communication given by personal delivery shall be conclusively deemed to have been given on the day of actual delivery thereof and, if given by facsimile, on the day of transmittal thereof if given during the normal business hours of the recipient, and on the business day during which such normal business hours next occur if not given during such hours on any day.

6.8    <u>Counterparts</u>. This Agreement and may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute a single instrument.

C060741/0213231/1563237.3

6.9    Entire Agreement.  This Agreement sets forth the entire understanding and agreement between the Parties as to the matters covered herein and therein and supersede and replace any prior understanding, agreement or statement of intent, in each case, written or oral, of any and every nature with respect thereto.

6.10    No Third Party Rights; Assignment.  Notwithstanding anything to the contrary contained herein, this Agreement is intended to be solely for the benefit of the Parties and is not intended to confer any benefits upon, or create any rights in favor, of any person other than the Parties and shall not be assignable without the prior written consent of the other Party.

6.11    Waivers and Amendments.  No modification of or amendment to this Agreement shall be valid unless in a writing signed by the Parties referring specifically to this Agreement and stating the Parties' intention to modify or amend the same.  Any waiver of any term or condition of this Agreement must be in a writing signed by the Party sought to be charged with such waiver referring specifically to the term or condition to be waived, and no such waiver shall be deemed to constitute the waiver of any other breach of the same or of any other term or condition of this Agreement.

[SIGNATURES ARE ON THE FOLLOWING PAGE]

10

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement of Certain Shareholders as of the date first above written.

**AMPAL-AMERICAN ISRAEL CORPORATION**

By:_____

Name:

Title:


**MERHAV (M.N.F) LIMITED**

By:_____

Name:

Title:


**MERHAV RENEWABLE ENERGIES LIMITED**



By:_____

Name:

Title:

[SIGNATURE PAGE TO AGREEMENT OF CERTAIN SHAREHOLDERS]

COUNTERPART SIGNATURE PAGE
TO AGREEMENT OF CERTAIN SHAREHOLDERS

The undersigned hereby agrees to comply with and be bound by all the terms and provisions to which Merhav (m.n.f.) Limited, a company organized under the laws of the State of Israel ("Merhav") is bound pursuant to the Agreement of Certain Shareholders, dated as of [_____], among a Merhav, Ampal-American Israel Corporation and Merhav Renewable Energies Limited.

Name: _____

Address for Notices
_____
_____
Facsimile: (___) _____

Date:_____

[COUNTERPART SIGNATURE PAGE TO AGREEMENT OF CERTAIN SHAREHOLDERS]

FILED: NEW YORK COUNTY CLERK 09/03/2014 06:24 PM INDEX NO. 652697/2014

NYSCEF DOC. NO. 305

14-02385-smb   Doc 736-W   Filed 09/24/14   Entered 09/24/14 12:58:47   Exhibit H   Pg 16 of 22   RECEIVED NYSCEF: 09/03/2014

# EXHIBIT H

## ASSIGNMENT & ASSUMPTION AGREEMENT

This Assignment & Assumption Agreement (this "Agreement"), dated as of December 31, 2010, is by and between Ampal-American Israel Corporation, a New York corporation ("Assignor"), and Merhav-Ampal Energy Ltd., a corporation organized under the laws of Israel ("Assignee").

### WITNESSETH:

**WHEREAS,** Merhav (M.N.F.) Limited ("Merhav"), directly and through certain subsidiaries, including Merhav Renewable Energies Limited, a corporation organized under the laws of Cyprus (the "Company"), intends to develop a sugarcane ethanol-producing project in Colombia (the "Project");

**WHEREAS,** Merhav and Assignor entered into an Option Agreement, dated as of December 25, 2007 (as amended from time to time, the "Option Agreement"), pursuant to which Assignor had an option to purchase an equity interest in the Project (the "Option");

**WHEREAS,** as partial consideration for entering into and amending the original Option Agreement, Assignor loaned Merhav $20,000,000 evidenced by the Amended and Restated Promissory Note, dated December 25, 2008, by Merhav in favor of Assignor (as may be amended from time to time, the "Promissory Note");

