UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>AMPAL-AMERICAN ISRAEL CORP.,<br><br>        Debtor. | Chapter 7<br><br>Case No. 12-13689 (SMB) |
| MERHAV AMPAL GROUP, LTD. f/k/a/ MERHAV-AMPAL ENERGY, LTD.,<br><br>        Plaintiff<br><br>- against -<br><br>MERHAV (M.N.F.) LIMITED AND YOSEF A. MAIMAN,<br><br>        Defendants. | Adv. Proc. No. 14-02385 (SMB) |
| MERHAV (M.N.F.) LTD. AND YOSEF A. MAIMAN,<br><br>        Third Party Plaintiffs<br><br>- against -<br><br>HERMATIC TRUST (1975) LTD., REZNIK PAZ NEVO R.P.N. TRUSTS 2007 LTD., MISHMERET - TRUSTS COMPANY LTD., PSAGOT INVESTMENT HOUSE LTD., MEITAV INVESTMENT HOUSE LTD., SHAPIRA & CO., AND OFER SHAPIRA,<br><br>        Third Party Defendants. | **THIRD PARTY COMPLAINT** |

      Third Party Plaintiffs Merhav (M.N.F.) Ltd. and Yosef A. Maiman, allege as follows for their complaint against Third Party Defendants Hermatic Trust (1975) Ltd., Reznik Paz Nevo R.P.N. Trusts 2007 Ltd., Mishmeret - Trusts Company Ltd., Psagot Investment House Ltd., Meitav Investment House Ltd., Shapira & Co., and Ofer Shapira:

## NATURE OF THIS ACTION

1.  This is an action by the Third-Party Plaintiffs against the Third-Party Defendants for tortious interference with contract and prospective business dealings and for disallowance of the claims asserted by the Bondholder Trustees (as defined below) against Ampal-American Israel Corp.

## PARTIES

**Plaintiffs**

2.  Third Party Plaintiff Merhav (M.N.F.) Ltd. ("Merhav") is an Israeli company.

3.  Third Party Plaintiff Yosef A. Maiman ("Maiman") is an Israeli citizen, and is the controlling and majority shareholder of Merhav.

**The Bondholder Defendants**

4.  Third Party Defendant Hermatic Trust (1975) Ltd. ("Hermatic") is, upon information and belief, an Israeli entity with its principal place of business in Tel Aviv, Israel. Hermatic is the trustee for the Ampal "Series A" debentures.

5.  Third Party Defendant Reznik Paz Nevo R.P.N. Trusts 2007 Ltd. ("Reznik") is, upon information and belief, an Israeli entity with its principal place of business located in Tel Aviv, Israel. Reznik is the trustee for the Ampal "Series B" debentures.

6.  Third Party Defendant Mishmeret - Trusts Company Ltd. ("Mishmeret" and collectively with Hermatic and Reznik, the "Trustees") is, upon information and belief, an Israeli entity with its principal place of business located in Tel Aviv, Israel. Mishmeret is the trustee for the Ampal "Series C" debentures (together with the "Series A" and "Series B" debentures, the "Ampal Debentures").

2

7.    Third Party Defendant Psagot Investment House Ltd. ("Psagot") is, upon information and belief, an Israeli entity with its principal place of business located in Tel Aviv, Israel and a holder of one or more series of Ampal Debentures.

8.    Third Party Defendant Meitav Investment House Ltd. ("Meitav") is, upon information and belief, an Israeli entity with its principal place of business located in Tel Aviv, Israel and a holder of one or more series of Ampal Debentures.

9.    Third Party Defendant Shapira & Co. is an Israeli law firm based in Tel Aviv, Israel, representing Hermatic, Mishmeret, and certain holders of Series A and Series C debentures. Upon information and belief, Shapira & Co. is controlled by Third Party Defendant Ofer Shapira.

**The Individual Defendant**

10.    Third Party Defendant Ofer Shapira is an attorney in Israel, representing Hermatic, Mishmeret, and certain holders of Series A and Series C debentures. Additionally, Mr. Shapira is contemporaneously representing Merhav Ampal Group, Ltd. ("MAG") a wholly-owned subsidiary of Ampal, who sued Merhav and Maiman in the underlying Adversary Proceeding.[1]

**Non-Party**

11.    Ampal-American Israel Corp. ("Ampal" or the "Debtor") is a New York corporation, and is the debtor in the present bankruptcy proceeding, Case No. 12-13689 (SMB) (the "Bankruptcy Proceeding"). Ampal is currently under the control of Alex Spizz, the Chapter 7 Trustee. Prior to its bankruptcy, Ampal stock was traded publicly on the NASDAQ.

