UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

|                                          |   |                               |
|------------------------------------------|---|-------------------------------|
| In re:                                   | : |                               |
|                                          | : |                               |
| AMPAL-AMERICAN ISRAEL CORP.,             | : | Chapter 7                     |
|                                          | : | Case No.: 12-13689 (SMB)      |
|                        Debtor.           | : |                               |

----------------------------------------------------------X

|                                          |   |                               |
|------------------------------------------|---|-------------------------------|
| MERHAV AMPAL GROUP, LTD.                 | : |                               |
| f/k/a MERHAV-AMPAL ENERGY, LTD.,         | : | Adv. Proc. No. 14-02385 (SMB) |
|                                          | : |                               |
|                        Plaintiff,        | : |                               |
|                                          | : |                               |
|  -- against –                            | : |                               |
|                                          | : |                               |
| MERHAV (M.N.F.) LIMITED and              | : |                               |
| YOSEF A. MAIMAN,                         | : |                               |
|                                          | : |                               |
|                        Defendants.       | : |                               |

----------------------------------------------------------X

## OPINION GRANTING PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

**A P P E A R A N C E S:**

TROUTMAN SANDERS, LLP
*Counsel for Merhav Ampal Group, Ltd.*
The Chrysler Building
405 Lexington Avenue
New York, NY 10174

      John P. Campo, Esq.
      J. David Dantzler, Jr., Esq.
      Brett D. Goodman, Esq.
          Of Counsel

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Counsel for Yosef A. Maiman and Merhav (M.N.F.) Limited*
1633 Broadway
New York, NY 10019

      David M. Friedman, Esq.
      Daniel A. Fliman, Esq.
      Nii-Amar Amamoo, Esq.
      Andrew R. Kurland, Esq.
          Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Merhav Ampal Group, Ltd. ("MAG"), an indirect wholly-owned subsidiary the debtor, Ampal-American Israel Corporation ("Ampal"), commenced this action against Yosef A. Maiman, the Chairman and former Chief Executive Officer and President of Ampal, and Merhav (M.N.F.) Limited ("MNF") (collectively with Maiman, the "Defendants"), an entity controlled by Maiman, to collect on a $20 million note executed in favor of Ampal by MNF, personally guaranteed by Maiman, and later assigned to MAG.  MAG moved for summary judgment against the defendants based on MNF's default.  Maiman and MNF opposed the motion on grounds that the tortious conduct of certain of Ampal's bondholders frustrated the performance of the Note and that Ampal failed to stop the bondholders.  In addition, the Court raised the issue, *sua sponte*, of its subject matter jurisdiction over an action commenced by a non-debtor subsidiary to collect a debt from other non-debtors.  For the following reasons, the Court concludes that it has subject matter jurisdiction over MAG's claims against MNF and Maiman, and grants the motion for summary judgment.

## BACKGROUND

The background to this case is discussed at length in previous decisions issued by the Court.  *See In re Ampal-American Israel Corp.*, No. 12-13689 (SMB), 2013 WL 1400346 (Bankr. S.D.N.Y. Apr. 5, 2013) (*Ampal I*); *In re Ampal-American Israel Corp.*, 502 B.R. 361 (Bankr. S.D.N.Y. 2013) (*Ampal II*); *In re Ampal-American Israel Corp.*, No. 12-13689 (SMB), 2015 WL 4510723 (Bankr. S.D.N.Y. 2015) (*Ampal III*).  I assume familiarity with these opinions and repeat only what is necessary to this decision.

2

## A.    The Transactions

At all relevant times, Ampal, a New York corporation, was primarily engaged in the acquisition of interests in businesses located in Israel.  MAG, an Israeli corporation, is a wholly-owned subsidiary of Ampal Energy, Ltd., which, in turn, is a wholly-owned subsidiary of Ampal. (*Affidavit of Shlomi Kelsi in Support of Motion for Summary Judgment in Lieu of Complaint*, sworn to Aug. 21, 2014 ("*Kelsi Affidavit*"),[1] at ¶ 5 (ECF Doc. # 24-1.)[2]  Until the appointment of the chapter 11 trustee in this case, Maiman controlled Ampal, serving as its President, Chief Executive Officer and Chairman of the Board of Directors.  He also controlled and directed the business operations of MNF, an Israeli corporation.  (*Id.* at ¶ 7.)

### 1.    The 2007 Note and Option Agreement

On December 25, 2007, Ampal agreed to partially finance MNF's development of an ethanol production project in Colombia (the "Project").  Ampal loaned MNF $20 million to purchase 11,000 hectares of land in Colombia, and MNF issued a note (the "2007 Note") in that amount in favor of Ampal on December 25, 2007.  (Ex. A, at ¶¶ 1, 3.)[3]  The 2007 Note was governed by New York law.  (*Id.* at ¶ 9(d).)  It matured on the earlier of December 25, 2008 or the "Financing Date," defined as the date on which MNF obtained third party debt financing. The maturity provision also required the third party lender to hold a 25% equity interest in the

---

[1]       Shlomi Kelsi is MAG's managing director.  (*Kelsi Affidavit* at ¶ 1.)  The *Kelsi Affidavit* was originally filed in New York state court with MAG's motion for summary judgment in lieu of complaint.  MAG cited and incorporated the *Affidavit* by reference in its memorandum of law and largely restated the *Affidavit* in its statement of undisputed material facts.  (*See Plaintiff's Statement of Undisputed Material Facts*, dated Dec. 23, 2014 (ECF Doc. # 14).)  The *Affidavit* was also refiled with the motion for summary judgment in this adversary proceeding. (*See Notice of Filing of Exhibits Referenced in Plaintiff's Motion for Summary Judgment*, dated Feb. 19, 2015 (ECF Doc. # 24).)

[2]       "ECF" refers to the electronic docket in this adversary proceeding, and "ECF/Main Case" refers to the electronic docket in the main bankruptcy case.

[3]       "Ex. ___" refers to exhibits attached to the *Complaint*, dated Oct. 23, 2014.  (ECF Doc. # 4.)

Project.  (*Id.* at ¶ 8(e).)  On the same date, the parties also executed an agreement granting Ampal an option to convert the 2007 Note into a 35% equity interest in the Project (the "Option Agreement").  (Ex. B; *Kelsi Affidavit* at ¶ 8.)  The Option Agreement was also governed by New York law, (Ex. B at Art. 6.1.), and was set to terminate on the earlier of December 25, 2007 or the "Qualified Financing Date," which shared the same definition as the "Financing Date" in the 2007 Note.  (*Id.* at Art. 2.1(a); Art. 1 (definitions of "Option Termination Date" and "Qualified Financing Date").)

In addition, the Option Agreement included a covenant (the "Further Assurances Provision") which stated that the parties would take reasonable commercial efforts to cause to be taken "all Necessary Actions" and all things "necessary, proper or advisable" under the applicable "Legal Requirements" to consummate and make effective the transaction contemplated by the "Transaction Documents," which included the Option Agreement, the 2007 Note and an agreement pledging MNF's shares in Ampal (the "Pledge Agreement").  (*Id.* at Art. 4.2.)  "Necessary Action" was defined as all actions reasonably necessary to cause a result that was required to be caused in the agreement.  "Legal Requirements" was defined as (1) all laws, ordinances and regulations, (2) all codes, standards, rules, requirements and other criteria issued under any laws or regulations, and (3) judgments, orders, and other similarly authoritative documents.  (*Id.* at Art. 1 (definitions of "Necessary Action" and "Legal Requirements").)

