UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

In re:                                                    :
                                                          :
AMPAL-AMERICAN ISRAEL CORP.,                              :          Chapter 7
                                                          :          Case No.: 12-13689 (SMB)
                            Debtor.                       :
------------------------------------------------------------X
MERHAV AMPAL GROUP, LTD.                                  :
f/k/a MERHAV-AMPAL ENERGY, LTD.,                          :
                                                          :
                            Plaintiff,                    :
                                                          :
            -- against --                                 :
                                                          :
MERHAV (M.N.F.) LIMITED and                               :
YOSEF A. MAIMAN,                                          :
                                                          :
                            Defendants.                   :
------------------------------------------------------------X          Adv. P. No. 14-02385 (SMB)
MERHAV (M.N.F.) LIMITED and                               :
YOSEF A. MAIMAN,                                          :
                                                          :
            Third Party Plaintiffs,                       :
                                                          :
            -- against --                                 :
                                                          :
HERMATIC TRUST (1975) LTD. REZNIK PAZ                     :
NEVO R.P.N. TRUSTS 2007 LTD.,                             :
MISHMERET – TRUST COMPANY LTD.,                           :
PSAGOT INVESTMENT HOUSE, LTD.,                            :
MEITAV INVESTMENT HOUSE, LTD.,                            :
SHAPIRA & CO., and OFER SHAPIRA,                          :
                                                          :
            Third Party Defendants.                       :
------------------------------------------------------------X

**MEMORANDUM DECISION GRANTING
THIRD PARTY DEFENDANTS' MOTION TO DISMISS**

**A P P E A R A N C E S :**

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Counsel for the Third Party Plaintiffs*
1633 Broadway

New York, NY 10019

>  David M. Friedman, Esq.
>  Daniel A. Fliman, Esq.
>  P. Nii-Amar Amamoo, Esq.
>  Andrew R. Kurland, Esq.
>      Of Counsel

AKIN GUMP STRAUSS HAUER & FELD LLP
*Counsel for the Third Party Defendants*
One Bryant Park
New York, NY 10036

>  Sean E. O'Donnell, Esq.
>  Arik Preis, Esq.
>  Rachel E. Albanese, Esq.
>  Patrick M. Mott, Esq.
>      Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Merhav Ampal Group, Ltd. ("MAG"), an indirect wholly-owned subsidiary of the debtor,

Ampal-American Israel Corporation ("Ampal"), brought this adversary proceeding to recover on

a $20 million note executed by Merhav (M.N.F.) Limited ("MNF") and guaranteed by Yosef A.

Maiman ("Maiman," and with MNF, the "Defendants").  The Court granted summary judgment

in favor of MAG, *see Merhav Ampal Grp., Ltd. v. Merhav (M.N.F.) Ltd.*, Adv. P. No. 14-02385

(SMB), 2015 WL 5176395, at *14 (Bankr. S.D.N.Y. Sept. 2, 2015) ("*Ampal II*"), *appeal*

*docketed,* No. 15-cv-07949 (JSR) (S.D.N.Y. Oct. 8, 2015), and entered a money judgment

against the Defendants for an amount in excess of $28 million, inclusive of pre-judgment

interest.  (*Judgment in Adversary Proceeding*, dated Sept. 21, 2015 (ECF Doc. # 40).)[1]

---

[1]      "ECF Doc. # __" refers to documents filed on the electronic docket of this adversary proceeding.

Meanwhile, the Defendants filed a *Third-Party Complaint*, dated Nov. 24, 2014 ("TPC") (ECF Doc. # 8) against three Indenture Trustees[2] of three series of bonds issued by Ampal, two bondholders (Psagot Investment House, Ltd. ("Psagot") and Meitav Investment House, Ltd. ("Meitav")), and an Israeli attorney, Ofer Shapira, and his law firm Shapira & Co. (collectively, "Shapira," and with the Indenture Trustees, Psagot and Meitev, the "Third Party Defendants"). The TPC alleged that the Third Party Defendants tortiously interfered with certain of the Defendants rights and also included a count objecting to the Indenture Trustees' bankruptcy claims. The Third Party Defendants have moved to dismiss the TPC for lack of subject matter and personal jurisdiction and for failure to state a claim upon which relief can be granted.

For the reasons that follow, the Court dismisses Count III for failure to state a claim, and declines to exercise supplemental jurisdiction, to the extent it exists, over Counts I and II. Accordingly, the TPC is dismissed in its entirety.

## BACKGROUND[3]

Ampal, a New York corporation, is a holding company headquartered in Tel Aviv, Israel. (¶¶ 11, 16.)[4] It filed a chapter 11 case in this Court on August 29, 2012, (¶ 39), but the case was subsequently converted to chapter 7, and Alex Spizz ("Spizz") was elected chapter 7 trustee. (¶ 11.) Maiman is the controlling and majority shareholder of MNF, (¶ 3), and began serving as chairman of Ampal in or around April 2002 and as CEO in or around October 2006. (¶ 16.) During Maiman's tenure, Ampal focused its investment strategy on the energy, chemical, and

---

[2]     The Indenture Trustees are Hermatic Trust (1975) Ltd. ("Hermatic"), Reznik Paz Nevo R.P.N. Trusts 2007 Ltd. ("Reznik"), and Mishmeret – Trusts Company Ltd. ("Mishmeret").