**WHEREAS,** Merhav and Assignor entered into the Option Exercise Agreement, dated as of December 31, 2009 (as may be amended from time to time, the "Option Exercise Agreement"), pursuant to which (i) the payment date for the purchase price of the equity interest upon the exercise of the Option was delayed, (ii) certain terms of the exercise of the Option as contained in the Option Agreement were modified and (iii) Assignor extended the maturity date of the Promissory Note;

**WHEREAS,** to secure Merhav's obligations under the Promissory Note, Merhav pledged all of its right, title and interest in all of the Class A Stock, par value $1.00 per share, of Assignor then or thereafter owned by Merhav, pursuant to a Pledge Agreement, dated as of December 25, 2007 (as may be amended from time to time, the "Pledge Agreement"), between Merhav and Assignor;

**WHEREAS,** to further secure the obligations under the Promissory Note and the Pledge Agreement, Yosef Maiman delivered a Guaranty, dated as of December 25, 2008, in favor of Assignor (as may be amended from time to time, the "Guaranty"); and

**WHEREAS,** in accordance with the terms hereof, Assignor desires to assign to Assignee and Assignee has agreed to assume from Assignor, all rights and future obligations of Assignor under the Promissory Note, the Option Agreement, the Option Exercise Agreement, the Pledge Agreement, the Guaranty and any other agreement or documents relating to the Project (collectively, the "Project Documents").

NOW, THEREFORE, for 22,273,437 Dollars and other good and valuable consideration, including the provisions and covenants herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      Assignment.    Assignor hereby contributes, conveys, transfers, assigns and delivers to Assignee all of Assignor's right, title and interest in and to the Project Documents as of the date hereof.

2.      Assumption. Assignee hereby accepts the foregoing assignment and assumes and agrees to observe, perform, pay and discharge when due the terms, covenants, conditions and obligations of Assignor under the Project Documents arising after the date hereof.

3.      Effectiveness; Entire Agreement.    This Agreement shall become effective immediately upon execution by both parties.  This Agreement constitutes the entire and only agreement between the parties hereto or their affiliates relating to the subject matter hereof.  Any and all prior arrangements, representations, promises, understandings and conditions in connection with said subject matter and not expressly incorporated herein shall not be binding upon any party.

4.      Further Assurances.  Assignor and Assignee hereby agree, from time to time, at the reasonable request of the other, to execute and deliver such other instruments of conveyance, transfer or assumption and to take such other actions as the other may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

5.      Indemnity.  To the maximum extent permitted by applicable law, Assignee agrees to defend, indemnify and hold Assignor harmless with respect to any third party claims, demands, damages, liabilities, and costs and expenses (including without limitation reasonable attorneys' fees) resulting from any failure by Assignee, arising after the date hereof, to observe, perform, pay and discharge when due the terms, covenants, conditions and obligations under the Project Documents, assumed by Assignee hereunder, with any such defense to be with counsel reasonably satisfactory to Assignor.

6.      Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto.

7.      Governing Law.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

8.      Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

1618130.2\C060741\0213231

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

ASSIGNOR:

**AMPAL-AMERICAN ISRAEL CORPORATION**

By: _____
Name: Irit Eluz, Yoram Firon
Title:    CFO ,    VP

ASSIGNEE:

**MERHAV-AMPAL ENERGY LTD.**

By: _____
Name: Irit Eluz, Yoram Firon
Title:    Directors

FILED: NEW YORK COUNTY CLERK 09/03/2014 06:24 PM          INDEX NO. 652697/2014

NYSCEF DOC. NO. 155    14-02385-smb    Doc 736-W    Filed Document 1    Entered 09/24/14 12:58:47    Page 120 of 132    NYSCEF: 09/03/2014

Pg 120 of 132

# EXHIBIT I

MERHAV (M.N.F) LTD
10 Abba Even St.
Ackersten Tower C
Herzliya, Israel


Ampal-American Israel Corporation
10 Abba Even St.,
Ackersten Tower C
9th Floor
Herzliya, Israel


December 31, 2010


Re:  Amendment to Colombia Ethanol Project Option Agreement

Ladies & Gentlemen:

Reference is made to the Option Exercise Agreement, dated as of December 31, 2009 (the "Original Exercise Agreement"), between Merhav (m.n.f.) Ltd. ("Merhav") and Ampal-American Israel Corporation ("Ampal").  Capitalized terms used herein but not defined herein shall have the meanings set forth in the Original Exercise Agreement.