---

[1] Substantially contemporaneously with the filing of this Complaint, Merhav and Maiman have filed their Answer to the complaint filed by MAG.

3

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1334, because it is related to the Ampal bankruptcy case currently pending before this Court. This action, at least in part, constitutes a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), because it relates to the allowance of claims against the estate asserted by the Trustees on behalf of holders of Ampal Debentures (the "Bondholders").

13. This Court has personal jurisdiction over the Bondholder Trustees, Psagot and Meitav because they have consented to this Court's personal jurisdiction through their proofs of claim, appearances, and other filings in the bankruptcy proceeding and because they subjected themselves to the personal jurisdiction of courts in the State of New York through their course of conduct.

14. Additionally, this Court has personal jurisdiction over Shapira & Co. and Mr. Shapira because they consented to this Court's personal jurisdiction through their prior appearances and filings in the bankruptcy proceeding and because they subjected themselves to the personal jurisdiction of courts in the State of New York through their course of conduct.

15. Venue is proper in this Court because of the pendency of the bankruptcy proceedings.

## FACTUAL BACKGROUND

**Background of Ampal**

16. Ampal is a holding company founded in 1942 that invests in various enterprises. Its operations are carried out from its headquarters in Tel Aviv, Israel. Maiman began serving as the Chairman of Ampal in or around April 2002, and as President and CEO of Ampal in or around October 2006.

4

17. Under Maiman's leadership in the years preceding its bankruptcy, Ampal focused its investment strategy on the energy, chemical, and related sectors.

18. Ampal funded its operations and investments in these industries primarily by issuing three series of debentures, referred to as the Series A debentures, the Series B debentures, and the Series C debentures. At issuance, the face value of the Ampal Debentures was approximately $268.7 million.

19. The Ampal Debentures are held in trusts and controlled by the Trustees for the benefit of the Bondholders.

20. Upon information and belief, defendants Psagot and Meitav are two of the largest Bondholders, together holding substantial amounts of the Ampal Debentures.

**The Ethanol Project**

21. In or around 2006, Merhav became interested in investing in ethanol production in Columbia as a result of the potential for its use as an alternative fuel to gasoline.

22. As a result of this interest, Merhav partnered with Ampal to explore the development of a facility in Columbia that would process and create ethanol from sugarcane (the "Project").

23. In December 2007, Ampal agreed to loan Merhav $20 million (the "Loan") to facilitate the purchase of the land necessary for the development of the Project. The terms of the Loan were documented in various agreements, including a promissory note dated December 25, 2007. In partial consideration for making this loan, Ampal was granted the right to convert the debt into equity in the Project pursuant to the terms of a contemporaneously executed option agreement.[2]

---

[2] As Ampal was a publicly traded company, the agreements mentioned throughout this complaint are all publicly available through, among other sources, the Securities and Exchange Commission's "EDGAR" website.

5

24. In December 2008, Merhav and Ampal mutually agreed to extend the maturity date of the Loan. In connection with this extension, Maiman executed a guaranty as additional security for the Loan (the "Guaranty").[3]

25. As of December 2009, progress on the Project in Columbia was being made, but Ampal and Merhav agreed that additional time was needed to give the Project a chance to become truly successful. With this mindset, Ampal and Merhav executed an "Option Exercise Agreement" on December 31, 2009 pursuant to which Ampal agreed to exercise its right to convert the Loan into a 25% equity interest in the Merhav subsidiary that was developing the Project. This planned debt-to-equity conversion was conditioned on Merhav securing debt financing for the Project that was determined to be necessary to fund the development of the ethanol refinery facility and sugarcane plantation (the "Project Financing"). Pursuant to the terms of the agreement, in the event the Project Financing was not secured by December 31, 2010, the debt-to-equity conversion would not occur, and instead the Loan would become due.

26. Ampal and Merhav subsequently agreed to extend the term of the Option Exercise Agreement an additional two times, eventually until December 31, 2012. Like the previous modifications, these extensions were granted primarily in order to provide additional time for the details of the Project Financing to be finalized.