Finally, MNF and Ampal executed the Pledge Agreement as security for payment of the 2007 Note.  (Ex. C at § 2; *Kelsi Affidavit* at ¶ 10.)  MNF owned 4,4767,389 shares of Ampal stock at the time of the agreement.  (Ex. C at § 4(a)(i).)

### 2.    The 2008 Note and Guaranty

MAG did not obtain third party financing or pay the balance of the 2007 Note by the

maturity date.  (*Kelsi Affidavit* at ¶ 11.)  Instead, the parties executed an amended and restated

promissory note on December 25, 2008 (the "2008 Note"), which extended the maturity date of

the 2007 Note and provided a higher interest rate.  The 2008 Note matured on the earlier of

December 31, 2009 or the Financing Date, which was defined in the same manner as it was in

the 2007 Note.  (Ex. D at 1, ¶ 8(e); *Kelsi Affidavit* at ¶ 11.)  Like the 2007 Note, the 2008 Note

was governed by New York law, (Ex. D at ¶ 9(d)), and secured by the Pledge Agreement.  (*Id.* at

¶ 6.)  The parties also agreed, by letter dated December 25, 2008 (the "2008 Letter Agreement"),

to extend the termination date of the Option Agreement to the earlier of June 30, 2009 or the

Qualified Financing Date.  (Ex. F at ¶ 2(a).)

As additional security, Maiman executed a personal guaranty in favor of Ampal (the

"Guaranty").  (Ex. E; *Kelsi Affidavit* at ¶ 13.)  The Guaranty was "an irrevocable, absolute,

continuing guaranty of payment and performance and not a guaranty of collection."  (Ex. E at

Art. 1.3.)  In the event that MNF failed to pay the balance of the 2008 Note when due, the

Guaranty obligated Maiman to pay the amount upon demand, without "presentment, protest,

notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of

acceleration of the maturity, or any other notice whatsoever."  (*Id.* at Art. 1.4.)  Maiman agreed

to be liable for the 2008 Note as a "primary obligor," (*id.* at Art. 1.1), and Ampal had no duty to

exhaust its remedies against MNF or any collateral before pursuing payment from Maiman.  (*Id.*

at Art. 1.5.)

Article II of the Guaranty provided a list of acts or omissions that would *not* reduce or

discharge Maiman's obligation.  Maiman waived any common law, equitable or statutory right

5

arising from, among other things, any modifications to the 2008 Note or other loan documents,

Maiman's financial condition, any release of MNF's obligation or collateral, or Ampal's lack of

diligence in collecting the 2008 Note or enforcing its rights against the collateral.  Lastly, it

included a catch-all provision that covered "any other action taken or omitted to be taken with

respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral

therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood

that Guarantor will be required to pay the Guaranteed Obligations…." (*Id.* at Art. 2.10.)  The

provision further provided that it was Maiman's "unambiguous and unequivocal intention" to be

obligated "notwithstanding any occurrence, circumstance, event, action or omission whatsoever,

whether contemplated or uncontemplated, and whether or not otherwise or particularly described

herein…." (*Id.*)

### 3.    Option Exercise Agreement

MNF did not obtain third party financing prior to December 31, 2009 or pay the 2008

Note by that date.  Instead, Ampal exercised its option to purchase equity in the Project by

agreement with MNF (the "Option Exercise Agreement").[4]  (Ex. G; *Kelsi Affidavit* at ¶15.)

Ampal agreed to purchase a 25% equity interest in the Project[5] for the balance of the 2008 Note,

which was then $22,249,000.  (*Kelsi Affidavit* at ¶ 15; Ex. G at Art. 2.1(a).)  Closing on the

purchase was expressly conditioned on the occurrence of the Qualified Financing Date, defined

as the date on which MNF obtained long term debt financing for the Project from either the

Banco do Brasil (the "BDB") or any other third party lender for no less than $185 million and the

---

[4]    The Option Agreement, as amended by the Letter Agreement, had already expired on June 30, 2009.  The parties apparently waived the expiration of the option when they executed the Option Exercise Agreement.

[5]    The Option Exercise Agreement actually provided for the purchase of shares of Merhav Renewable Energies Limited, a Cypriot corporation, referred to as the "Company."  The Company was the entity developing the Project by this time.  (*Option Exercise Agreement*, p. 84 of 132.)

first disbursement or some other proof of commitment had been made under the facility. (Ex. G at Art. 2.3(b)(i); Art. 1 (definition of "Qualified Financing Date").) Closing was to occur on the Qualified Financing Date or as soon as practicable thereafter (the "Closing Date"), but the agreement also provided for a "drop dead" date of December 31, 2010. (*Id.* at Art. 2.3(a); Art. 1 (definition of "Termination Date").) On the Closing Date, Ampal was to deliver to MNF documentation evidencing the cancellation of the 2008 Note and release of the pledge of shares under the Pledge Agreement. (*Id.* at Art. 2.1(d)(viii).) The Option Exercise Agreement also included the identical Further Assurances Provision found in the Option Agreement. Finally, the Option Exercise Agreement amended the 2008 Note, extending the maturity date to the earlier of December 31, 2010, the "drop dead" date, or the Qualified Financing Date. As with all prior agreements, the Option Exercise Agreement was governed by New York law. (*Id.* at Art. 6.1.)

MNF failed to obtain financing by the "drop dead" date. On that date, Ampal and MNF executed an agreement (the "2010 Letter Agreement") to extend the "drop dead" date of the Option Exercise Agreement and the maturity date of the 2008 Note to December 31, 2011. (Ex. I at ¶ 1; *Kelsi Affidavit* at ¶ 18.) On the same day, Ampal assigned its interest in the 2008 Note, the Guaranty, the Option Agreement, the Option Exercise Agreement, and the Pledge Agreement to MAG. (Ex. H; *Kelsi Affidavit* at ¶ 17.) Prior to the expiration of the extended deadline, the parties entered into one final agreement (the "2011 Letter Agreement") to extend the "drop dead" and maturity dates to December 31, 2012. (Ex. J at ¶ 1; *Kelsi Affidavit* at ¶ 19.)

## B.     The Bankruptcy

Ampal commenced the chapter 11 case on August 29, 2012, prior to the expiration of the extended "drop dead" and maturity dates. Ampal's principal non-affiliate debt at the time of the filing consisted of three series of debentures, Series A, B and C. The indenture trustees of the

7

Series A, B and C debentures were, respectively, Hermetic Trust (1975) Ltd., Reznik Paz Nevo

R.P.N. Trusts 2007 Ltd. and Mishmeret – Trusts Company Ltd. (collectively, the "Indenture

Trustees").  Following the commencement of the chapter 11 case, the United States Trustee

appointed the Indenture Trustees to the Official Committee of Unsecured Creditors.

(*Appointment of Official Committee of Unsecured Creditors*, dated Sept. 25, 2012 (ECF/Main

Case Doc. # 27).)

    Maiman controlled Ampal when the case was filed, serving as its Chairman of the Board

(since April 25, 2002) and President and Chief Executive Officer (since October 1, 2006).