[3]     The Background is derived from the TPC as well as those matters as to which the Court may take judicial notice.

[4]     Citations to the TPC are denoted as "(¶ __)."

related sectors.  (¶ 17.)  Ampal funded its operations and investments primarily by issuing three

series of debentures – Series A, Series B and Series C debentures (collectively, "Debentures") –

with face value totaling $268.7 million.  (¶ 18.)  The Debentures are held in trusts and controlled

by the Indenture Trustees for the benefit of bondholders.  (¶ 19.)  Psagot and Meitav were two of

the largest bondholders.  (¶ 20.)

## A.    The Ethanol Project and the Third Party Defendants' Interference

In or around 2006, MNF partnered with Ampal to explore the development of a facility

that would process and create ethanol from sugarcane (the "Project").  (¶¶ 21-22.)  In December

2007, Ampal agreed to loan MNF $20 million (the "Loan") to facilitate the purchase of the land

for development of the Project.  (¶ 23.)  The terms of the Loan were documented in various

agreements, including a promissory note dated December 25, 2007.  (¶ 23.)  Ampal was granted

the right to convert the debt into equity in the Project under the terms of a contemporaneously

executed option agreement.  (¶ 23.)

In December 2008, MNF and Ampal agreed to extend the maturity date of the Loan, and

Maiman executed a personal guaranty as additional security (the "Guaranty").  (¶ 24.)  In

December 2009, MNF and Ampal agreed that the Project needed more time and entered into an

"Option Exercise Agreement" under which Ampal exercised its right to convert the Loan into a

25% equity interest in the MNF subsidiary developing the Project.  (¶ 25.)  The debt-to-equity

conversion was conditioned on MNF securing debt financing for the Project needed to fund the

development of the ethanol refinery facility and sugarcane plantation ("Project Financing").  (¶

25.)  Under the agreement, failure to secure Project Financing by December 31, 2010 would

cancel the debt-to-equity conversion, and the Loan would become due.  (¶ 25.)

On December 31, 2010, Ampal assigned its interests and rights in the Loan and Guaranty, as well as the Option Exercise Agreement, to MAG.  (¶ 24 n. 3; *Ampal II*, 2015 WL 5176395, at *3.)  Ampal and MNF subsequently agreed to extend the term of the Option Exercise Agreement an additional two times, until December 31, 2012.  (¶ 26.)

During 2011 and 2012, the Defendants made progress on the Project, including (1) arranging to acquire or lease almost 30,000 acres of land, (2) receiving a "Tax Free Zone" determination covering the refinery plant itself and various tax reliefs for the import of goods and services, (3) obtaining a license to develop a port on the Magdalena River, and (4) negotiating an agreement with a Brazilian contractor.  (¶ 27.)  MNF had also obtained the approval of Seguradora Brasileira de Crédito á Exportação, a government loan insurer, to back $270 million of Project Financing from the Brazilian Development Bank ("BNDES")[5].  (¶ 27.)  The BNDES Project Financing was conditioned on raising an additional amount of equity to bring the Project to fruition.  (¶ 28.)  To secure the final commitment for the Project Financing, MNF sought additional equity investors.  During 2011-2012, negotiations proceeded with at least six potential investors, many of whom signed letters of intent or preliminary commitments.  (¶ 28.)

Notwithstanding progress on the Project, Ampal faced difficulties in connection with its most significant preexisting investments.  (¶ 29.)  As a result of turmoil in the Middle East in 2011, often referred to as the "Arab Spring," companies to which Ampal had dedicated the majority of its investment resources began to experience financial strife.  (¶ 29.)  These difficulties prevented those companies from paying dividends to Ampal.  (¶ 29.)  As a result,

---

[5]      BNDES is the abbreviation for Banco Nacional de Desenvolvimento Econômico e Social.

Ampal was unable to meet its debt service obligations on the Debentures, (¶ 29), and beginning in or around January 2012, commenced negotiations with the Indenture Trustees and the bondholders regarding alternative repayment terms.  (¶ 30.)  Negotiations continued for approximately eight months, but no restructuring deal was reached due to the bondholders' unreasonable demands.  (¶ 31.)

The Third Party Defendants also embarked on a public smear campaign to improve their negotiating leverage.  (¶ 32.)  "Numerous articles with inflammatory and untrue comments appeared in media outlets" containing "defamatory and utterly false statements made by the [b]ondholders and their representatives regarding the directors' appropriation of corporate funds, their inability to lead Ampal, and their failure to live up to supposed obligations to the [b]ondholders. . . ." (¶ 33.)  Moreover, the Third Party Defendants even blamed the political uprising and terrorist attacks that had occurred in Egypt on the Ampal directors.  (¶ 33.)