Merhav has informed Ampal that the Qualified Financing Date has not occurred and is unlikely to occur by December 31, 2010, which date is (i) the Termination Date under the Original Exercise Agreement and (ii) the maturity date of the $20,000,000 Amended and Restated Promissory Note, dated December 24, 2008 (as amended by the Original Exercise Agreement, the "Note").  Merhav has requested and Ampal has agreed, that the maturity date of the Note be extended to December 31, 2011, and Ampal has requested and Merhav has agreed, that the Termination Date be extended to December 31, 2011.

To carry out the agreements set forth in the preceding paragraph, Merhav and Ampal hereby agree as follows:

1.  Amendment to Original Exercise Agreement.  The Original Exercise Agreement is hereby amended as follows:

(a) The definition of "Termination Date" is amended in its entirety to read as follows:

"'Termination Date' means the earlier of (i) December 31, 2011 or (ii) the Qualified Financing Date."

(b) Section 4.3 of the Original Exercise Agreement is hereby amended to read in its entirety as follows:

"Amendment to Promissory Note: The Promissory Note is hereby deemed amended to extend the maturity date to the earlier of (i) December 31, 2011 and (ii) the Qualified Financing Date."

2. <u>Miscellaneous</u>. This Letter Agreement shall not derogate from or revise any provisions of the <u>Original Exercise Agreement</u> unless specifically stated otherwise in this Letter Agreement. Nothing expressed or referred to in this Letter Agreement will be construed to give any person or entity other than the parties to this Letter Agreement or their affiliates any legal or equitable right, remedy or claim under or with respect to this Letter Agreement or any provision of this Letter Agreement This Letter Agreement (i) shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflicts of law principles thereof, (ii) may be executed by facsimile (with the same effectiveness as if an original signed copy were delivered), (iii) may be executed in counterparts and (iv) sets forth the entire understanding of the parties with respect to the subject matter hereof.

If you are in Agreement with the forgoing please sign a copy of this letter and return it to the undersigned.

MERHAV (M.N.F)  LIMITED

By: _____

Name: Yosef A. Maiman

Title:      President


AMPAL-AMERICAN ISRAEL
  CORPORATION

By: _____

Name: Irit Eluz  ;  Yoram Firon

Title:     SVP       ;       VP

FILED: NEW YORK COUNTY CLERK 09/03/2014 06:24 PM INDEX NO. 652697/2014

NYSCEF DOC. NO. 155 RECEIVED NYSCEF: 09/03/2014

# EXHIBIT J

MERHAV (M.N.F) LTD
10 Abba Even St.
Ackersten Tower C
Herzliya, Israel

Merhav-Ampal Group Ltd
10 Abba Even St.,
Ackersten Tower C
9th Floor
Herzliya, Israel

December 8, 2011

Re:  Amendment to Colombia Ethanol Project Option Agreement

Ladies & Gentlemen:

Reference is made to the Option Exercise Agreement, dated as of December 31, 2009 (as amended by Amendment to Colombia Ethanol Option Agreement, dated December 31, 2010, the "Exercise Agreement"), between Merhav (m.n.f.) Ltd. ("Merhav") and Merhav-Ampal Group Ltd. ("MAG"), as assignee of Ampal-American Israel Corporation.  Capitalized terms used herein but not defined herein shall have the meanings set forth in the Exercise Agreement.