27. These extensions proved worthwhile, as during 2011 and 2012 Merhav and Ampal had made great progress securing the required land, permitting, and the additional financing necessary for the Project. Specifically, almost 30,000 acres of land had been arranged to be acquired or leased, and the Project had obtained: a full environmental license and water use permit; a "Tax Free Zone" determination covering the refinery plant itself and various tax reliefs

---

[3] On or about December 31, 2010, Ampal assigned its interests and rights in the Loan and the Guaranty to MAG.

for the import of goods and services for the Project; and a license to develop a port on the Magdalena river for use in connection with the Project. In addition, an agreement for the construction of the Project had been negotiated with the Brazilian contractor. Moreover, after much effort, Merhav obtained written approval by Seguradora Brasileira de Crédito à Exportação, a government loan insurer, to back $270 million of Project Financing from Brazilian Development Bank ("BNDES").[4]

28.  The BNDES Project Financing was conditioned only on the raising of an additional amount of equity that was determined necessary to bring the Project to fruition. In order to secure the final commitment for the Project Financing, Merhav accordingly set out to partner with additional equity investors. During the 2011-2012 period, negotiations proceeded with at least six potential partners, many of whom signed letters of intent or preliminary commitments to invest in the Project.

**Ampal Experiences Financial Difficulties and Enters Restructuring Talks with the Bondholders**

29.  In stark contrast to the significant progress being made in Columbia with regard to the Project during this period, Ampal was faced with great difficulties in connection with its most significant preexisting investments. As a result of turmoil in the Middle East in 2011, often referred to as the "Arab Spring," the companies in which Ampal had dedicated the majority of its investment resources -- including a gas pipeline concern located in Egypt -- began to experience extreme financial strife. These difficulties prevented the companies from timely paying the significant dividends they owed to Ampal, and on which Ampal relied to meet its debt service obligations on the Ampal Debentures.

---

[4]  BNDES is the abbreviation for *Banco Nacional de Desenvolvimento Econômico e Social*.

7

30. Because Ampal never received these expected, crucial dividend payments from its portfolio companies, Ampal realized it would soon become impossible for it to make required payments on the Ampal Debentures. Ampal accordingly commenced negotiations with the Trustee and the Bondholders in attempt to reach a mutually acceptable solution regarding alternative repayment terms, such as the immediate payment of current interest with principal payments deferred for a period of two years.

31. The negotiations with the Bondholders began in or around January 2012, and continued over the course of approximately eight months. During this time, a multitude of restructuring proposals were proposed by Ampal, and various term sheets were exchanged between Ampal and the elected negotiation teams of the Bondholders. Indeed, on two occasions, term sheets were signed between Ampal and the Bondholders' negotiation teams, but were rejected by the Bondholders, who would not relent from their unreasonable demands. For instance, the Bondholders threatened Ampal's individual directors with (undoubtedly frivolous) lawsuits unless Ampal made certain payments to the Bondholders that were not provided for in the loan documents. Without such payment, the Bondholders would not agree to any restructuring deal.

32. Additionally, it also became clear during the course of these restructuring negotiations that the Bondholders and their representatives, including the Trustees and Mr. Shapira, were not acting in good faith even while away from the bargaining table. As evidenced by a multitude of inflammatory reports in the Israeli press, Defendants had embarked upon a well orchestrated and very public smear campaign targeting Ampal's management and directors, a campaign no doubt designed to gain leverage when negotiating the terms of the inevitable restructuring of Ampal's debt.

33. Numerous articles with inflammatory and untrue comments appeared in media outlets throughout the course of the restructuring talks. The articles contained defamatory and utterly false statements made by the Bondholders and their representatives regarding the directors' appropriation of corporate funds, their inability to lead Ampal, and their failure to live up to supposed obligations to the Bondholders, among other untruths. Further, Defendants attempted to assign the blame for events well beyond the Ampal directors' control -- such as the political uprisings and terrorist attacks that had occurred in Egypt -- squarely on the directors' heads.

**Defendants' Improper Conduct Causes the Ethanol Project to Stall Indefinitely**

34. As if Defendants' conduct wasn't egregious enough with regard to these false accusations, they also sought to improperly gain further leverage over the Ampal debt restructuring talks by causing potential investors in the Columbia Project to second-guess any involvement with Ampal and Merhav.

35. Throughout the period of these restructuring negotiations, Defendants were well aware that Ampal and Merhav were negotiating with potential equity investors in the Project so that BNDES would be able to go forward with the $270 million Project Financing. Defendants also were well aware that on the date the Project Financing closes, the $20 million Loan from Ampal to Merhav would automatically be converted to a 25% equity stake in the Project.