(*Declaration of Irit Eluz Pursuant to Local Bankruptcy Rule 1007-2 and in Support of the

Debtor's Chapter 11 Petition and First-Day Motions*, dated Aug. 29, 2012, at ¶ 9 & Ex. A

(ECF/Main Case Doc. # 2).)  Maiman also held 61.99% of Ampal's Class A stock through

family and affiliated entities.  (*Id.*, Ex. E.)  Maiman continued to control Ampal as well as MAG

until the Court approved the appointment of a chapter 11 trustee.  (*Order Approving

Appointment of Chapter 11 Trustee,* dated Apr. 8, 2013 (ECF/Main Case Doc. # 241).)  Less

than a month later, the Court converted the case to chapter 7, (*Order Converting Chapter 11

Case to Chapter 7 and for Related Relief*, dated May 2, 2013 (ECF/Main Case Doc. # 258)), and

the creditors elected Alex Spizz as the chapter 7 trustee (the "Trustee").  (*See United States

Trustee's Report of Undisputed Election of Chapter 7 Trustee*, dated May 29, 2013, at 3-4 (ECF

Doc. # 275).)

    The Trustee subsequently moved for authority to operate Ampal's business and for other,

related relief.  (*Chapter 7 Trustee's Motion for an Order Authorizing Trustee to Operate

Debtor's Business for a Limited Time, Including Authority to Manage the Debtor's Investments

and Take All Acts Necessary to Preserve the Debtor's Equity Interest in its Subsidiaries,*

Pursuant to 11 U.S.C. §§105(a), 541(a), and 721, and 28 U.S.C. §§1334(e)(1), dated Jul. 3, 2013

("*Trustee Motion for Authority*") (ECF/Main Case Doc. # 310).)  The Trustee identified Ampal's

100% ownership of stock in Ampal Energy, Ltd., which in turn owned 100% of the stock in

MAG, among Ampal's most significant assets.  (*Id.* at ¶ 15.)  The Trustee stated that he intended

to liquidate Ampal's holdings and the assets of its subsidiaries and sought, among other things,

the authority to commence and prosecute legal actions on behalf of the subsidiaries and to sell

their assets.  (*Id.* at ¶ 36.)

At a hearing on the motion, the Court expressed its view that the Trustee lacked the

authority under New York law to prosecute legal actions on behalf of the subsidiaries or to sell

their assets but could instead exercise Ampal's rights as the sole shareholder of the subsidiaries.

(Transcript of hearing held on July 23, 2013, at 13:9-14:18 (ECF/Main Case Doc. # 327).)  By

order dated July 25, 2013, the Court authorized *nunc pro tunc* the Trustee's exercise of Ampal's

shareholder rights with respect to the business and affairs of its subsidiaries.  (*Order Authorizing

Chapter 7 Trustee to Exercise Debtor's Shareholder Rights*, dated July 25, 2013 ("*Shareholder

Rights Order*") (ECF/Main Case Doc. # 325).)

## C.    The Action on the Note and Guaranty

On July 14, 2014, MAG made a written demand on MNF for payment of the 2008 Note.

(Ex. K.)  On the same day, MAG also made a written demand on Maiman for payment under the

Guaranty.  (Ex. L.)  Neither MAG nor Maiman complied with the demands, and MAG

subsequently commenced an action to collect on the 2008 Note and Guaranty against MNF and

Maiman in New York state supreme court by filing a motion for summary judgment in lieu of

complaint.  (*See Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment in

Lieu of Complaint*, dated Sept. 3, 2014, p. 6 of 132 (ECF Doc. # 1-1).)  Maiman and MNF

removed the action to this Court, (*Notice of Removal*, dated Sept. 24, 2014 (ECF Doc. # 1)), and

MAG filed a complaint against the Defendants in this adversary proceeding to recover on the

2008 Note and the Guaranty.  (*Complaint*, dated Oct. 23, 2014, at ¶¶ 22-23 (ECF Doc. # 4).)

The *Complaint* sought damages in the amount of $25,618,365—the $20 million principal plus

interest accrued on the 2007 and 2008 Notes through August 13, 2014—in addition to interest for

the period beginning on August 14, 2014 and ending on the judgment date.  MAG also sought

payment of its attorneys' fees and costs.  (*Complaint* at 8-9; *see also Kelsi Affidavit* at ¶ 29.)

The Defendants filed an answer asserting multiple affirmative defenses.  (*Answer*, dated

Nov. 24, 2014 (ECF Doc. # 7).)  Among other things, the Defendants asserted that MAG's

claims were barred by MAG's breach of the implied covenant of good faith and fair dealing,

adding that Plaintiff had "knowledge of the tortious conduct of third parties which prevented

Defendants from undertaking certain actions."  (*Id.* at 6.)  Specifically, the Defendants asserted

that Ampal's bondholders and the Indenture Trustees and representatives "made consummation

of the [Project] impossible through their tortious interference."  (*Id.*)  The Defendants also

contended that the bondholders' conduct should be imputed to the Trustee and MAG due to the

bondholders' "extensive control and influence over the Trustee and [MAG]."  (*Id.*)

The Defendants simultaneously filed a third party complaint against the Indenture

Trustees, Psagot Investment House Ltd. and Meitav Investment House Ltd., two of Ampal's

bondholders, and Shapira & Co. and Ofer Shapira[6] (the "Third Party Defendants") for tortious

interference.  (*See Third Party Complaint*, dated Nov. 24, 2014 (ECF Doc. # 8).)  The

Defendants alleged that MNF had made "great progress" toward acquiring the land, the permits

---

[6]    Shapira's involvement in this case is chronicled in more detail in *Ampal III*, 2015 WL 4510723, at *1-2.

and the financing necessary for the Project, (*id.* at ¶ 27), and were close to obtaining $270 million from the Brazilian Development Bank ("BNDES"), conditioned only on MNF securing additional equity in the Project. (*Id.* at ¶ 28.) At the same time, Ampal was experiencing financial difficulties due to circumstances arising from the "Arab Spring" in 2011. This in turn resulted in Ampal failing to meet its debt service obligations under the debentures.

According to the third party complaint, Ampal entered into negotiations with the Indenture Trustees and the bondholders around January 2012 and continued over the course of eight months. The Defendants contended that the negotiations were ultimately unsuccessful due to the bondholders' "unreasonable demands." (*Id.* at ¶ 31.) The Defendants also alleged that the Indenture Trustees and Shapira "embarked upon a well-orchestrated and very public smear campaign targeting Ampal's management and directors," motivated by a desire to gain leverage in the negotiations, (*id.* at ¶ 32), knowing that it would cause potential investors in the Project to second guess any involvement with MNF or Ampal and apply even more pressure on Maiman to acquiesce to the bondholders' demands. (*Id.* at ¶¶ 34-37.) As a result, potential equity investors backed out, and MNF was unable to obtain debt financing from BNDES. (*Id.* at ¶ 38.)