The Third Party Defendants also sought to gain leverage over the Ampal debt restructuring by causing potential investors in the Project to second guess any involvement with Ampal or MNF.  (¶ 34.)   During the restructuring negotiations, the Third Party Defendants were aware that Ampal and MNF were negotiating with potential Project investors so that BNDES would proceed with the $270 million Project Financing, and the $20 million Loan would be converted to a 25% equity stake in the Project for Ampal.  (¶ 35.)  They believed that Maiman had "more to lose" than Ampal if the Project failed given MNF's greater stake in the Project, and would be more likely acquiesce in their demands if they could influence MNF's efforts to raise equity for the Project.  (¶ 36.)  Accordingly, the Third Party Defendants had the incentive to ensure regular publication of defamatory articles in order to dissuade potential Project investors from working with Ampal while negotiations continued.  (¶ 37.)  As a consequence of the Third

Party Defendants' improper conduct, all potential investors pulled out of the Project. (¶ 38.)

This prevented the Project Financing from BNDES, and in turn, prevented the debt-to-equity

conversion of the $20 million Loan. (¶ 38.) The Third Party Defendants were aware that absent

conversion, MNF and Maiman would be unable to repay the Loan and Guaranty. (¶ 38.) Ampal

was unable to reach a deal with the bondholders and filed a chapter 11 petition on August 29,

2012. (¶ 39.)

The Third Party Defendants' conduct prevented the Project Financing from going

forward, and consequently, the Project, "25% of which would have been owned by Ampal or

MAG," was never completed. (¶ 40.) Thus, Ampal "lost the opportunity to own a large portion

of what would have been an extremely lucrative asset." (¶ 40.)[6]

## B.    The Third Party Action

The TPC asserted three claims for relief. Count I alleged that the Third Party Defendants

tortiously interfered with the Loan and Guaranty. As a result of their "systematic, coordinated

dissemination of defamatory content regarding Ampal, [MNF], and Ampal's directors, including

Maiman," (¶ 46), potential Project investors backed out and the Project Financing could not

close. (¶ 47.) Absent Project Financing, the Third Party Defendants knew (i) MNF "would be

unable to repay the Loan" constituting a breach of the Loan documents, and (ii) "Maiman would

---

[6]     The TPC also alleged that the bondholders' representatives informed the Israeli press that they intended to force a sale of Gadot (one of Ampal's portfolio companies). The very next day, Israel Discount Bank nominated a receiver for Gadot's shares, and the appointment of a receiver caused Ampal to lose tens of millions of dollars in its investment in Gadot. (¶ 42.) The Defendants' opposition papers did not mention Gadot. Instead, the only harm to Ampal that they discussed related to the Project. Hence, to the extent the Defendants asserted Gadot-related claims against the Third Party Defendants, I deem those claims to have been abandoned. *See Hanig v. Yorktown Cent. Sch. Dist.,* 384 F.Supp.2d 710, 723 (S.D.N.Y.2005) ("[B]ecause plaintiff did not address defendant's motion to dismiss with regard to this claim, it is deemed abandoned and is hereby dismissed.").

be unable to repay the Guaranty." (¶ 48.)  The Defendants asserted damages resulting from their inability to meet their contractual obligations.  (¶ 49.)

Count II asserted a claim for tortious interference with prospective business relations.  As a result of the same conduct by the Third Party Defendants, "the potential equity investors either backed out of the Project or, at a minimum, questioned their involvement in it," (¶ 52), and MNF "was forced to abandon the Project,"  causing harm to the Defendants.  (¶ 54).  For convenience, Counts I and II are referred to as the "Tortious Interference Claims."

Count III sought to disallow and expunge the Indenture Trustees' proofs of claim (the "Claims") pursuant to 11 U.S.C. § 502(b)(1).[7]  The Defendants asserted that Ampal would have received an equity interest in the Project had it been successful.  (¶ 56.)  The Third Party Defendants actions made it impossible for the Project to come to fruition and deprived Ampal of this valuable asset.  (¶¶ 57, 61.)  They acted immorally and unconscionably, (¶ 62), and the Claims should be expunged on the basis of "unclean hands."  (¶ 63.)  Alternatively, the Claims should be reduced, or offset, by the value of the equity interest in the Project that Ampal would have received.  (¶ 64.)  These two branches of Count III are referred to, respectively, as the "Disallowance Claim" and the "Setoff Claim."

The Third Party Defendants moved to dismiss the TPC on February 26, 2015.[8]  They argued that (1) the Court lacked subject matter jurisdiction over the Tortious Interference Claims

---

[7]        The TPC implies that Psagot and Meitav filed proofs of claim, (¶ 13), and Count III is also asserted against them.  The claims register does not reflect that they filed claims, but in light of the disposition of Count III, it is unnecessary to resolve this question.

[8]        *See Third-Party Defendants' Notice of Motion to Dismiss the Third Party Complaint*, dated Feb. 26, 2015 (ECF Doc. # 28) and *Third Party Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Third Party Complaint*, filed Feb. 26, 2015 ("*Moving Memo*") (ECF Doc. # 29).

because they were not "related to" Ampal's bankruptcy, (*Moving Memo* at 15-17), (2) the Court

lacked personal jurisdiction over the Third Party Defendants, (*id*. at 17-21), and (3) the Tortious

Interference Claims were time-barred because they were disguised defamation claims subject to

a one-year statute of limitation.  (*Id*. at 22-27.)  The Indenture Trustees also argued that the

Defendants lacked standing to object to the Claims through Count III, (*id*. at 28-29) and the

objection were otherwise meritless and facially implausible.  (*Id*. at 29-34.)  Finally, they argued

that the Setoff Claim was invalid because the TPC did not identify a claim belonging to Ampal.