Merhav has informed MAG that the Qualified Financing Date has not occurred and is unlikely to occur by December 31, 2011, which date is an extension of (i) the Termination Date under the Exercise Agreement and (ii) the maturity date of the $20,000,000 Amended and Restated Promissory Note, dated December 24, 2008 (as amended by the Exercise Agreement, the "Note").  Merhav has requested and MAG has agreed, that the maturity date of the Note be extended to December 31, 2012, and MAG has requested and Merhav has agreed, that the Termination Date be extended to December 31, 2012.

To carry out the agreements set forth in the preceding paragraph, Merhav and MAG hereby agree as follows:

1.  Amendment to Exercise Agreement.  The Exercise Agreement is hereby amended as follows:

(a) The definition of "Termination Date" is amended in its entirety to read as follows:

"'Termination Date' means the earlier of (i) December 31, 2012 or (ii) the Qualified Financing Date."

(b) Section 4.3 of the Exercise Agreement is hereby amended to read in its entirety as follows:

"Amendment to Promissory Note: The Promissory Note is hereby deemed amended to extend the maturity date to the earlier of (i) December 31, 2012 and (ii) the Qualified Financing Date."

2. Miscellaneous. Nothing expressed or referred to in this Letter Agreement will be construed to give any person or entity other than the parties to this Letter Agreement or their affiliates any legal or equitable right, remedy or claim under or with respect to this Letter Agreement or any provision of this Letter Agreement. This Letter Agreement (i) shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflicts of law principles thereof, (ii) may be executed by facsimile (with the same effectiveness as if an original signed copy were delivered), (iii) may be executed in counterparts and (iv) sets forth the entire understanding of the parties with respect to the subject matter hereof.

If you are in agreement with the foregoing, please sign a copy of this letter and return it to the undersigned.

MERHAV (M.N.F) LIMITED

By: _____

Name: Yosef A Maiman
Title: Director

MERHAV AMPAL GROUP LTD.

By: _____

Name: Irt Eluz ; Yoram firon
Title: Directors

FILED: NEW YORK COUNTY CLERK 09/03/2014 06:24 PM
INDEX NO. 652697/2014

NYSCEF DOC. NO. 196
14-02385-smb Doc 736-W Filed Document 1 Entered 09/24/44 21:58:47 120 of 122 f 1
RECEIVED NYSCEF: 09/03/2014

Pg 126 of 132

# EXHIBIT K

14-02385-smb-Doc736-Filed 09/24/14 Entered 09/24/14 21:58:47 part 1
14-02385-smb-Doc736-WFiled 09/24/14 Entered 09/24/14 21:58:47 part 132 of 1
Pg 127 of 132

## MERHAV AMPAL GROUP, LIMITED

July 14, 2014

BY HAND DELIVERY

Merhav (M.N.F.) Limited
33 Havatzelet Hasharon Street
Herzlia, Israel

Attention: Yosef A. Maiman

     Re:    Notice of Default and Demand for Payment of Amended and Restated Promissory
            Note dated December 25, 2008

Dear Mr. Maiman:

As you know, Merhav Ampal Group, Limited, formerly known as Merhav-Ampal Energy
Ltd. ("MAG"), is the holder of the Amended and Restated Promissory Note dated December 25,
2008 ("the Note"), which sets forth the payment terms of a $20,000,000 loan made to Merhav
(M.N.F.) Limited ("M.N.F.") by Ampal-American Israel Corporation. As a result of extensions,
the Note was payable at the earlier of (i) December 31, 2012, or (ii) the Qualified Financing Date
as defined in the Option Exercise Agreement dated December 25, 2009. The Qualified
Financing Date did not occur, and M.N.F. did not make payment on December 31, 2012 (or at
any time since that date). Accordingly, M.N.F. is in default under the terms of the Note.

Demand for payment may have been made previously, but payment has not been
received. Accordingly, demand is hereby made for payment of the principal in the amount of
$20,000,000, plus all interest accrued, in accordance with the terms of the Note. As holder,
MAG reserves any and all rights that it may have under the Note or applicable law, including the
right to recover legal fees and other expenses in the event that you fail to make payment in
accordance with this demand.