36. Due to the fact that the Ampal equity stake was comparatively smaller than that which would have been held by Merhav had the Project Financing closed, Defendants believed that Maiman had "more to lose" than Ampal if the future of the Project were called into question. They figured Maiman therefore would be even more likely to acquiesce to their demands as they

9

negotiated a workout if they could somehow influence the discussions that were simultaneously occurring in South America regarding raising equity for the Project.

37. Accordingly, Defendants had even more incentive to ensure the defamatory articles were regularly published, so any potential equity investors would be dissuaded from working with Ampal while Defendants' negotiations with Ampal continued.

38. As a result of Defendants' improper conduct, all of the potential equity investors that Merhav had worked so diligently to attract pulled out of the Project. This prevented the Project Financing from BNDES from going forward, and as a result prevented the debt-to-equity conversion of the $20 million Loan from Ampal to Merhav. Without this conversion, Defendants were well aware that Merhav and Maiman would be unable to repay the Loan (or, for that matter, the Guaranty on the Loan).

**Ampal Files for Bankruptcy**

39. On August 29, 2012, Ampal was forced to commence a chapter 11 bankruptcy case because, despite eight months of good faith negotiations on the part of Ampal, an out-of-court restructuring agreement could not be reached with the Bondholders.

40. In addition to forcing this filing, the Defendants' conduct also harmed the Debtor's estate in a variety of fashions. Because Defendants prevented the Project Financing from closing, the Project -- 25% of which would have been owned by Ampal or MAG -- was never completed, and the estate has lost the opportunity to own a large portion of what would have been an extremely lucrative asset.

41. Moreover, Defendants' continuing assault in the press on Ampal and its officers and directors caused extensive damage to the estate. Indeed, in a letter dated November 19, 2012, Bryan Cave, counsel to the Debtor, warned that Mr. Shapira's actions, carried out on

10

behalf of Mishmeret, were harming the Debtor, its estate and the process. Yet, Mr. Shapira and the other Defendants did not relent.

42. The damage Defendants caused was severe and immediate. For instance, when Bondholder representatives improperly informed the press that the Bondholders intended to force a sale of Gadot (one of Ampal's portfolio companies), the very next day Israel Discount Bank nominated a receiver for Gadot's shares. The appointment of a receiver caused Ampal to lose tens of millions of dollars in its investment in Gadot.

43. The Trustees have each filed a proof of claim in the bankruptcy proceeding, found at Claim Nos. 9, 11 and 12 (the "Proofs of Claim").

**FIRST CLAIM FOR RELIEF**
**Tortious Interference With Contract**
**(Against All Defendants)**

44. Merhav and Maiman reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Third Party Complaint as if fully set forth herein.

45. Defendants had explicit and implicit knowledge of the agreements that set forth the terms of the Loan and the Guaranty, and all extensions and modifications to the Loan. Each of these constitutes a contract between Merhav and/or Maiman on the one hand, and Ampal or its assignee, MAG, on the other.

46. During the course of their 2012 negotiations with Ampal concerning the restructuring of Ampal's debts, Defendants orchestrated a scheme involving the systematic, coordinated dissemination of defamatory content regarding Ampal, Merhav, and Ampal's directors, including Maiman.

47. As a direct result of Defendants' dissemination of these untruths, all of the parties who were considering investing in the Project were compelled to back out. Without these equity investors, the Project Financing would not close, as Defendants were well aware.

48. Without the Project Financing, Defendants also knew that would be unable to repay the Loan when it came due, and such nonpayment would constitute a breach pursuant to the terms of the Loan agreements. Likewise, Defendants knew that Maiman would be unable to repay the Guaranty if it came due, and such nonpayment would constitute a breach pursuant to the terms of the Guaranty agreement.

49. Merhav and Maiman were damaged by the foregoing conduct by Defendants because they were deprived of the economic consideration underlying the Loan and Guaranty, thereby being prevented from meeting their alleged contractual obligations.

## SECOND CLAIM FOR RELIEF
### Tortious Interference With Prospective Business Relations
### (Against All Defendants)

50. Merhav and Maiman reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Third Party Complaint as if fully set forth herein.

51. As was widely reported in the global press and based on the public filings of Ampal, Defendants had knowledge that Merhav was actively negotiating with potential equity investors in the Project during 2011 and 2012.

52. Defendants embarked on their defamatory scheme during this time in order to ensure the potential equity investors either backed out of the Project or, at a minimum, questioned their involvement in it.

53. Defendants' purpose in engaging in this improper conduct was solely to gain undeserved leverage for use in the Ampal debt restructuring negotiations that were simultaneously occurring.