### D.    The Motion for Summary Judgment

MAG subsequently moved for summary judgment. (*See Plaintiff's Notice of Motion for Summary Judgment*, dated Dec. 23, 2014 (ECF Doc. # 24); *Memorandum of Law in Support of Plaintiff Merhav Ampal Group, Ltd.'s Motion for Summary Judgment*, dated Dec. 23, 2014 ("*MAG Memo*") (ECF Doc. # 25).) As a threshold matter, MAG asserted that the Court had subject matter jurisdiction over the proceeding because recovery against the Defendants would likely net $10 million or more for Ampal and its subsidiaries. (*MAG Memo* at 5-6 (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984); *see also Declaration of Shlomi Kelsi*, dated

Dec. 15, 2014 ("*Kelsi Jurisdiction Declaration*"), at ¶ 6 (ECF Doc. # 15).)  On the merits, MAG

contended that the undisputed facts established a *prima facie* case for MNF's default on the 2008

Note, (*MAG Memo* at 8-9), and Maiman's breach of the Guaranty  (*Id.* at 12-13.)

The Defendants opposed the motion.[7]  They conceded that Ampal made a $20 million

loan to MNF in 2007 to partially finance the Project, (*Maiman Affidavit* at ¶ 4; *Response to Facts*

at ¶ 4, p. 2 of 9), the 2008 Note had superseded the 2007 Note (*Maiman Affidavit* at ¶ 7;

*Response to Facts* at ¶ 7, p. 3 of 9), Ampal later assigned the 2008 Note and other related

documents to MAG, (*Response to Facts* at ¶ 12, p. 4 of 9), and neither Maiman nor MNF had

paid the 2008 Note or Guaranty.  (*Id.* at ¶ 25, p. 7 of 9.)  The Defendants also agreed that Ampal

later exercised the option, (*id.* at ¶ 10, p. 3 of 9), and the transaction did not close by the "drop

dead" date.  (*See id.* at ¶ 15, p. 4 of 9.)   The Defendants contended, however, that the parties

always intended to convert the debt into equity in lieu of repayment, (*id.* at ¶ 1, p. 8 of 9), and

while Maiman did execute the Guaranty, he believed that the "primary security" for payment of

the 2008 Note remained the pledge of shares under the Pledge Agreement.  (*Maiman Affidavit* at

¶ 8; *Response to Facts* at ¶ 2, p. 8 of 9.)

In addition, the Defendants restated and elaborated the factual allegations in the *Answer*

and the third party complaint.  They alleged that they had been working diligently to secure the

third party debt financing that Ampal required before closing on the Option Exercise Agreement.

(*Maiman Affidavit* at ¶¶ 9-10.)  MNF had a commitment for a $270 million facility from BNDES,

but it required an additional equity investment of $75 million before BNDES would consummate

---

[7]     *See Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Request for Discovery Pursuant to Fed. R. Civ. P. 56(d)*, dated Jan. 20, 2015 ("*Opposition*") (ECF Doc. # 20); *Affidavit of Yosef A. Maiman*, dated Jan. 20, 2015 ("*Maiman Affidavit*") (ECF Doc. # 20-2); *Defendants' Response to Plaintiff's Rule 7056-1 Statement of Undisputed Material Facts*, dated Jan. 20, 2015 ("*Response to Facts*") (ECF Doc. # 21).

the deal.  (*Id.* at ¶¶ 11-12.)  MNF had received "strong expressions of interest" from at least six

investors by 2012.  Some of these investors had also conducted costly due diligence.  (*Id.* at ¶ 13.)

The Third Party Defendants' alleged statements caused these investors to back out of any

potential transactions, scuttling the BNDES deal and the Ampal option transaction as a result.

(*Id.* at ¶ 20.)  The Defendants alleged further that Ampal "did nothing to prevent or dissuade the

[Third Party Defendants] from causing these defamatory articles to be published."  (*Id.* at ¶ 18;

*see also Response to Facts* at ¶ 5, p. 8 of 9.)

The Defendants also argued that payment of the 2008 Note and Guaranty was excused for

two reasons.  First, MAG materially breached the Further Assurances Provision of the Option

Exercise Agreement, which required it to do "all things necessary, proper or advisable" to

consummate the transaction, by failing to stop the Third Party Defendants.   (*Opposition* at 9-10.)

Second, the doctrine of commercial frustration excused payment.  The purpose of the 2008 Note

was to provide Ampal with a right to buy into the Project, which was frustrated by the

unanticipated conduct of the Third Party Defendants.   (*Opposition* at 11-12; *Response to Facts*

at ¶ 16.)  Finally, the Defendants asserted that the Court should delay ruling on the motion for

summary judgment until the Defendants had an opportunity to conduct discovery under Rule

56(d) of the Federal Rules of Civil Procedure, contending that they needed discovery concerning

the Third Party Defendants' statements to the press and what efforts, if any, Ampal undertook to

curtail the Third Party Defendants.  (*Id.* at 20; *Declaration of Daniel A. Fliman*, dated Jan. 20,

2015, at ¶¶ 4-5 (ECF Doc. # 20-1).)

# DISCUSSION

## A.    Subject Matter Jurisdiction

Because this action involves non-debtors, the Court questioned its subject matter

jurisdiction and invited further briefing.[8]  The Court now concludes that it has "related to"

jurisdiction, and moreover, can enter a final judgment in light of the parties' express consent.

Section 1334(a) grants the district court original jurisdiction over all bankruptcy cases,

and § 1334(b) grants the district court original but non-exclusive jurisdiction over all civil

proceedings arising under title 11 or arising in or related to cases under title 11.  Civil

proceedings arising under title 11 or arising in a case under title 11 invoke substantive rights

under title 11 or rights that could only arise in the context of a bankruptcy case.  *Binder v. Price

Waterhouse & Co., LLP* (*In re Resorts Int'l, Inc.*), 372 F.3d 154, 162–63 (3d Cir. 2004).

"Related proceedings are those whose outcome might have a "conceivable effect" on the estate.

*Publicker Indus., Inc. v. United States* (*In re Cuyahoga Equip. Corp.*), 980 F.2d 110, 114 (2d Cir.

1992); *Pacor, Inc. v. Higgins* (*In re Pacor, Inc.*), 743 F.2d 984, 994 (3d Cir. 1984), *overruled in

part on other grounds by Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 124–25 (1995).

"An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities,

options, or freedom of action (either positively or negatively) and which in any way impacts

upon the handling and administration of the bankrupt estate."  *Pacor*, 743 F.2d at 994; *accord

Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995).

The district court may refer all cases and proceedings within its bankruptcy jurisdiction to

the bankruptcy court.  28 U.S.C. § 157(a).  The United States District Court for the Southern

---

[8]        *See Supplemental Memorandum of Law in Support of Plaintiff Merhav Ampal Group, Ltd.'s Motion for
Summary Judgment*, dated Feb. 20, 2015 ("*MAG Jurisdiction Brief*") (ECF Doc. # 25) and *Defendants' Submission
Concerning Subject Matter Jurisdiction*, dated Feb. 20, 2015 ("*Defendants' Jurisdiction Brief*") (ECF Doc. # 26).

District of New York first referred its bankruptcy jurisdiction to this Court pursuant to its *Order,*
No. M10–450, (S.D.N.Y. July 10, 1984), and following the Supreme Court's decision in *Stern v.
Marshall*, 131 S. Ct. 2594 (2011), issued an amended order of reference.  *See Amended Standing
Order of Reference,* No. M10–468, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012).