(*Id*. at 34-35.)

The Defendants opposed the motion.[9]  They argued that this Court had jurisdiction over

all claims in the TPC because they were "related to" the Ampal bankruptcy, (*Opposing Memo* at

7-8), or in the alternative, the Court could exercise supplemental jurisdiction over the Tortious

Interference Claims.  (*Id*. at 8-10.)  Next, they argued that the bondholder defendants consented

to jurisdiction by filing the Claims, appearing in the bankruptcy case and filing motions.  (*Id.* at

10-12.)  The Defendants also asserted that the Tortious Interference Claims were not disguised

defamation claims because they alleged an injury distinct from reputational harm.  (*Id.* at 14-17.)

Further, they had standing to prosecute the Disallowance Claim, (*id*. at 18-20) and unclean hands

provided a complete defense to the Claims.  (*Id*. at 20-23.)  Finally, the Setoff Claim was valid

because the injury to Ampal was "plausible" given Ampal's equity in MAG.  (*Id*. at 25-26.)

The Third Party Defendants replied[10] reiterating the arguments made in the *Moving*

*Memo*, and the Court heard oral argument on June 2, 2015.  During oral argument, counsel for

---

[9]        *Third-Party Plaintiffs' Opposition to Third Defendants' Motion to Dismiss the Third Party Complaint*,
dated Apr. 13, 2015 ("*Opposing Memo*") (ECF Doc. # 33).

[10]       *Third-Party Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss the
Third Party Complaint*, filed May 26, 2015 ("*Reply*") (ECF Doc. # 36).

the Defendants acknowledged that Count III was the jurisdictional hook; the supplemental

jurisdiction over Counts I and II flowed from the Court's jurisdiction over Count III.  (*Transcript*

*of June 2, 2015 Hearing* at 35:11-20.)

## DISCUSSION

### A.    Standing to Pursue the Disallowance Claim

The Defendants have standing to object to the Claims.  Section 502(a) provides that a

"claim . . . is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  A

creditor is a "party in interest" under section 502(a).  *Pascazi v. Fiber Consultants, Inc.*, 445

B.R. 124, 128 (S.D.N.Y. 2011); *accord* 4 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON

BANKRUPTCY ¶ 502.02[2][d] at 502-13 (16th ed. 2015) ("COLLIER") ("There is no doubt that the

phrase "parties in interest" in section 502(a) includes those who have some interest in the assets

of the debtor being administered in the case.  Under such definition, the debtor's creditors are the

primary parties in interest.").  The claims register reflects that MNF and Maiman filed proofs of

claim, and the Third Party Defendants do not dispute that they are creditors of Ampal.

The Third Party Defendants nonetheless argue that Defendants lack standing to object to

the Claims because, in a chapter 7 case, parties in interest may not object to a claim until the

trustee has refused to do so.  (*Moving Memo* at 28-29.)  Despite the plain language of section

502(a), a creditor's standing to object to a proof of claim in a chapter 7 case has been questioned.

*See Kowal v. Malkemus* (*In re Thompson*), 965 F.2d 1136, 1147 (1st Cir. 1992) ("[A]bsent leave

of court, the chapter 7 trustee alone may interpose objections to proofs of claim.  Leave to object

is not generally accorded an individual creditor unless the chapter 7 trustee refuses to object,

notwithstanding a request to do so, and the bankruptcy court permits the creditor to object in the

trustee's stead."); *Pascazi*, 445 B.R. at 128-29 (observing that the "majority of courts" allow

only chapter 7 trustees to object to claims absent leave of court and collecting cases); *In re Manshul Constr. Corp.*, 223 B.R. 428, 430-31 (Bankr. S.D.N.Y. 1998) (agreeing with *Thompson* in *dicta*); *but see In re C.P. Hall Co.*, 513 B.R. 540, 543-44 (Bankr. N.D. Ill. 2014) ("The right to object to claims that section 502(a) grants creditors . . . is unqualified."). "Demands of orderly and expeditious administration have led to a recognition that the right to object is generally exercised by the trustee." FED. R. BANKR. P. 3007 advisory committee's note; *In re Sinclair's Suncoast Seafood, Inc.*, 140 B.R. 588, 592 (Bankr. M.D. Fla. 1992) ("If every creditor were entitled to challenge the claim of another creditor . . . an orderly administration could degrade to chaos.") (quoting FED. R. BANKR. P. 3007 editor's comment); *accord* 4 COLLIER ¶ 502.02[2][d] at 502-13 (while a creditor's right to object "should be undisputed on principal . . . needs of orderly and expeditious administration do not permit the full and unfettered exercise of such right.").