                          Sincerely,

                          Shlomi Kelsi
                          Managing Director

FILED: NEW YORK COUNTY CLERK 09/03/2014 06:24 PM
INDEX NO. 652697/2014

NYSCEF DOC. NO. 185
RECEIVED NYSCEF: 09/03/2014

14-02385-smb Doc 736-W Filed Document 1 Entered 09/24/14 21:38:47 Pg 128 of 132

Pg 128 of 132

# EXHIBIT L

## MERHAV AMPAL GROUP, LIMITED

July 14, 2014

BY HAND DELIVERY

Yosef A. Maiman
33 Havatzelet Hasharon Street
Herzlia, Israel

      Re:     Demand for Payment Pursuant to Guaranty dated December 25, 2008

Dear Mr. Maiman:

As you know, Merhav Ampal Group, Limited, formerly known as Merhav-Ampal Energy Ltd. ("MAG"), is the holder of the Amended and Restated Promissory Note dated December 25, 2008 ("the Note"), which sets forth the payment terms of a $20,000,000 loan made to Merhav (M.N.F.) Limited ("M.N.F.) by Ampal-American Israel Corporation. You are the guarantor of the Note in accordance with the terms of the Guaranty dated December 25, 2008 ("the Guaranty").

M.N.F. is in default under the terms of the Note. Demand for payment was previously delivered to your counsel in New York on or about February 12, 2013, but payment has not been received. Accordingly, demand is again made for payment of the principal in the amount of $20,000,000, plus all interest accrued under the Note as required by the Guaranty. As holder, MAG reserves any and all rights that it may have under the Note, the Guaranty or applicable law, including the right to recover legal fees and other expenses in the event that you fail to make payment in accordance with this demand.

                         Sincerely,

                         Shlomi Kelsi
                         Managing Director

FILED: NEW YORK COUNTY CLERK 09/03/2014 06:24 PM
INDEX NO. 652697/2014
NYSCEF DOC. NO. 195
RECEIVED NYSCEF: 09/03/2014

# EXHIBIT M

**$20 Million Amended and Restated Promisory Note dated December 25, 2008**
**Between Merhav (M.N.F) Limited and Ampal-American Israel Corporation**
**Principal and Accrued Interest as of August 13, 2014**
*(in US dollars)*