54. As a direct result of Defendants' conduct, the potential equity investors *all* pulled out of the Project, which in turn caused the Project Financing to fail. Without this necessary

financing, Merhav was forced to abandon the Project, causing great economic harm to Merhav and Maiman.

### THIRD CLAIM FOR RELIEF
**Objection to Claims Asserted by Trustees on Behalf of Bondholders**
**11 U.S.C. §§ 502(b)(1) and 558**
**(Against the Trustees, Psagot, and Meitav)**

55.    Merhav and Maiman reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Third Party Complaint as if fully set forth herein.

56.    Had the Project been successful, the Debtor and its estate would have received an equity interest in the Project that would be a valuable asset.

57.    The Defendants, through their egregious scheme to defame Ampal, Merhav, Maiman, and other Ampal directors, rendered it impossible for Merhav to secure the additional equity investment necessary to complete the Project.  This prevented the Project from coming to fruition, and deprived the Debtor of a substantial asset, to the detriment of the Debtor and its estate.

58.    Upon information and belief, the Defendants committed the improper acts in order to gain leverage during the Ampal debt restructuring negotiations.  Because their personal animosity towards Maiman was so fervent, they failed to care or consider whether they were acting in a commercially reasonable manner during the course of their negotiations, and were even amenable to inflicting harm upon the Debtor itself.

59.    All of the foregoing constitutes immoral, unconscionable conduct, of which the Defendants are guilty.

60.    The Debtor relied upon the Defendants to act in a commercially reasonable manner in furtherance of completing the Project, for the benefit of all the Debtor's stakeholders, including the Defendants.

61. As a result of the Defendants' improper conduct, the Debtor and its estate were injured inasmuch as the Project was unsuccessful and the Debtor was deprived of its equity interest therein.

62. The Defendants' immoral, unconscionable conduct is immediately and necessarily related to the Proofs of Claim, because such actions, committed with the goal of disparaging Maiman at all costs, sabotaged the Project and directly contributed to the Debtor's inability to fulfill its financial obligations to the Bondholders alleged in the Proofs of Claim.

63. The Proofs of Claim should thus be disallowed and expunged under 11 U.S.C. § 502(b)(1) on the basis of the unclean hands by the Bondholders and their representatives and agents.

64. In the alternative, if the Court allows any amounts asserted in the Proofs of Claim, the Proofs of Claim should be offset by the value of the equity interest in the Project of which the Debtor and its estate were deprived, as a result of the Defendants' immoral and unconscionable conduct (the "Equity Value Claim").

65. The Proofs of Claim and Equity Value Claim are between the same parties, because the Proofs of Claim are alleged against the Debtor and its estate by the Trustees and Bondholders, and the Equity Value Claim is due to the Debtor and its estate from the Bondholders and their representatives and agents.

66. The Proofs of Claim and the Equity Value Claim are both general unsecured claims. Thus, the Debtor and Bondholders stand in the same capacity in relation to each other with respect to both claims.

67. Additionally, the Court should offset the Equity Value Claim against the Proofs of Claim in the exercise of its discretion to avert injustice.

68. Accordingly, under 11 U.S.C. §§ 502(b)(1) and 558, the Proofs of Claim should be disallowed or, alternatively, reduced to the extent of the Equity Value Claim.

**PRAYER FOR RELIEF**

WHEREFORE, Merhav and Maiman respectfully request that judgment be entered in their favor against Defendants, and provide the following relief:

a. As to the First and Second Claims for Relief, a judgment awarding money damages in an amount to be determined by the trier of fact, in addition to any interest, costs, and fees, including attorneys' fees related to the prosecution of this Third Party Complaint;

b. as to the Third Claim for Relief, an order disallowing entirely the Proofs of Claim filed by the Bondholders, or, in the alternative, offsetting the Proofs of Claim by the Debtor's Equity Value Claim; and

c. such other and further relief to the Third Party Plaintiffs as this Court deems just and proper.

Dated: November 24, 2014
New York, New York

                KASOWITZ, BENSON, TORRES
                  & FRIEDMAN LLP

                By: /s/ David M. Friedman
                    David M. Friedman (dfriedman@kasowitz.com)
                    Daniel A. Fliman (dfliman@kasowitz.com)
                    Nii-Amar Amamoo (namamoo@kasowitz.com)
                    Andrew R. Kurland (akurland@kasowitz.com)
                1633 Broadway
                New York, New York 10019
                Telephone: (212) 506-1700
                Facsimile: (212) 506-1800

                *Attorneys for Merhav (M.N.F.) Ltd.*
                *and Yosef A. Maiman*