Title 28 divides bankruptcy proceedings into core proceedings and non-core proceedings.
Core proceedings correspond to proceedings that arise in the bankruptcy case or arise under title
11.  *Stern*, 131 S. Ct. at 2605.  Non-core proceedings are synonymous with "related to"
proceedings.  *Id.* (quoting 1 COLLIER ON BANKRUPTCY ¶ 3.02[2], p. 3–26, n.5); *see New York
Skyline, Inc. v. Empire State Bldg. Trust Co. L.L.C.* (*In re New York Skyline, Inc.*), 512 B.R. 159,
173 (S.D.N.Y. 2014), *aff'd*, 601 F. App'x 52 (2d Cir. 2015).  Absent the parties' consent to enter
a final judgment, the bankruptcy court can only issue proposed findings of fact and conclusions
of law that were then subject to *de novo* review.  28 U.S.C. 157(c)(1).[9]

The Defendants stated in the *Notice of Removal* that the state court action (asserting the
same claim alleged in the *Complaint*) was core, (*see Notice of Removal*, dated Sept. 24, 2014, at
¶ 4 (ECF Doc # 1), but I disagree.  The claims asserted by MAG against the Defendants do not
arise under title 11 or in a case under title 11.  They arose before the bankruptcy under non-
bankruptcy law.  Instead, the question is whether they are "related to" Ampal's bankruptcy case.
MAG, the party asserting the subject matter jurisdiction of the bankruptcy court, bears the

---

[9]       Title 28, § 157(c)(1) states:

A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise
related to a case under title 11.  In such proceeding, the bankruptcy judge shall submit proposed
findings of fact and conclusions of law to the district court, and any final order or judgment shall
be entered by the district judge after considering the bankruptcy judge's proposed findings and
conclusions and after reviewing de novo those matters to which any party has timely and
specifically objected.

burden of proof on the issue. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."); *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) ("The burden of proving jurisdiction is on the party asserting it.").

The jurisdictional facts are set forth in the *Kelsi Jurisdiction Declaration*. MAG does not operate and is winding up. (*Kelsi Jurisdiction Declaration* at ¶ 4.) It owes approximately $10.7 million in current liabilities to the Israeli taxing authorities and other third party creditors. (*Id.* at ¶ 5.) MAG also owes approximately $61.9 million directly to Ampal and $266.8 million and $54.2 million to Ampal (Israel) Ltd. and Ampal Holdings (1991) Ltd., respectively, under capital notes currently in default. (*Id.*) Although it appears to be insolvent, and any direct or indirect equity interest in MAG is valueless, MAG will have approximately $10 million available after payment of its tax and third party liabilities to make a payment on the capital notes to Ampal and the other subsidiaries if it prevails in this adversary proceeding. (*Id.* at ¶ 6.)

Disputes between third parties are "related to" a bankruptcy if they "bring into question the very distribution of the estate's property." *Cuyahoga Equip.*, 980 F.2d at 114. Despite *Pacor's* seemingly more restrictive test, courts in this district have regularly held that "[i]f a resolution of an action between nondebtors would affect the amount of property available for distribution to the creditors of a bankruptcy estate . . . such civil proceeding will be regarded as related to the bankruptcy case." *Kolinsky v. Russ* (*In re Kolinsky*), 100 B.R. 695, 702 (Bankr. S.D.N.Y. 1989); *accord Sealink Funding Ltd. v. Bear Stearns & Co.*, No. 12 Civ. 1397 (LTS)(HBP), 2012 WL 4794450, at *2 (S.D.N.Y. Oct. 9, 2012); *Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*, No. 11 Civ. 2232 (NRB), 2011 WL 4965150, at *3 (S.D.N.Y. Oct. 19, 2011); *see also Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, No. 11 Civ. 6212 (BSJ), 2011 WL 6778473,

at *4 (S.D.N.Y. Dec. 20, 2011) ("related to" jurisdiction over a third party action existed where recovery by plaintiff would reduce the amounts available for distribution in bankruptcy case); *Five Mile Capital II SPE ESH LLC v. Cerberus Capital Mgmt.* (*In re Extended Stay Inc.*), 435 B.R. 139, 150, 152 (S.D.N.Y. 2010) ("related to" jurisdiction over third-party action existed where indemnity claim against the estate could conceivably affect distributions).

This does not mean that a bankruptcy court has "related to" jurisdiction over every action by a debtor of a bankruptcy debtor to recover money from a third party.  The bankruptcy court's "related to" jurisdiction is not limitless.  *Celotex Corp. v. Edwards,* 514 U.S. 300, 308 (1995); *In re Turner,* 724 F.2d 338, 341 (2d Cir.1983) ("… Congress must have intended to put some limit on the scope of 'related to' jurisdiction.").  "Thus, any contingencies cannot be too far removed; too many links in the chain of causation before the bankruptcy estate is affected may preclude 'related to' jurisdiction."  *Allstate Ins. Co.*, 2011 WL 4965150, at * 3; *accord Sealink Funding*, 2012 WL 4794450, at *2.  In a typical case, the lawsuit by the debtor of the bankruptcy debtor may result in a successful outcome, and the successful outcome may enhance the plaintiff's financial ability to pay the debtor's claim, and this may make it more likely that the plaintiff will pay the debtor's claim.  On the other hand, the plaintiff may pay other debts or keep the money. These links are too remote to be "related to" the bankruptcy case; if they were not, the bankruptcy court's "related to" jurisdiction over third party disputes involving a party that owes the debtor money would be virtually limitless.

Here, however, the link is more direct.  The person in charge of prosecuting this adversary proceeding on behalf of MAG is also the Trustee of Ampal.  If MAG recovers a judgment, it may have $10 million or more to distribute after satisfying MAG's tax and third-

party debts.  MAG owes substantial amounts to Ampal and its affiliates, and the Trustee could conceivably use all of the remaining proceeds to satisfy Ampal's $62 million claim.[10]

The cases cited by the Defendants are distinguishable.  In *Samuel's Temple Church of God in Christ v. Parade Place, LLC* (*In re Parade Place, LLC*), 508 B.R. 863 (Bankr. S.D.N.Y. 2014), the plaintiff contended that the bankruptcy court had jurisdiction over a money damage claim against one of the non-debtor defendants.  There was no evidence that the plaintiff's recovery would inure to the benefit of the debtor.  Hence, the court concluded that it had no jurisdiction to hear the monetary claim since it could not have any conceivable effect on the bankruptcy estates.  *Id.* at 872.

The Defendants also referred to *Feldman v. Trustees of Beck Indus., Inc.* (*In re Beck Indus., Inc.*), 479 F.2d 410 (2d Cir. 1973) and *Tower Auto. Inc. v. Grupo Proeza (In re Tower Auto.)*, 356 B.R. 598 (Bankr. S.D.N.Y. 2006), two cases the Court mentioned when it raised the issue of its subject matter jurisdiction.  In *Beck*, a chapter X case decided under the former Bankruptcy Act, the Court of Appeals reversed lower court orders that had enjoined lawsuits brought against the debtor's solvent, non-debtor subsidiary, based on lack of subject matter jurisdiction.  The court reasoned that the debtor did not own the assets of the subsidiary, and although the lawsuit might lessen the value of the debtor's equity interest and the worth of the debtor's estate, it would not affect the debtor's title to the subsidiary's stock.  *Id.* at 416.