The question raised by the foregoing authorities need not detain us for long.  Spizz has not opposed the Third Party Defendants' efforts to disallow or reduce the Claims, and he does not intend to file his own objection for the reasons discussed in *In re Ampal-Am. Israel Corp.*, 534 B.R. 569 (Bankr. S.D.N.Y. 2015) ("*Ampal I*").  There, the Defendants objected to the retention of Tarter Krinsky & Drogin LLP as substitute counsel for Spizz, and sought to disqualify him as trustee.  They asserted, among other things, that Spizz refused to pursue claims against the Third Party Defendants based on the same conduct alleged in the TPC.

In opposition, Spizz explained that he did not see any merit in the claims against the Third Party Defendants.  Maiman never mentioned their wrongful conduct or pursued them while he ran Ampal, and Ampal's "[Local Bankruptcy] Rule 1007-2 Declaration [ran] on for twenty-three pages without mentioning the ethanol project or the tortious conduct of the

bondholders or Shapira." *Ampal I*, 534 B.R. at 586.  Thus, their timing was suspect and

appeared to be "a litigation tactic," *id*. at 586-87.  In addition, the Defendants had failed to

identify any of the defamatory statements supporting the claims, *id*. at 587, and the pursuit of

claims against the Third Party Defendants could undermine MAG's claims against the

Defendants under the Loan and Guaranty.  *Id*.  In short, Spizz wholly discounted the claims that

the Defendants are asserting against the Third Party Defendants in the TPC, and is not likely to

object to the Claims, if at all, on that basis.

## B.    Count III

### 1.    The Disallowance Claim

Section 502(b)(1) of the Bankruptcy Code provides that, upon objection to a claim, "the

court . . . shall determine the amount of such claim . . . and shall allow such claim in such

amount, except to the extent that (1) such clam is unenforceable against the debtor and property

of the debtor, under any agreement or applicable law for a reason other than because such claim

is contingent or unmatured."  11 U.S.C. § 502(b)(1).  The Indenture Trustees filed the Claims in

the Ampal bankruptcy case, (¶ 43), on account of the unpaid Debentures.  MNF and Maiman

assert that these claims should be "disallowed and expunged under 11 U.S.C. § 502(b)(1) on the

basis of the unclean hands" or immoral conduct of the Third Party Defendants.  (¶ 63.)

The parties dispute the threshold question of whether unclean hands is a defense to the

non-payment of the Debentures.  The doctrine of unclean hands is based on the maxim that "one

who comes into equity must come with clean hands."  *Bentley v. Tibbals*, 223 F. 247 (2d Cir.

1915).  The defense is limited by the rule that the plaintiff's improper conduct "must be related

in some substantial and significant way to the claim he now asserts."  1 DAN B. DOBBS, LAW OF

REMEDIES § 2-4(2), at 95 (2nd ed. 1993) ("DOBBS") (footnote omitted).  Thus, under New York

law,[11] the unclean hands doctrine "bars the grant of equitable relief where the defendant proves:

'(1) that the plaintiff is guilty of immoral, unconscionable conduct directly related to the subject

matter in litigation; (2) that the conduct was relied upon by the defendant; and (3) that the

defendant was injured thereby.'" *Atl. Cas. Ins. Co. v. Coffey*, 548 F. App'x 661, 664 (2d Cir.

2013) (quoting *Lia v. Saporito*, 909 F. Supp. 2d 149, 174 (E.D.N.Y. 2012), *cert. denied*, 134 S.

Ct. 2305 (2014)).

        As an equitable defense, unclean hands will not bar a legal claim. *Aetna Cas. & Sur. Co.*

*v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 607 (2d Cir. 2005) (adopting the District Court's

decision holding, *inter alia*, that defendant may not "avail itself of the unclean hands as a

defense" because plaintiff was seeking "damages in an action at law"); *Chevron Corp. v.*

*Salazar*. Nos. 11 cv 3718, 11 cv 0691 (LAK), 2011 WL 3628843, at *6 n. 39 (S.D.N.Y. Aug. 17,

2011) (collecting cases).  However, unclean hands finds its legal counterpart in the doctrine of *in*

*pari delicto*, *Byron v. Clay*, 867 F.2d 1049, 1052 (7th Cir. 1989) (Posner, J.); *see Kirschner v.*

*KPMG LLP*, 938 N.E.2d 941, 960 (N.Y. 2010) (noting the "doctrinal similarity" between the

defense of unclean hands and *in pari delicto*) (citing *Stahl v. Chem. Bank*, 655 N.Y.S.2d 24, 25

(N.Y. App. Div. 1997)), which "instructs courts to refrain from intervening in a dispute between

two parties at equal fault." *Id.* at 961.  Perhaps reflecting the merger of law and equity, courts

use unclean hands and *in pari delicto* interchangeably, 1 DOBBS § 2.4(2), 93 n. 6, and apply

unclean hands to bar legal relief where the "plaintiff's reprehensible conduct is 'directly related

to the subject matter in litigation and the party seeking to invoke the (unclean hands) doctrine

---

[11]        The parties' cited and discussed New York law on the issue of whether the unclean hands defense was
available.  (*See Moving Memo* at 30-31; *Opposing Memo* at 20-21; *Reply* at 15-56.)  They also relied on New York
law in discussing the viability of the setoff defense discussed later in the text.  (*See Moving Memo* at 34-35;
*Opposing Memo* at 25-26.)  As a result, they have impliedly consented to the Court's application of New York law.
*Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014) (quoting *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d
Cir. 2000)).

was injured by such conduct.'" *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 75 (2d Cir. 1980)

(Friendly, J.) (quoting *Weiss v. Mayflower Doughnut Corp.*, 135 N.E.2d 208, 210 (N.Y. 1956)),

*cert. denied*, 449 U.S. 1123 (1981).