| LIBOR Reset Date (a) | 30-Day LIBOR on Reset Date (b) | Premium Over LIBOR | Applicable Interest Rate (c) | Date of Interest Calculation | Monthly Opening Balance (d) | Monthly Interest | Monthly Ending Balance | Balance Applicable for Quarterly Compounding |
|---|---|---|---|---|---|---|---|---|
| 12/1/2008 | 1.91125% | 3.25% | 5.16125% | 12/25/2008 | $20,988,576 | - | $20,988,576 | n/a |
| 1/2/2009 | 0.43000% | 3.25% | 3.68000% | 1/1/2009 | $20,988,576 | $21,064 | $21,009,640 | $20,988,576 |
| 2/2/2009 | 0.43750% | 3.25% | 3.68750% | 2/1/2009 | $21,009,640 | $66,577 | $21,076,217 | $21,009,640 |
| 3/2/2009 | 0.49750% | 3.25% | 3.74750% | 3/1/2009 | $21,076,217 | $60,257 | $21,136,474 | $21,009,640 |
| 4/1/2009 | 0.49500% | 3.25% | 3.74500% | 3/31/2009 | $21,136,474 | $65,611 | $21,202,085 | $21,009,640 |
| 5/1/2009 | 0.41438% | 3.25% | 3.66438% | 4/30/2009 | $21,202,085 | $66,168 | $21,268,254 | $21,202,085 |
| 6/1/2009 | 0.32000% | 3.25% | 3.57000% | 5/31/2009 | $21,268,254 | $66,902 | $21,335,155 | $21,202,085 |
| 7/1/2009 | 0.30625% | 3.25% | 3.55625% | 6/30/2009 | $21,335,155 | $63,076 | $21,398,232 | $21,202,085 |
| 8/3/2009 | 0.27563% | 3.25% | 3.52563% | 8/2/2009 | $21,398,232 | $69,756 | $21,467,988 | $21,398,232 |
| 9/1/2009 | 0.25625% | 3.25% | 3.50625% | 8/31/2009 | $21,467,988 | $60,773 | $21,528,761 | $21,398,232 |
| 10/1/2009 | 0.24563% | 3.25% | 3.49563% | 9/30/2009 | $21,528,761 | $62,523 | $21,591,284 | $21,398,232 |
| 11/2/2009 | 0.24125% | 3.25% | 3.49125% | 11/1/2009 | $21,591,284 | $67,089 | $21,658,373 | $21,591,284 |
| 12/1/2009 | 0.23469% | 3.25% | 3.48469% | 11/30/2009 | $21,658,373 | $60,723 | $21,719,096 | $21,591,284 |
| 1/4/2010 | 0.23344% | 3.25% | 3.48344% | 1/3/2010 | $21,719,096 | $71,059 | $21,790,155 | $21,591,284 |
| 2/1/2010 | 0.22906% | 3.25% | 3.47906% | 1/31/2010 | $21,790,155 | $59,037 | $21,849,192 | $21,790,155 |
| 3/1/2010 | 0.22813% | 3.25% | 3.47813% | 2/28/2010 | $21,849,192 | $58,963 | $21,908,155 | $21,790,155 |
| 4/1/2010 | 0.24863% | 3.25% | 3.49863% | 3/31/2010 | $21,908,155 | $65,263 | $21,973,417 | $21,790,155 |
| 5/4/2010 | 0.28469% | 3.25% | 3.53469% | 5/3/2010 | $21,973,417 | $70,470 | $22,043,888 | $21,973,417 |
| 6/1/2010 | 0.35088% | 3.25% | 3.60088% | 5/31/2010 | $22,043,888 | $60,409 | $22,104,297 | $21,973,417 |
| 7/1/2010 | 0.34719% | 3.25% | 3.59719% | 6/30/2010 | $22,104,297 | $65,936 | $22,170,233 | $21,973,417 |
| 8/2/2010 | 0.30281% | 3.25% | 3.55281% | 8/1/2010 | $22,170,233 | $70,889 | $22,241,123 | $22,170,233 |
| 9/1/2010 | 0.25781% | 3.25% | 3.50781% | 8/31/2010 | $22,241,123 | $65,639 | $22,306,762 | $22,170,233 |
| 10/1/2010 | 0.25688% | 3.25% | 3.50688% | 9/30/2010 | $22,306,762 | $64,807 | $22,371,569 | $22,170,233 |
| 11/1/2010 | 0.25375% | 3.25% | 3.50375% | 10/31/2010 | $22,371,569 | $67,558 | $22,439,127 | $22,371,569 |
| 12/1/2010 | 0.26531% | 3.25% | 3.51531% | 11/30/2010 | $22,439,127 | $65,320 | $22,504,447 | $22,371,569 |