---

[10]    The Defendants' jurisdictional opposition assumes that the Trustee must distribute the remaining proceeds (which may be less than what Kelsi projected) *pari passu* among MAG's affiliated creditors, who may also be insolvent, netting Ampal only 16% of the distribution.  (*Defendants' Jurisdiction Brief* at ¶ 10).  There is no requirement that the effect on the estate be certain or likely.  *Bayerische Landesbank v. Deutsche Bank AG* (*In re Residential Capital, LLC*), 488 B.R. 565, 572-73 (Bankr. S.D.N.Y. 2013); *see also Am. Int'l Grp.*, 2011 WL 6778473, at *4 (holding that the conceivable effect test does not require a "substantial" or "concrete" effect); *Extended Stay*, 435 B.R. at 150 (noting that adversary proceeding could "as a technical matter" affect distribution and that bankruptcy court had jurisdiction "however unlikely it might be" that there would be sufficient assets to distribute to creditors).  Furthermore, I am not aware of any rule that would prevent MAG from preferring Ampal over MAG's other affiliated creditors.  In any case, 16% of $10 million is still $1.6 million.

Similarly, in *Tower*, a non-debtor subsidiary of the debtor filed an adversary proceeding to enjoin

a Mexican litigation and compel arbitration of a dispute with a third party joint venturer.

Relying on *Beck* and the test for "related to" jurisdiction established under *Pacor*, the bankruptcy

court ruled that the possible diminution in the value of the subsidiary's stock was not sufficient

to confer jurisdiction over the dispute.  *Tower*, 356 B.R. at 600-01.  The bankruptcy court added

that the non-debtor plaintiff remained out of bankruptcy, allowing it to operate its business and

pay its creditors free of the burdens of the Bankruptcy Code.  In exchange, it could not bring its

third-party dispute into the bankruptcy court as a controversy "related to" the pending

bankruptcy case.  *Id.* at 603.

  *Beck* is still considered to be good law.  *Tower*, 356 B.R. at 601 (collecting cases).

Decisions like *Beck* and *Tower* reflect a line that courts have drawn to cabin the reach of the

bankruptcy court's "related to" jurisdiction.  Absent an *alter ego* relationship between the debtor

and the non-debtor subsidiary, a bankruptcy court lacks "related to" jurisdiction over disputes

between a non-debtor subsidiary and a third party that may affect the value of the subsidiary's

stock but not the debtor's title to that stock.  As another court observed in similar circumstances:

> EBC's action may have an effect on the ultimate value with [*sic*] the estate
> receives for the stock it owns, but it does not alter the estate's rights, liabilities,
> options or freedom of action.  If the court were to find that this action was under
> the jurisdiction of the Bankruptcy Court, the decision would have the result of
> bringing every wholly owned subsidiary into every Bankruptcy case regardless of
> the circumstances and without the safeguards afforded by schedules, statements of
> financial affairs, notices to creditors, or meetings of creditors.

*Equity Broad. Corp. v. Shubert* (*In re Winstar Commc'ns, Inc.*), 284 B.R. 40, 51 (Bankr. D. Del.

2002).

  When the Court originally raised the issue, it thought that the jurisdictional basis of this

action was the indirect parent-subsidiary relationship between Ampal and MAG.  It questioned

its jurisdiction in light of the decisions in *Beck* and *Tower*.  It has since become clear that the

parent-subsidiary relationship does not provide a jurisdictional basis to decide this adversary

proceeding because, *inter alia*, MAG is insolvent, its stock is worthless and the outcome of this

lawsuit will not relieve its insolvency.  Rather, the "related to" jurisdiction flows from the very

conceivable possibility that the Trustee will pay some or all of the net proceeds of any recovery

to Ampal in partial satisfaction of its $62 million claim against MAG.  In that event, it will

directly affect the distributions in this case.

Accordingly, the Court concludes that it has "related to" jurisdiction over MAG's claims

against the Defendants.  Furthermore, the parties have expressly consented to this Court's

authority to enter a final judgment.  (*See Notice of Removal* at ¶ 4 ("[E]ven if the State Court

Action is determined to be a non-core proceeding, Defendants consent to the entry of final orders

or judgments by the Bankruptcy Court."); *Complaint* at ¶ 4 ("Plaintiff MAG hereby consents to

the entry of final orders or judgments by this Court in this case, regardless of whether it is a core

or non-core proceeding."); *Answer* at ¶ 3 (admitting the allegation in ¶ 3 of the *Complaint* that

"defendants have consented to the entry of final orders or judgments by this Court in this case,

regardless of whether it is a core or non-core proceeding").)  In light of their consent, the Court

can hear and determine MAG's claims and enter appropriate orders and judgments.  28 U.S.C. §

157(c)(2)

## B.    Standard Governing Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary

proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, governs summary

judgment motions.  "The court shall grant summary judgment if the movant shows that there is

no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law."

FED. R. CIV. P. 56(a).[11]   The moving party bears the initial burden of showing that the undisputed

facts entitle it to judgment as a matter of law.  *Rodriguez v. City of New York,* 72 F.3d 1051,

1060–61 (2d Cir.1995).  If the movant carries this initial burden, the nonmoving party must set

forth specific facts that show triable issues, and cannot rely on pleadings containing mere

allegations or denials.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87

(1986); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  In deciding whether

material factual issues exist, all ambiguities must be resolved and all reasonable inferences must

be drawn in favor of the nonmoving party.  *Matsushita Elec.,* 475 U.S. at 587.

### 1.      The Plaintiff's *Prima Facie* Case

To establish a *prima facie* case under New York law for breach of an obligation to pay

under a promissory note, the plaintiff must submit proof of the note and the defendant's failure to

pay on the maturity date.  *Camofi Master LDC v. College P'ship, Inc.*, 452 F. Supp. 2d 462, 470

(S.D.N.Y. 2006); *RMM Records & Video Corp. v. Universal Music & Video Distrib. Co.* (*In re

RMM Records & Video Corp.*), 372 B.R. 603, 609 (Bankr. S.D.N.Y. 2007); *Dvoskin v. Prinz*,

613 N.Y.S.2d 654, 661 (N.Y. App. Div. 1994).  Once the plaintiff establishes a *prima facie* case,

the burden shifts to the defendant to prove the existence of a triable issue of fact relating to a

*bona fide* defense against payment of the note.  *Camofi*, 452 F. Supp. 2d at 470; *RMM Records*,

372 B.R. at 609.  The defendant may not rely on conclusory allegations to defeat a motion for

summary judgment for non-payment of a promissory note, and must demonstrate by admissible

evidence a genuine and substantial issue rebutting the plaintiff's right to payment.  *Camofi*, 452

---

[11]      The motion is governed by the amendments to Rule 56 that became effective on December 1, 2010.
Although some language has changed, the standard for granting summary judgment remains unchanged, and the
amendments will not "affect continuing development of the decisional law construing and applying these phrases."
FED. R. CIV. P. 56 advisory committee's note (2010).

F. Supp. 2d at 471; *RMM Records*, 372 B.R. at 609; *Dvoskin*, 613 N.Y.S.2d at 661; *Quest Commercial, LLC v. Rovner*, 825 N.Y.S.2d 766, 767 (N.Y. App. Div. 2006).