The Claims asserted by the Indenture Trustees are obviously legal in nature and arise

from Ampal's failure to pay off the Debentures.  To serve as a bar under New York law, the

Indenture Trustees' unclean hands must directly relate to the Claims.  But the present

bondholders or their predecessors, whose interests the Indenture Trustees represent, purchased

the Debentures for consideration that flowed to Ampal, and years later, they engaged in tortious

conduct (according to the Defendants) that had no connection to their Claims in this case.

Hence, the unclean hands defense does not bar the Claims.

The Defendants nevertheless argue that the law is "unsettled," (*Opposing Memo* at 20),

and cite to several decisions they say support the opposite conclusion.  They do not.  For

example, in *Ins. Co. of N. Am. v. Milberg Weiss Bershad Specthrie & Lerach*, No. 95 cv 3722

(LLS), 1996 WL 520902 (S.D.N.Y. Sept. 12, 1996), the defendant law firm counterclaimed for

damages resulting from the plaintiff insurer's breach of contract and bad faith refusal to defend,

and the insurer sought leave to amend its answer to the counterclaim to assert equitable defenses

including unclean hands.  *Id.* at *8.  The District Court ruled that "equitable defenses — waiver,

estoppel and unclean hands — may be asserted regardless of the legal nature" of the claim, and

cited *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295 (1996) and *Mallis* in support.  *Id.* at *8.

Neither Second Circuit case supported the District Court's conclusion.  In *Readco*, which

did not involve unclean hands, the plaintiff asserted affirmative claims for relief based on

estoppel and waiver and not as defenses to legal claims.  In *Mallis*, the Court addressed whether

unclean hands (*i.e.*, *in pari delicto*) barred the plaintiffs' legal claims for fraud and negligent

misrepresentation.  Quoting *Weiss v. Mayflower Doughnut Corp*, Judge Friendly observed that

unclean hands is a defense when the underlying conduct is entwined with the subject matter of

the litigation, but concluded that unclean hands did not apply because "appellants' supposedly

wrongful actions do not possess the requisite connection to the subject matter in litigation."

*Mallis*, 615 F.2d at 75.  His conclusion reinforced the general rule that unclean hands does not

apply to legal claims except where the plaintiff seeks to reap the fruits of his own immoral

conduct.[12]

MNF and Maiman also cite two New York Appellate Division cases – *Ta Chun Wang v.*

*Chun Wong*, 557 N.Y.S.2d 434 (N.Y. App. Div. 1990), *appeal denied*, 77 N.Y.S.2d 804 (N.Y.),

*cert. denied*, 501 U.S. 1252 (1991) and *Smith v. Long*, 723 N.Y.S.2d 584 (N.Y. App. Div. 2001)

– but both involved situations in which the plaintiffs' unclean hands were intertwined with the

claims they asserted.  In *Chun Wong*, the plaintiff, an illegal alien at the time, entered into a

conspiracy with the defendants, husband and wife, to pose as the husband for the purpose of

purchasing a home and applying for a mortgage.  The plaintiff executed the note and mortgage in

the defendant husband's name (with the defendant wife), and impersonated the defendant

husband at the closing.  557 N.Y.S.2d at 435.

---

[12]       In *RST (2005) Inc. v. Research In Motion Ltd.*, No. 07 cv 3737 (VM), 2008 WL 5416379 (S.D.N.Y. Dec.
17, 2008) another District Court Judge also rejected the *Milberg* court's conclusion for a different reason.  The
*Milberg* Court, it said, had mistakenly relied on *Mallis*, a case that "considered and rejected on the merits an unclean
hands defense in a legal action, without considering whether the defense was available in a legal action."  *Id.* at *8.
As noted in the text, however, Judge Friendly specifically addressed New York's unclean hands defense and
concluded that it would bar a legal claim (there, fraud and negligent misrepresentation) if the plaintiffs' wrongful
conduct was directly related to the subject matter of the litigation.

The plaintiff subsequently sued the defendants to reform the deed, to impose a constructive trust and equitable lien and for damages, but the Appellate Division affirmed the dismissal of the complaint.  It ruled "that the plaintiff's unclean hands in participating in a course of conduct of deception and deceit is an effective bar to all of the causes of action in the complaint, including . . .  the cause of action sounding in fraud.  Having engaged in a fraudulent scheme involving the conveyance of the premises, the plaintiff has forfeited his right, in law or equity, to protection or recourse in a dispute involving his accomplices in that very scheme."  *Id.* at 436.