| 1/4/2011 | 0.26063% | 3.25% | 3.51063% | 1/3/2011 | $22,504,447 | $74,274 | $22,578,721 | $22,371,569 |
| 2/1/2011 | 0.26300% | 3.25% | 3.51300% | 1/31/2011 | $22,578,721 | $61,651 | $22,640,372 | $22,578,721 |
| 3/1/2011 | 0.26100% | 3.25% | 3.51100% | 2/28/2011 | $22,640,372 | $61,693 | $22,702,065 | $22,578,721 |
| 4/1/2011 | 0.24295% | 3.25% | 3.49295% | 3/31/2011 | $22,702,065 | $68,264 | $22,770,329 | $22,578,721 |
| 5/3/2011 | 0.20950% | 3.25% | 3.45950% | 5/2/2011 | $22,770,329 | $70,698 | $22,841,027 | $22,770,329 |
| 6/1/2011 | 0.19043% | 3.25% | 3.44043% | 5/31/2011 | $22,841,027 | $63,457 | $22,904,484 | $22,770,329 |
| 7/1/2011 | 0.18505% | 3.25% | 3.43505% | 6/30/2011 | $22,904,484 | $65,283 | $22,969,767 | $22,770,329 |
| 8/1/2011 | 0.19206% | 3.25% | 3.44206% | 7/31/2011 | $22,969,767 | $67,944 | $23,037,710 | $22,969,767 |
| 9/1/2011 | 0.22150% | 3.25% | 3.47150% | 8/31/2011 | $23,037,710 | $68,082 | $23,105,793 | $22,969,767 |
| 10/3/2011 | 0.24000% | 3.25% | 3.49000% | 10/2/2011 | $23,105,793 | $70,880 | $23,176,672 | $22,969,767 |
| 11/1/2011 | 0.24528% | 3.25% | 3.49528% | 10/31/2011 | $23,176,672 | $65,159 | $23,241,831 | $23,176,672 |
| 12/1/2011 | 0.27144% | 3.25% | 3.52144% | 11/30/2011 | $23,241,831 | $67,507 | $23,309,338 | $23,176,672 |
| 1/3/2012 | 0.29530% | 3.25% | 3.54530% | 1/2/2012 | $23,309,338 | $74,814 | $23,384,152 | $23,176,672 |
| 2/1/2012 | 0.26400% | 3.25% | 3.51400% | 1/31/2012 | $23,384,152 | $66,784 | $23,450,936 | $23,384,152 |
| 3/1/2012 | 0.24300% | 3.25% | 3.49300% | 2/29/2012 | $23,450,936 | $66,194 | $23,517,130 | $23,384,152 |
| 4/2/2012 | 0.24125% | 3.25% | 3.49125% | 4/1/2012 | $23,517,130 | $72,605 | $23,589,735 | $23,384,152 |
| 5/1/2012 | 0.23875% | 3.25% | 3.48875% | 4/30/2012 | $23,589,735 | $66,344 | $23,656,079 | $23,589,735 |
| 6/1/2012 | 0.23975% | 3.25% | 3.48975% | 5/31/2012 | $23,656,079 | $70,868 | $23,726,947 | $23,589,735 |
| 7/2/2012 | 0.24475% | 3.25% | 3.49475% | 7/1/2012 | $23,726,947 | $70,889 | $23,797,836 | $23,589,735 |
| 8/1/2012 | 0.24470% | 3.25% | 3.49470% | 7/31/2012 | $23,797,836 | $69,306 | $23,867,142 | $23,797,836 |
| 9/4/2012 | 0.22825% | 3.25% | 3.47825% | 9/3/2012 | $23,867,142 | $78,546 | $23,945,688 | $23,797,836 |
| 10/2/2012 | 0.21450% | 3.25% | 3.46450% | 10/1/2012 | $23,945,688 | $64,380 | $24,010,069 | $23,797,836 |
| 11/1/2012 | 0.21000% | 3.25% | 3.46000% | 10/31/2012 | $24,010,069 | $69,319 | $24,079,388 | $24,010,069 |
| 12/3/2012 | 0.21500% | 3.25% | 3.46500% | 12/2/2012 | $24,079,388 | $73,844 | $24,153,232 | $24,010,069 |
| 1/2/2013 | 0.20770% | 3.25% | 3.45770% | 1/1/2013 | $24,153,232 | $73,844 | $24,227,076 | $24,010,069 |
| 2/1/2013 | 0.19920% | 3.25% | 3.44920% | 1/31/2013 | $24,227,076 | $69,808 | $24,296,885 | $24,227,076 |
| 3/1/2013 | 0.20370% | 3.25% | 3.45370% | 2/28/2013 | $24,296,885 | $64,994 | $24,361,879 | $24,227,076 |
| 4/2/2013 | 0.20270% | 3.25% | 3.45270% | 4/1/2013 | $24,361,879 | $74,376 | $24,436,255 | $24,227,076 |