A similar standard applies to actions for breach of a guaranty under New York law. The plaintiff must prove the existence of the guaranty, the underlying debt, and the guarantor's failure to perform under the guaranty. *North Fork Bank Corp. v. Graphic Forms Assocs., Inc.*, 828 N.Y.S.2d 194, 195 (N.Y. App. Div. 2007); *JPMorgan Chase Bank v. Gamut-Mitchell, Inc*., 811 N.Y.S.2d 777, 777 (N.Y. App. Div. 2005); *Kensington House Co. v. Oram*, 739 N.Y.S.2d 572, 572 (N.Y. App. Div. 2002); *see also HSH Nordbank AG New York Branch v. Street*, 421 F. App'x 70, 72 (2d Cir. 2011); *AXA Inv. Managers UK Ltd. v. Endeavor Capital Mgmt. LLC*, 890 F. Supp. 2d 373, 381 (S.D.N.Y. 2012). The burden then shifts to the defendant to demonstrate by admissible evidence a triable issue of fact relating to a *bona fide* defense. *AXA Inv.*, 890 F. Supp. 2d at 381; *E.D.S. Sec. Sys., Inc. v. Allyn*, 691 N.Y.S.2d 567, 567 (N.Y. App. Div. 1999). Once again, conclusory allegations are insufficient to defeat a motion for summary judgment for breach of guaranty. *E.D.S.*, 691 N.Y.S.2d at 567.

MAG has established a *prima facie* case for breach of the 2008 Note and Guaranty, and in fact, the Defendants do not dispute its *prima facie* case. The evidence shows the execution of the 2008 Note and Guaranty, and despite due demand, MNF's failure to pay the 2008 Note and Maiman's failure to honor the Guaranty. The burden shifted to the Defendants to show a triable issue relating to a *bona fide* defense.

## 2.    The Defenses

Initially, Maiman's defenses are limited if they even exist. Under New York law, when a party guarantees "payment of a debt" as opposed to "collection of a debt," the guaranty is

absolute and unconditional, and there is no obligation to exhaust remedies against the original

obligor before proceeding against the guarantor. *U.S. Bank Nat'l Assoc. v. Perlmutter* (*In re*

*South Side House, LLC*), 470 B.R. 659, 675 (Bankr. E.D.N.Y. 2012); *see also New York City*

*Dep't of Fin. v. Twin Rivers, Inc.*, 920 F. Supp. 50, 52-53 (S.D.N.Y. 1996). The interpretation of

a guaranty is governed by generally applicable principles of contract interpretation under New

York law. *South Side House*, 470 B.R. at 675. The parties' intent, as expressed in the text of the

agreement, determines whether or not the guaranty is absolute and conditional. *AXA Inv.*, 890 F.

Supp. 2d at 384; *South Side House*, 470 B.R. at 675.

Here, the parties expressed a clear intent that the Guaranty was absolute and

unconditional. Maiman "irrevocably and unconditionally guarantee[d]…payment and

performance of the [2008 Note]" and was liable as a "primary obligor," (*Guaranty* at Art. 1.1),

the Guaranty was "an irrevocable, absolute, continuing guaranty of payment and performance

and not a guaranty of collection," (*id.* at Art. 1.3), and Ampal had no duty to exhaust remedies

against MNF or collateral before seeking payment from Maiman. (*Id.* at Art. 1.5.) Where a

guaranty states that it is absolute and unconditional, the guarantor is generally precluded from

raising any affirmative defenses. *HSH Nordbank*, 672 F. Supp. 2d 409, 418 (S.D.N.Y. 2009),

*aff'd*, 421 F. App'x 70 (2d Cir. 2011). Furthermore, a guarantor cannot assert defenses that it

expressly waived in the agreement. *Id.*; *Sterling Nat'l Bank v. Biaggi*, 849 N.Y.S.2d 521, 522

(N.Y. App. Div. 2008); *Citibank N.A. v. Plapinger*, 485 N.E.2d 974, 976-77 (N.Y. 1985).

MAG argued in its moving memorandum that the absolute and unconditional nature of

the Guaranty barred Maiman from asserting any defenses. (*MAG Memo* at 12-13.) Maiman did

not respond to this argument. His failure to oppose MAG's argument places an unacceptable

burden on me to construct his legal argument for him. *See Broad v. DKP Corp.*, No. 97 Civ.

2029 (LAP), 1998 WL 516113, at *3 (S.D.N.Y. Aug. 19, 1998), *aff'd*, 182 F.3d 898 (2d Cir.

1999) (unpublished opinion).  I decline to do so and deem Maiman to have conceded the point.

*Cf. WeCare Holdings, LLC v. Bedminster Int'l Ltd.*, No. 08-CV-6213, 2009 WL 604877, at *8

(W.D.N.Y. Mar. 9, 2009) ("As a result of the defendant's failure to respond to the plaintiffs'

arguments, the court finds that the defendant abandoned these claims relating to the eight

affirmative defenses and four counterclaims and thus plaintiffs' motion for summary judgment

with respect to those claims is granted.")

In any event, MNF can assert defenses to the 2008 Note, and even if Maiman could too,

the defenses they asserted plainly lack merit.  Their principal defense is to blame Ampal for their

breach.  They contend that the Third Party Defendants defamed MNF and Maiman and tortiously

interfered with MNF's efforts to consummate the Project, Ampal failed to stop the Third Party

Defendants (they don't say how this could have been accomplished) and Ampal's failure to stop

the Third Party Defendants' tortious conduct breached the Further Assurances Provisions in the

Option Agreement and the Option Exercise Agreement and excused payment.  (*Opposition* at 9-

10.)

The argument is frivolous.  Maiman ran Ampal at the time and also controlled MNF.  In

essence, the Defendants are contending that they should be excused from honoring the 2008

Note and Guaranty because they didn't do anything to stop the Third Party Defendants.  Suffice

it to say, a party may not cause a breach of contract and claim that the breach excused its own

obligation to perform.  *See Food Mgmt. Grp., LLC v. Matrix Realty Grp., Inc.* (*In re Food Mgmt.*

*Grp., LLC*), 372 B.R. 171, 192-93 (collecting cases).

Furthermore, the Further Assurances Provision required the parties to use "reasonable commercial efforts" to take "all Necessary Actions."  "Necessary Action" was defined as all actions reasonably necessary to cause a result that was required to be caused in the agreement, (Ex. B at Art. 1 (definition of "Necessary Action"; Ex. G at Art. 1 (same)), and required the parties to do "all things necessary, proper or advisable under all applicable Legal Requirements to consummate and make effective the transactions…."  "Legal Requirements" was defined as all judgments; all laws, ordinances and regulations; and all codes, standards, rules, requirements and criteria issued under any laws or regulations.  (Ex. B at Art. 1 (definition of "Legal Requirements"; Ex. G at Art. 1 (same)).  Neither the agreements nor the Further Assurances Provisions required Ampal to take affirmative steps to stop third party tortious conduct, or "prevent the Bondholders from defaming [MNF] or Mr. Maiman in order to ensure the Project Financing was not jeopardized."  (*Opposition* at 10.)   Furthermore, the Defendants do not even speculate on what "reasonable commercial efforts" Ampal should have made.  If the Bondholders were defaming MNF and Maiman, it was up to MNF and Maiman to stop them.