*Smith* involved a similar fraudulent agreement.  There, the Smiths (the plaintiffs) and the Longs (the defendants) formed a new corporation and entered into a shareholders' agreement that allocated the equity in the new venture.  The corporation applied for an SBA loan, but the application was denied based on the ownership percentages held by plaintiffs and their previous problems with an SBA loan.  The plaintiffs subsequently transferred the majority of their aggregate shares to the defendants to reduce the plaintiff George Smith's interest in the new corporation to below 10%.  On the same day, the parties executed a buy back agreement that allowed the plaintiffs to buy back their interests within eight years for $1.00, and subsequently entered into an amendment providing that the transfer of the plaintiffs' shares did not relinquish their rights under the original shareholder agreement.  723 N.Y.S.2d at 585-86.  Thus, the parties' side deals negated the ostensible effects of the share transfers.

Relations between the parties eventually soured, and the plaintiffs sued to enforce the buy-back agreement.  They successfully moved for summary judgment in the trial court on their claims for specific performance and money damages, but the Appellate Division reversed.  The Court ruled that "'unclean hands in participating in a course of conduct of deception and deceit is

an effective bar' to causes of action to enforce the agreement that results from that deception and deceit." *Id.* at 586 (quoting *Chun Wong*, 557 N.Y.S.2d at 436). "The unclean hands doctrine rests on the premise that one cannot prevail in an action to enforce an agreement where the basis of the action is immoral and one to which equity will not lend its aid," *id.* at 587 (internal citations and quotation marks omitted), and thus, "one who has executed an agreement to perpetrate a fraud has 'forfeited his right, in law or equity, to protection or recourse in a dispute involving his accomplices in that very scheme.'" *Id.* (quoting *Chun Wong*, 557 N.Y.S.2d at 436). The Court identified, as an issue of fact, whether the plaintiff "executed the Buy–Back Agreement to perpetrate a fraud on the SBA." *Id.*

The unclean hands doctrine discussed by the *Smith* and *Chun Wong* courts is the same limited exception identified by the *Mallis* Court to the rule that unclean hands does not bar a legal claim. The defense does not bar the Claims because they have no connection to the course of tortious conduct alleged in the TPC.

Finally, *Jaksich v. Thompson McKinnon Sec., Inc.*, 582 F. Supp. 485 (S.D.N.Y. 1984) is inapposite. In *Jaksich*, a customer of the defendant securities brokerage firm brought claims for damages relating to the mishandling her account, and the brokerage firm counterclaimed for an unsecured debit balance in the plaintiff's account. Although the Court was "appalled" by the brokerage firm's conduct in dealing with plaintiff's account, it ultimately dismissed the plaintiff's securities law and related claims. *Id.* at 503. Turning to the defendants' counterclaim, the District Court held that "[t]o recognize any merit in the counter-claim would certainly violate the letter and spirit of the protections conferred by Rule 10b-5 and overwhelmingly would fail to serve the interests of justice. Accordingly, we invoke the equitable doctrine of 'unclean hands' in our determination to reject defendants' counter-claim." *Id.* The holding affirmed the axiom

17

that the unclean hands defense is a defense in a securities action if the application of the doctrine

"will better promote the objectives of the securities laws by increasing protection afforded to the

investing public." *Id.*; *accord Wolf v. Frank*, 477 F.2d 467, 474 (5th Cir.) ("While the defense of

'unclean hands' is available in securities actions . . . its application rests within the sound

discretion of the District Court."), *cert. denied*, 414 U.S. 975 (1973). Here, the Claims are not

based on securities law violations, and unclean hands does not bar a legal claim asserted by a

plaintiff who may have engaged in immoral conduct unrelated to his claim.

The Defendants' brief also seemed to assert that the unclean hands doctrine may be

applied differently in bankruptcy proceedings given their equitable nature. (*See Opposing Memo*

at 21-22 ("The unclean hands doctrine is especially relevant and applicable in bankruptcy

proceedings. . . . Filing a proof of claim in bankruptcy court – a court of equity – triggers the

possibility of an unclean hands defense under applicable non-bankruptcy law.").) At oral

argument, the Court asked the Defendants' counsel whether he was contending that unclean

hands could bar the Claims notwithstanding the inapplicability of unclean hands to legal claims

under New York law. (*Transcript of June 2, 2015 Hearing* at 36:2-13.) Counsel clarified that he

was not making that argument. (*Id.* at 36:19-21 ("[W]e're not asking for a deviation from what

applicable law would have been.").)

Accordingly, unclean hands is not a defense to the Claims, and the Disallowance Claim is

rejected.

### 2.    Setoff Claim

"The right of setoff . . . allows entities that owe each other money to apply their mutual

debts against each other, thereby avoiding the absurdity of making A pay B when B owes A."

*Malinowski v. New York State Dep't of Labor* (*In re Malinowski*), 156 F.3d 131, 133 (2d Cir.

1998) (quoting *Official Comm. of Unsecured Creditors v. Mfrs. and Traders Trust Co.* (*In re*

*Bennett Funding Grp., Inc.*), 146 F.3d 136, 140 (2d Cir.1998)) (internal quotation marks

omitted); *accord Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 149 (2d Cir. 2002);

*Pavarini McGovern, LLC v. Waterscape Resort LLC* (*In re Waterscape Resort LLC*), Adv. P.