**$20 Million Amended and Restated Promisorry Note dated December 25, 2008**
**Between Merhav (M.N.F) Limited and Ampal-American Israel Corporation**
**Principal and Accrued Interest as of August 13, 2014**
*(in US dollars)*

| LIBOR Reset Date (a) | 30-Day LIBOR on Reset Date (b) | Premium Over LIBOR | Applicable Interest Rate (c) | Date of Interest Calculation | Monthly Opening Balance (d) | Monthly Interest | Monthly Ending Balance | Balance Applicable for Quarterly Compounding |
|---|---|---|---|---|---|---|---|---|
| 5/1/2013 | 0.19820% | 3.25% | 3.44820% | 4/30/2013 | $24,436,255 | $67,966 | $24,504,220 | $24,436,255 |
| 6/3/2013 | 0.19398% | 3.25% | 3.44398% | 6/2/2013 | $24,504,220 | $77,239 | $24,581,460 | $24,436,255 |
| 7/1/2013 | 0.19580% | 3.25% | 3.44580% | 6/30/2013 | $24,581,460 | $65,456 | $24,646,916 | $24,436,255 |
| 8/1/2013 | 0.18593% | 3.25% | 3.43593% | 7/31/2013 | $24,646,916 | $73,133 | $24,720,049 | $24,646,916 |
| 9/3/2013 | 0.18206% | 3.25% | 3.43206% | 9/2/2013 | $24,720,049 | $77,628 | $24,797,677 | $24,646,916 |
| 10/1/2013 | 0.17800% | 3.25% | 3.42800% | 9/30/2013 | $24,797,677 | $65,792 | $24,863,469 | $24,646,916 |
| 11/1/2013 | 0.16850% | 3.25% | 3.41850% | 10/31/2013 | $24,863,469 | $73,394 | $24,936,863 | $24,863,469 |
| 12/2/2013 | 0.16825% | 3.25% | 3.41825% | 12/1/2013 | $24,936,863 | $73,191 | $25,010,054 | $24,863,469 |
| 1/2/2014 | 0.16830% | 3.25% | 3.41830% | 1/1/2014 | $25,010,054 | $73,185 | $25,083,239 | $24,863,469 |
| 2/3/2014 | 0.15710% | 3.25% | 3.40710% | 2/2/2014 | $25,083,239 | $76,215 | $25,159,454 | $25,083,239 |
| 3/3/2014 | 0.15530% | 3.25% | 3.40530% | 3/2/2014 | $25,159,454 | $66,470 | $25,225,924 | $25,083,239 |
| 4/1/2014 | 0.15100% | 3.25% | 3.40100% | 3/31/2014 | $25,225,924 | $68,807 | $25,294,731 | $25,083,239 |
| 5/1/2014 | 0.15050% | 3.25% | 3.40050% | 4/30/2014 | $25,294,731 | $71,689 | $25,366,421 | $25,294,731 |
| 6/2/2014 | 0.15100% | 3.25% | 3.40100% | 6/1/2014 | $25,366,421 | $76,458 | $25,442,878 | $25,294,731 |
| 7/1/2014 | 0.15520% | 3.25% | 3.40520% | 6/30/2014 | $25,442,878 | $69,300 | $25,512,178 | $25,294,731 |
| 8/1/2014 | 0.15600% | 3.25% | 3.40600% | 7/31/2014 | $25,512,178 | $74,808 | $25,586,986 | $25,512,178 |
|  |  |  |  | 8/13/2014 | $25,586,986 | $31,379 | $25,618,365 | $25,512,178 |

*Notes:*

(a) The applicable interest rate shall be reset at the first Business Day of each month which is defined as a day other than Saturday, Sunday or other day that commercial banks in New York and Israel are required or permitted by law to remain closed.

(b) Per Bloomberg.

(c) LIBOR plus the stated premium over the 30-day LIBOR.

(d) Monthly opening balance on 12/25/2008 per Section 1 of $20 Million Amended and Restated Promisorry Note dated December 25, 2008 between Merhav (M.N.F) Limited and Ampal-American Israel Corporation.