The Defendants also seek improperly to interject uncertainty and ambiguity into documents clear on their face.  *See Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61 (2d Cir. 2002) ("It is well established that a court may not admit extrinsic evidence in order to determine the meaning of an unambiguous contract.");  *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) ("If the language unambiguously conveys the parties' intent, extrinsic evidence may not properly be received, nor may a judicial preference be interjected since these extraneous factors would vary the effect of the contract's terms.").  Notwithstanding the absolute nature of the Guaranty, Maiman alleges that he understood that the pledge of shares under the Pledge Agreement constituted the "primary security" for the 2008 Note, implying that MAG was

required to first pursue remedies against the collateral. (*Maiman Affidavit* at ¶ 8.) His argument is contradicted by the plain terms of the Guaranty, which expressly disclaimed any obligation on MAG's part to pursue remedies against collateral before proceeding against Maiman, (*see Guaranty* at Art. 1.5), and acknowledged that "Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations." (Ex. E at Art. 2.3.)

The Defendants also argue that the 2008 Note was intended to allow Ampal to make an equity investment in the Project and that the purpose was frustrated by the Third Party Defendants' conduct. (*Opposition* at 10-12.) Frustration of purpose requires an unforeseen event, which, in the context of the entire transaction, destroys the underlying reasons for performing the contract. *Bank of Am. Nat'l Trust and Sav. Ass'n v. Envases Venezolanos, S.A.*, 740 F.Supp. 260, 266 (S.D.N.Y. 1990); *Matter of Fontana D'Oro Foods, Inc.*, 472 N.Y.S.2d 528, 532 (N.Y. Sup. Ct. 1983) (*Fontana I*), *rev'd*, 484 N.Y.S.2d 644 (N.Y. App. Div. 1985) (*Fontana II*), *aff'd*, 482 N.E.2d 1216 (N.Y. 1985) (*Fontana III*). "The frustrated purpose must be so completely the basis of the contract that, as both parties understood, without it, the transaction would have made little sense." *PPF Safeguard, LLC v. BCR Safeguard Holding, LLC*, 924 N.Y.S.2d 391, 394 (N.Y. App. Div. 2011); *Crown IT Servs., Inc. v. Koval-Olsen*, 782 N.Y.S.2d 708, 711 (N.Y. App. Div. 2004). When considering a claim of frustration of purpose, the Court must give effect to the intent of the parties as reflected in the language and the structure of their agreement. *See Suburban Tool & Die Co., Inc. v. Century Mold Co., Inc.*, 78 N.Y.S.2d 746, 747 (N.Y. App. Div. 2010); *Fontana III*, 482 N.E.2d at 1217 (holding that lower courts erroneously disregarded structure of transaction when considering frustration of purpose defense). Finally,

the doctrine of frustration of purpose does not apply where one of the parties assumed the risk.
*Fontana II*, 484 N.Y.S.2d at 645.

The unambiguous language of the loan documents and the structure of the transaction show that Ampal was making a loan with an option to convert its loan into equity. The purpose of the transaction, as stated in the 2008 Note at ¶ 3, was to finance the Project, and that purpose was fulfilled when MNF received $20 million from Ampal. *See Bank of Boston Int'l of Miami v. Arguello Tefel*, 644 F. Supp. 1423, 1426-27 (E.D.N.Y. 1986) (purpose of note was to borrow money, and purpose was fulfilled when promisor received the loan proceeds). Furthermore, if Ampal never intended to enforce the 2008 Note, it would not have insisted on collateral to secure the debt and the Guaranty. Ampal also bargained for an option to convert its loan into equity in the Project, provided MNF obtained another equity investor or third party financing. The Defendants' frustration argument ignores the structure of the lending transaction. It gave Ampal, not MNF, an option to convert the loan into equity and forego payment on the 2008 Note and Guaranty.

Moreover, the parties anticipated "ordinary deal risk," (*Maiman Affidavit* at ¶ 9; *Opposition* at 11), and MNF obviously bore the risk that it would not be able to get the necessary financing, for whatever reason, to relieve it of its obligation to Ampal. Ampal, a lender with the option, did not assume that risk. In fact, the structure of the option allowed Ampal to collect the debt if MNF could not procure the necessary third party investment in the Project. This conclusion follows even more strongly with respect to the Guaranty, which expressly waived Maiman's defense relating to

> [a]ny other action taken or omitted to be taken with respect to the Loan
> Documents, the Guaranteed Obligations, or the security and collateral therefor,
> whether or not such action or omission prejudices Guarantor or increases the

likelihood that Guarantor will be required to pay the Guaranteed Obligations
pursuant to the terms hereof, it is the unambiguous and unequivocal intention of
Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations
when due, *notwithstanding any occurrence, circumstance, event, action, or
omission whatsoever, whether contemplated or uncontemplated, and whether or
not otherwise or particularly described herein*, which obligation shall be deemed
satisfied only upon the full and final payment and satisfaction of the Guaranteed
Obligations.

(Ex. E at Art. 2.10 (emphasis added).)

Accordingly, the Defendants have failed to demonstrate a triable issue of fact relating to a

*bona fide* defense.

## C.    Delaying Resolution of the Motion to Allow for Discovery

Finally, the Defendants seek to forestall the determination of the motion to take discovery

under Rule 56(d) of the Federal Rules of Civil Procedure.  Rule 56(d) requires the non-moving

party to show by affidavit that it cannot, for specified reasons, present facts essential to its

opposition to a motion for summary judgment.  The affidavit must state the nature of the

discovery, how the facts sought are reasonably expected to create a genuine issue of material fact,

what efforts the affiant has made to obtain those facts, and why those efforts were unsuccessful.

*Cont'l Cas. Co. v. Marshall Granger & Co., LLP*, 921 F. Supp. 2d 111, 126-27 (S.D.N.Y. 2013).

Even where an affidavit is sufficient, the court may refuse to allow discovery if it deems the

request to be an excuse to embark on a fishing expedition.  *Id.*

The Defendants submitted a declaration of their counsel, Daniel A. Fliman, Esq.,

pursuant to the rule.  (*Declaration of Daniel A. Fliman*, dated Jan. 20, 2015 (ECF Doc. # 20-1).)

Fliman declared that the Defendants were entitled to take discovery of the Third Party

Defendants, specifically concerning their "statements to the press, how those statements were

reported, what, if anything Ampal did to try to curtail such conduct, and the impact such conduct

had on the Project." (*Id.* at ¶ 4.)  In addition, the Defendants were entitled to take discovery of the circumstances surrounding the execution of the 2008 Note and Guaranty and the parties' commercial expectations.

The Court has concluded that the actions by the Third Party Defendants did not excuse performance of the 2008 Note and Guaranty and extrinsic evidence relating to the 2008 Note and Guaranty are inadmissible because they are unambiguous.  Hence, discovery would not elicit any evidence material to the dispute and would serve no purpose other than to delay resolution of the matter further.  The Court declines, therefore, to permit the requested discovery and grants the motion for summary judgment.  MAG is directed to settle an order on notice.

Dated: New York, New York
        September 2, 2015

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Court