No. 11-02248 (SMB), 2016 WL 197089, at *14 (Bankr. S.D.N.Y. Jan. 14, 2016).  Although the

parties' debts may arise from different transactions, they must be mutual.  *Westinghouse Credit*,

278 F.3d at 149.  "[D]ebts are mutual when they are due to and from the same persons in the

same capacity."  *Id.* (quoting *Scherling v. Hellman Elec. Corp.* (*In re Westchester Structures,*

*Inc.*), 181 B.R. 730, 740 (Bankr. S.D.N.Y. 1995)).  The Setoff Claim argues that the Claims

"should be offset by the value of the equity in the Project of which [Ampal] and its estates were

deprived, as a result of the [Third Party Defendants'] immoral and unconscionable conduct (the

"Equity Value Claim")."  (¶ 64.)

      The Defendants are not entitled to setoff because the debts lack mutuality.  The Claims

are owed by Ampal to the Indenture Trustees (for the benefit of bondholders).  Assuming the

Equity Value Claim is valid, the debt is owed by the Indenture Trustees (and the other Third

Party Defendants) to MAG, not Ampal, because Ampal assigned its rights in the Project to MAG

on December 31, 2010.  The Defendants nevertheless argue that the debts are mutual because "it

is at least plausible given Ampal's equity in MAG in 2012 that Ampal was harmed by [Third

Party Defendants'] conduct."  (*Opposing Memo* at 26.)  While this "conceivable effect" might

support "related to" jurisdiction, *see Ampal II*, 2015 WL 5176395, at *8, the indirect effect of

MAG's loss on Ampal does not support an offset against the Claims because mutuality is

lacking.  *See Westchester Structures,* 181 B.R. at 741 ("There is no mutuality between [creditor's

debt] to [debtor's related company], and Debtor's debt to [creditor] . . . because the debts are not between the same parties. Thus, they are not subject to setoff.").

The Setoff Claim is also rejected, and Count III is dismissed in its entirety.

## C.    Jurisdiction Over Counts I and II

The Court has entered judgment on the only claim brought by the plaintiff (MAG) and has dismissed Count III. This leaves Counts I and II, the Tortious Interference Claims. These claims lie between the Defendants and the Third Party Defendants, and the outcome will not have any conceivable effect on Ampal. The Court lacks "related to" jurisdiction over the Tortious Interference Claims,[13] and as noted above, counsel for the Defendants conceded during oral argument that the jurisdictional basis for the Tortious Interference Claims was supplemental jurisdiction under 28 U.S.C. § 1367. The latter provides:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).[14] Even where it exists, "district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if (1) the claim raises a novel or

---

[13]    "Related" proceedings are those whose outcome might have a "conceivable effect" on the estate. *Publicker Indus., Inc. v. United States* (*In re Cuyahoga Equip. Corp.*), 980 F.2d 110, 114 (2d Cir. 1992); *Pacor, Inc. v. Higgins* (*In re Pacor, Inc.*), 743 F.2d 984, 994 (3d Cir. 1984), *overruled in part on other grounds by Things Remembered, Inc. v. Petrarca*, 516 U.S. 124, 124–25 (1995). "An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Pacor*, 743 F.2d at 994; *accord Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.5 (1995).

[14]    The Second Circuit has ruled that bankruptcy courts may exercise supplemental jurisdiction. *See Klein v. Civale & Trovato, Inc.* (*In re Lionel Corp.*), 29 F.3d 88, 92 (2d Cir. 1994)

complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."  28 U.S.C. § 1367(c).

The exercise of supplemental jurisdiction is not appropriate, assuming that it is present. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7 (1988); *accord Oneida Indian Nation of N.Y. v. Madison Cnty.*, 665 F.3d 408, 437 (2d Cir. 2011), *cert. dismissed*, 134 S. Ct. 1582 (2014) (if plaintiff's federal claims are dismissed before trial, then state law claims should be dismissed as well); *Brzak v. United Nations*, 597 F.3d 107, 113-14 (2d Cir.) (same), *cert. denied*, 562 U.S. 948 (2010); *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) (same).  The Court had original "related to" bankruptcy jurisdiction over the main claim, *see Ampal II*, 2015 WL 5176395, at *10, and core jurisdiction over the claim objection in Count III, 28 U.S.C. § 157(b)(2)(B), but both claims have been fully resolved. In addition, it seems that the Tortious Interference Claims will be governed by Israeli law, which the parties have ignored, and their resolution is best left to an Israeli court.[15]

Accordingly, the Court declines to exercise supplemental jurisdiction over the Tortious Interference Claims, and they are dismissed.  In light of this determination, the Court does not

---

[15]     Although the TPC does not disclose the defamatory statements, they were made in the Israeli press, and, I suspect, were in Hebrew.  If so, this is another factor that weighs in favor of trying the Defendants' Tortious Interference Claims in Israel.

reach the other grounds asserted by the Third Party Defendants in support of the dismissal of the

Tortious Interference Claims.

Settle order on notice.

Dated:  New York, New York
          February 29, 2016

                          /s/  *Stuart M. Bernstein*
                          STUART M. BERNSTEIN
                          United States Bankruptcy Judge